# EXHIBIT I

**LexisNexis**® *Total Research System*    Switch Client ┊ Preferences ┊ Sign Off ┊ [?] Help

My Lexis™ ┊ Search ┊ Research Tasks ┊ Get a Document ┊ *Shepard's*® ┊ Alerts ┊ Total Litigator ┊ Transactional A

Source: Legal > States Legal - U.S. > Florida > Find Cases > FL Federal & State Cases, Combined [i]
Terms: **jones v. FLGA, inc., 908 s. 2d 435** (Edit Search | Suggest Terms for My Search | Feedback on Your Search)

✦Select for FOCUS™ or Delivery
☐

*908 So. 2d 435, \*; 2005 Fla. LEXIS 1465, \*\*;*
*30 Fla. L. Weekly S 581*

BETTY **JONES,** etc., Petitioner, vs. FLORIDA INSURANCE GUARANTY ASSOCIATION, INC.,
Respondent.

No. SC03-1259

SUPREME COURT OF FLORIDA

908 So. 2d 435; 2005 Fla. LEXIS 1465; 30 Fla. L. Weekly S 581

July 7, 2005, Decided

**PRIOR HISTORY:  [\*\*1]** Application for Review of the Decision of the District Court of
Appeal - Direct Conflict. First District - Case No. 1D01-4350 (Leon County).
Fla. Ins. Guar. Ass'n v. **Jones**, 847 So. 2d 1020, 2003 Fla. App. LEXIS 6538 (Fla. Dist. Ct.
App. 1st Dist., 2003)

**CASE SUMMARY**

**PROCEDURAL POSTURE:** After petitioner estate obtained a judgment against an insured
in a wrongful death action, the insured assigned to the estate all of his claims against his
insolvent insurer and respondent Florida Insurance Guaranty Association (FIGA). The
estate sued FIGA, seeking payment of the judgment. The trial court entered final summary
judgment in favor of the estate; the First District Court of Appeal (Florida) reversed. The
estate appealed.

**OVERVIEW:** The insured's employee permitted a woman to drive a "for sale" car from the
insured's sales lot; this car collided with the decedent's vehicle. FIGA refused to defend
the insured even though the allegations of the estate's complaint invoked coverage under
the insolvent insurer's policy. The trial court held that FIGA breached its duty to defend
the insured. The court of appeal reversed, holding that the claims were not covered under
the FIGA Act, Fla. Stat. chs. 631.50-.70 (1995), and were barred by Fla. Stat. ch. 631.66.
The high court disagreed. Under Fla. Stat. ch. 631.57(1)(b), when the insurer became
insolvent, FIGA stepped in its shoes to the full extent of the policy coverage, including the
duty to defend. Fla. Stat. ch. 631.66 barred only bad faith settlement claims against FIGA,
not claims based on its breach of duties imposed by statute and the contract of an
insolvent insurer. FIGA's liability could not exceed the policy limits of the insolvent insurer
(up to the statutory maximum), plus interest from the date of judgment against the
insured (as the payment of such interest was provided for under the policy), as well as
post-judgment interest and attorneys' fees.

**OUTCOME:** The high court quashed the decision of the court of appeal. The court of
appeal was instructed to enter an award of attorneys' fees in favor of the estate and to
remand the case to the trial court with instructions to reinstate the final summary

judgment in favor of the estate, to recalculate the damage award, and to determine the amount of trial and appellate attorneys' fees to be assessed against FIGA.

**CORE TERMS:** coverage, insured, duty to defend, insurer, covered claim, FIGA Act, bad faith, insolvent insurer, death action, contractual, misrepresentation, supplementary, immunity, immunity provision, guaranty, insurance policy, settle, policy limits, summary judgment, insolvent, attorneys' fees, final judgment, insolvency, drive, statutory duties, legal action, settlement, claimant, underlying action, affirmative defenses

## LEXISNEXIS® HEADNOTES                                      ⊟**Hide**

Insurance Law > General Liability Insurance > Obligations > Defense 📋
Insurance Law > Industry Regulation > Insurance Guaranty Associations > Coverage 📋
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview 📋

HN1⬇The Florida Supreme Court holds that the duty of the Florida Insurance Guaranty Association to defend a claim against an insured party is identical to that of the insolvent insurer, and, as such, is triggered when the complaint alleges facts that fairly and potentially bring the action within policy coverage. More Like This Headnote | *Shepardize:* Restrict By Headnote

Insurance Law > Bad Faith & Extracontractual Liability > General Overview 📋
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview 📋
Torts > Public Entity Liability > Immunity > General Overview 📋

HN2⬇The Florida Supreme Court rejects the contention that the immunity provision of the Florida Insurance Guaranty Association's (FIGA) enabling act precludes the initiation of actions for FIGA's breach of its duty to defend, as such actions flow from FIGA's statutory and contractual duties. However, no viable cause of action for bad faith may be asserted against FIGA. More Like This Headnote

Civil Procedure > Judgments > General Overview 📋
Insurance Law > Industry Regulation > Insurance Guaranty Associations > Coverage 📋
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview 📋

HN3⬇With regard to permissible damages in a duty to defend action, the Florida Insurance Guaranty Association's (FIGA) liability shall not exceed the policy limits of the insolvent insurer (up to the statutory maximum), plus interest from the date of judgment against the insured (if the payment of such interest is provided for under the policy's supplementary payment provision), as well as statutory interest from the date of judgment against FIGA and any attorneys' fees resulting from FIGA's denial of coverage. More Like This Headnote | *Shepardize:* Restrict By Headnote

Governments > Legislation > Interpretation 📋
Insurance Law > Industry Regulation > Insurance Guaranty Associations > General Overview 📋
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview 📋

HN4⬇The Florida Insurance Guaranty Association (FIGA) Act, Fla. Stat. chs. 631.50-.70 (1995), was intended to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer. Fla. Stat. ch. 631.51(1). The Florida Insurance Guaranty Association (FIGA) Act, Fla. Stat. chs. 631.50-.70 (1995), specifically provides and instructs that it shall be liberally construed to effect the purposes of the statute. Fla. Stat. ch. 631.53. The Act is designed to protect Florida citizens, not the insurance

industry. More Like This Headnote | *Shepardize:* Restrict By Headnote

Insurance Law > Industry Regulation > Insurance Guaranty Associations > Coverage
Insurance Law > Industry Regulation > Insurance Guaranty Associations > Limits on Claims
Torts > Transportation Torts > General Overview

**HN5** The Florida Insurance Guaranty Association (FIGA) Act, Fla. Stat. chs. 631.50-.70 (1995), obligates FIGA to respond to covered claims that arise either prior to adjudication of the insurer's insolvency or arise within 30 days after determination of insolvency of the responsible carrier. Fla. Stat. ch. 631.57(1)(a)(1). The Act limits FIGA's liability for each covered claim to the amount in excess of $ 100 and less than $ 300,000. Ch. 631.57(1)(a)(2). Most importantly, the Act specifies that FIGA shall be deemed the insolvent insurer to the extent of the insolvent insurer's obligation on covered claims, and, to such extent, shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent. Ch. 631.57(1)(b). "Covered claim" means an unpaid claim which arises out of, and is within the coverage, and not in excess of, the applicable limits of an insurance policy. Fla. Stat. ch. 631.54(3). More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation
Insurance Law > General Liability Insurance > Obligations > Defense
Insurance Law > Motor Vehicle Insurance > Obligations > Defense

**HN6** It is well settled that an insurer's duty to defend its insured against a legal action arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage. The duty to defend must be determined from the allegations in the complaint. The duty to defend is of greater breadth than the insurer's duty to indemnify, and the insurer must defend even if the allegations in the complaint are factually incorrect or meritless. Indeed, when the actual facts are inconsistent with the allegations in the complaint, the allegations in the complaint control in determining the insurer's duty to defend. Any doubts regarding the duty to defend must be resolved in favor of the insured. More Like This Headnote | *Shepardize:* Restrict By Headnote

Governments > State & Territorial Governments > Claims By & Against
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview
Torts > Public Entity Liability > Immunity > General Overview

**HN7** See Fla. Stat. ch. 631.66 (1995).

Governments > State & Territorial Governments > Claims By & Against
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview
Torts > Public Entity Liability > Immunity > General Overview

**HN8** Fla. Stat. ch. 631.66 (1995), the immunity provision, bars only bad faith settlement claims against the Florida Insurance Guaranty Association (FIGA). Case law does not establish that FIGA cannot be held responsible for breaching its duties imposed by statute and flowing from the contract of an insolvent insurer, including the statutory duty to be deemed the insolvent insurer in the defense of covered claims. More Like This Headnote | *Shepardize:* Restrict By Headnote

Governments > State & Territorial Governments > Claims By & Against
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview
Torts > Public Entity Liability > Liability > General Overview

**HN9** Florida courts have not taken the position that actions against the Florida Insurance Guaranty Association (FIGA) alleging a violation of statutory and

contractual duties are not cognizable, or are in all instances barred by the immunity provision of the FIGA Act, Fla. Stat. chs. 631.50-.70 (1995). Fla. Stat. ch. 631.57(2)(c) itself clearly provides that FIGA may be sued.  More Like This Headnote

Civil Procedure > Judgments > Preclusion & Effect of Judgments > General Overview
Insurance Law > General Liability Insurance > Coverage > General Overview
Insurance Law > Motor Vehicle Insurance > Obligations > Defense

*HN10* Where an indemnitor has notice of a suit against his indemnitee and is afforded an opportunity to appear and defend, a judgment therein rendered against the indemnitee, if without fraud or collusion, is conclusive against the indemnitor as to all material questions therein determined.  More Like This Headnote

Civil Procedure > Pretrial Judgments > General Overview
Civil Procedure > Judgments > General Overview
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview

*HN11* The Florida Insurance Guaranty Association (FIGA) is bound by a default judgment entered against an insolvent insurer due to the mutual or successive relationship created by the legislature. An insurer and FIGA may be free to challenge properly pled issues pertaining to fraud in the procurement of the insurance policy or the insured's alleged breach of an essential condition of the policy. However, questions such as identity, negligence, and other factual issues, which were interwoven with and a necessary and integral part of the determination of judgment in the underlying action, are precluded from further review and subsequent collateral attack.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Insurance Law > Motor Vehicle Insurance > Vehicle Use > Permissive Users > Implied Permission

*HN12* In the context of auto liability insurance coverage, Florida courts have held that the doctrine of implied consent imputes any grant of permission by those entrusted with the vehicle to the original permittor.  More Like This Headnote

Civil Procedure > Parties > Joinder > Necessary Parties
Governments > Legislation > Statutes of Limitations > Time Limitations
Insurance Law > Industry Regulation > Insurance Guaranty Associations > Coverage

*HN13* Including an insured as a named defendant is a necessary precursor to initiating any action against an insolvent insurer (or the Florida Insurance Guaranty Association (FIGA)) under Florida's nonjoinder of insurers statute and satisfying the limitation period of the FIGA Act, Fla. Stat. chs. 631.50-.70 (1995). Fla. Stat. chs. 627.4136(1), 631.68 (1995).  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Insurance Law > Claims & Contracts > Disclosure Obligations > General Overview
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview
Insurance Law > Motor Vehicle Insurance > Vehicle Ownership > Automobile Dealers

*HN14* The Florida Insurance Guaranty Association (FIGA) Act, Fla. Stat. chs. 631.50-.70 (1995), cannot be held to apply to a cause of action which has not yet accrued, and such argument is contrary to the terms of the Act, which requires the action to be filed against the insured or FIGA. Fla. Stat. ch. 631.68.  More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses
Criminal Law & Procedure > Defenses > General Overview

Insurance Law > Motor Vehicle Insurance > Exclusions > Intentional Acts

*HN15* Affirmative defenses do not simply deny the facts of the opposing party's claim. They raise some new matter which defeats an otherwise apparently valid claim. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Waiver & Preservation

Insurance Law > General Liability Insurance > Exclusions > General Overview

Insurance Law > Motor Vehicle Insurance > Exclusions > General Overview

*HN16* Florida courts have held that a defense based on a policy exclusion ordinarily should be raised as an affirmative defense. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Waiver & Preservation

Insurance Law > Motor Vehicle Insurance > Obligations > Defense

*HN17* Affirmative defenses are waived if not pled. More Like This Headnote

Insurance Law > General Liability Insurance > Obligations > Cooperation

Insurance Law > Motor Vehicle Insurance > Obligations > General Overview

*HN18* To constitute a defense to insurance coverage, lack of cooperation must be prejudicial. More Like This Headnote

Civil Procedure > Remedies > Judgment Interest > General Overview

Insurance Law > Industry Regulation > Insurance Guaranty Associations > Coverage

Insurance Law > Industry Regulation > Insurer Insolvency > General Overview

*HN19* The Florida Insurance Guaranty Association (FIGA) Act, Fla. Stat. chs. 631.50-.70 (1995), obligates FIGA to the extent of covered claims for that amount which is in excess of $ 100 but less than $ 300,000. Fla. Stat. ch. 631.57(1)(a)(2). The $300,000 liability cap becomes applicable only if FIGA's obligation would otherwise exceed that amount. In all other cases, liability is generally limited to the amount for which the insurer would have otherwise been responsible under the policy. Ch. 631.57(1)(a)(3). Attorney's fees may also be awarded pursuant to Fla. Stat. ch. 631.70 when FIGA denies a covered claim by affirmative action other than delay. The Act specifically provides that in no event shall FIGA be liable for any penalties or interest. Fla. Stat. ch. 631.57(1)(b). More Like This Headnote

Governments > State & Territorial Governments > Claims By & Against

Insurance Law > Industry Regulation > Insurer Insolvency > General Overview

Torts > Public Entity Liability > Liability > General Overview

*HN20* See Fla. Stat. ch. 631.57 (1995).

Insurance Law > Industry Regulation > Insurance Guaranty Associations > Coverage

Insurance Law > Industry Regulation > Insurance Guaranty Associations > Limits on Claims

Insurance Law > Industry Regulation > Insurer Insolvency > General Overview

*HN21* Under the Florida Insurance Guaranty Association (FIGA) Act, Fla. Stat. chs. 631.50-.70 (1995), the concept of a "covered claim" is defined and limited by the statutory definitional phrase, "is within the coverage, and not in excess of, the applicable limits of an insurance policy." Fla. Stat. ch. 631.54(3). Further, FIGA is obligated to the extent of the covered claims. Fla. Stat. ch. 631.57(1)(a)(1). More Like This Headnote

Criminal Law & Procedure > Criminal Offenses > Property Crimes > Embezzlement > General Overview

Insurance Law > Industry Regulation > Insurance Guaranty Associations > Coverage
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview

HN22⊹The Florida Insurance Guaranty Association (FIGA) Act, Fla. Stat. chs. 631.50-.70 (1995), limits FIGA's liability to the policy limit not to exceed $ 300,000, no matter how high the insured's policy limits may be. While $ 300,000 is the upper bound, FIGA is only obligated to the same extent as the insurer under the policy. If the insurer's obligation amounted to only $ 101 under the policy, then FIGA's liability would be only $ 1. FIGA's responsibility and liability is directly linked to the insolvent insurer's contractual obligations. Although the defalcations of FIGA may cause and generate damages far greater than the contractual limit of coverage or the statutory maximum, the legislature has not made any provision for recovery in excess of these amounts. FIGA's liability must be adjudged from the perspective of the insurer's obligation under the policy giving rise to the claim. FIGA is not liable for any amounts in excess of policy limits and is not vicariously liable for tortious acts of members' insurers. Where it is FIGA itself that actually causes the damages, not an insolvent insurer, the same statutory provision appears applicable.  More Like This Headnote | *Shepardize*: Restrict By Headnote

Contracts Law > Contract Interpretation > General Overview
Insurance Law > Claims & Contracts > Premiums > General Overview
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview

HN23⊹Under Fla. Stat. ch. 631.53, the obligations imposed on the Florida Insurance Guaranty Association (FIGA) under Fla. Stat. ch. 631.57(1)(b) must be construed liberally to effect the purposes of the FIGA Act, Fla. Stat. chs. 631.50-.70 (1995), one of which is to avoid financial loss to claimants or policyholders because of the insolvency of the insurer. Fla. Stat. ch. 631.51(1). The contract must be interpreted as though FIGA satisfied and performed the contractual provisions.  More Like This Headnote | *Shepardize*: Restrict By Headnote

Governments > State & Territorial Governments > Claims By & Against
Insurance Law > Industry Regulation > Insurance Guaranty Associations > Coverage
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview

HN24⊹The language in Fla. Stat. ch. 631.57 providing that in no event shall Florida Insurance Guaranty Association (FIGA) be liable for any penalties or interest, ch. 631.57(1)(b), does not undermine the conclusion that FIGA is liable under a policy's supplementary payment coverage provision for interest accruing on an underlying judgment.  More Like This Headnote

Contracts Law > Contract Interpretation > General Overview

HN25⊹Courts are required to read provisions of a contract harmoniously to give effect to all portions thereof.  More Like This Headnote

Civil Procedure > Judgments > General Overview
Civil Procedure > Remedies > Judgment Interest > General Overview
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview

HN26⊹The Florida Insurance Guaranty Association is liable for interest assessed following a judgment against it.  More Like This Headnote

Insurance Law > Industry Regulation > Insurance Guaranty Associations > Coverage
Insurance Law > Industry Regulation > Insurer Insolvency > General Overview
Torts > Public Entity Liability > Liability > General Overview

HN27⊹Fla. Stat. ch. 631.70 (1995) provides that attorneys' fees shall not be applicable to any claim presented to the Florida Insurance Guaranty Association (FIGA),

except where FIGA denies a covered claim by affirmative action other than delay. More Like This Headnote

**COUNSEL:** George A. Vaka of Vaka, Larson and Johnson, P.L., Tampa, Florida for Petitioner.

Richard Burton Bush and Barbara Debelius of Bush, Augspurger and Lynch, P.A., Tallahassee, Florida, for Respondent.

**JUDGES:** PARIENTE, C.J., and ANSTEAD, LEWIS, and QUINCE, JJ., concur. CANTERO, J., dissents with an opinion, in which WELLS and BELL, JJ., concur.

## OPINION

[*438] PER CURIAM.

We have for review *Florida Insurance Guaranty Ass'n, Inc. v. Jones*, 847 So. 2d 1020 (Fla. 1st DCA 2003), which expressly and directly conflicts with the decision in *Florida Insurance Guaranty Ass'n v. Giordano*, 485 So. 2d 453 (Fla. 3d DCA 1986). We have jurisdiction. *See* art. V, § 3(b)(3), Fla. Const. For the reasons stated herein, we quash the decision of the district court of appeal along with the denial of petitioner's motion for attorneys' fees. *HN1* ⊼We hold that the duty of the Florida Insurance Guaranty Association (FIGA) to defend a claim against an insured [**2] party is identical to that of the insolvent insurer, and, as such, is triggered when the complaint alleges facts that fairly and potentially bring the action within policy coverage. 1 *HN2*⊼We reject the contention that the immunity provision of FIGA's enabling act precludes the initiation of actions for FIGA's breach of its duty to defend, as such actions flow from FIGA's statutory and contractual duties. We do recognize, however, that no viable cause of action for bad faith may be asserted against FIGA. *HN3*⊼With regard to permissible damages in a duty to defend action, we hold that FIGA's liability shall not exceed the policy limits of the insolvent insurer (up to the statutory maximum), plus interest from the date of judgment against the insured (if the payment of such interest is provided for under the policy's supplementary payment provision), as well as statutory interest from the date of judgment against FIGA and any attorneys' fees resulting from FIGA's denial of coverage.

## FOOTNOTES

1 Particular to the facts of the matter on review, we conclude that **Jones'** complaint did indeed fairly and potentially bring the action within the ambit of the insured's policy coverage. Moreover, we determine that the coverage defenses FIGA raises in the instant context were either decided adversely to FIGA in entry of the judgment in the underlying action or were properly rejected by the trial court.

[**3] We direct the district court to remand the case to the circuit court with instructions to reinstate the final summary judgment in favor of petitioner, Betty **Jones,** and to recalculate the damage award in accordance with the limitations set forth in this opinion. We further instruct the district court of appeal to enter an award of attorneys' fees in favor of **Jones** and remand the case to the trial court to determine the amount of fees to be assessed for services rendered at the trial and all appellate levels.

*BACKGROUND AND FACTS*

The instant action arises from a decision reversing the final summary judgment entered in favor of **Jones**. See **Jones**, 847 So. 2d at 1022. The case below involved an action by **Jones** to satisfy a $ 75,000,000 judgment obtained in a wrongful death action against Michael Pratt, one of FIGA's insureds. FIGA is an insurance guaranty association created by and governed under sections 631.50 - 631.70 of the Florida Statutes. See §§ 631.50-.70, Fla. Stat. (1995) (the "FIGA Act"). The facts underlying the instant matter are not complex but are very simple and clear.

   **[**4]** On May 18, 1994, a vehicle operated by Heath Gilliam collided with the vehicle operated by Althea **Jones,** resulting in her death. Betty **Jones,** the personal representative of Althea's estate, initiated a wrongful death action against Heath Gilliam **[*439]** and Althea's uninsured motorist insurance carrier. The car Gilliam was driving at the time of the accident was connected to Spruill Auto Sales, an enterprise owned by Michael Pratt. Pratt's business was insured under a "garage policy" issued by Dealers Insurance Company. The policy provided, among other coverages, automobile liability insurance coverage with a coverage limit of $ 25,000, plus supplemental payment provisions, and was in effect at the time of the collision. Several months after the accident, Dealers Insurance was declared insolvent in December 1994, at which time FIGA stepped into the shoes of the insolvent insurance company.

On September 28, 1995, **Jones'** counsel timely submitted a proof of claim form in conformity with the applicable statute against Dealers Insurance to Dealers' receiver. In the fall of 1995, **Jones'** counsel also transmitted a copy of the wrongful death complaint filed against Gilliam to the FIGA claims adjuster, **[**5]** James Leezer. At this time, neither Pratt, Spruill Auto Sales, nor FIGA were joined as parties in the wrongful death action.

On March 15, 1996, **Jones** amended the complaint in the wrongful death action to include Michael Pratt, d/b/a Spruill Auto Sales as a party defendant. Count I of the amended complaint reiterated the negligence claim against Heath Gilliam. Count II asserted a negligence claim against Pratt, alleging that at the time of the accident, Michael Pratt owned Spruill Auto Sales and had given his consent to an employee, Anthony Dixon, to drive one of the "for sale" vehicles on the lot. Dixon, in turn, permitted Heath Gilliam to drive one of these cars, which was the vehicle that collided with the automobile driven by Althea **Jones.** On this basis, the complaint contended that Pratt and Spruill Auto Sales were legally responsible for Gilliam's negligence.

FIGA investigated **Jones'** claim and Pratt's insurance policy, and asserted a position that the claim was not a "covered claim" under the FIGA Act. On May 16, 1996, FIGA sent a letter to **Jones** advising that FIGA denied coverage to Pratt and Spruill Auto Sales in connection with this accident. In this letter, FIGA asserted **[**6]** as grounds for denying the claim that Pratt (1) never reported the accident to FIGA or Dealers Insurance; (2) failed to cooperate in defense of the claim by failing to answer certified letters sent by FIGA and adjusters assigned to investigate the case; (3) made a material misrepresentation on his insurance application; (4) neither owned nor possessed the car in question at the time of the incident; and (5) failed to notify FIGA of the service of process in the wrongful death action. For those asserted reasons, FIGA simply failed and refused to defend Pratt even though the allegations of the complaint invoked coverage under the insurance policy for which FIGA assumed all obligations.

Due to FIGA's failure to act no defense was presented and the trial court correctly proceeded to enter a default against Pratt in the wrongful death action. Thereafter, a jury was empaneled and returned a verdict on damages, and the trial court entered final judgment pursuant to the jury verdict on May 16, 1997, for $ 75,000,000. Subsequently, Michael Pratt assigned all of his rights against Dealers Insurance and FIGA to the estate of Althea **Jones.**

On September 11, 1998, **Jones** filed a three-count complaint **[**7]** against FIGA seeking payment of the judgment entered in the underlying action. **Jones** filed the complaint in the dual capacities as the personal representative of the estate of Althea **Jones** and as personal representative of the estate as Pratt's assignee. **[*440]** Count I alleged that FIGA was "deemed the insurer" to the extent of Dealers Insurance's obligations on the claims within coverage of the policy, and that FIGA had the rights, duties, and obligations of Dealers as if the company had not become insolvent. The complaint outlined that under Pratt's insurance policy, Dealers Insurance had assumed the duty to defend Pratt to the exclusion of others against complaints alleging facts within the scope of the coverage of the insuring agreement, whether true or not, the duty to indemnify Pratt for the same, and the duty to make any and all payments required under the policy with regard to judgments entered against Pratt. The complaint asserted that the underlying wrongful death action alleged facts which fell within the scope of liability coverage of the insurance agreement, and that FIGA breached its statutory duties stemming from the contractual obligations in failing to defend and indemnify **[**8]** Pratt. Counts II and III alleged breach of contract and fiduciary duty claims arising from the same factual basis. **Jones** sought a judgment against FIGA for all damages incurred as well as costs, interests, attorneys fees, and any other relief the court deemed just.

In its answer, FIGA admitted that the Association had the same duties as the insurer. FIGA further conceded that under the FIGA Act, it was deemed the insurer to the extent of the insurer's obligations on covered claims, and to such extent, had the identical rights, duties and obligations of the insurer as if the insurer had not become insolvent. FIGA also asserted six affirmative defenses--only two of which pertained to coverage of the underlying claim. The balance of the defenses challenged the negligence determination--an issue that was decided adverse to FIGA with entry of the default judgment in the underlying action. ² With regard to coverage, FIGA first asserted that Pratt fraudulently attempted to procure the insurance, and that Pratt's claim for coverage was correctly denied based on fraudulent misrepresentation. Second, FIGA argued that **Jones** had failed to timely file her claim, and that the claim was therefore **[**9]** barred. FIGA also asserted that damages against the Association were only available as permitted by section 768.81 of the Florida Statutes (1995) (the comparative negligence provision), as limited by section 631.57.

### FOOTNOTES

2 FIGA alleged that (i) Althea **Jones** was comparatively negligent in causing the injuries leading to her death; (ii) her injuries were caused solely by parties beyond FIGA's control, including other vehicles on the roadway; and (iii) her injuries were caused by the intervening actions or negligence of third parties not under FIGA's control.

Pursuant to an agreed order, FIGA withdrew all of the negligence defenses, was granted leave to amend the misrepresentation defense and limited liability argument, and was permitted to proceed on the timeliness defense. The issues were narrowed and limited when FIGA amended its affirmative defenses to assert that FIGA's liability is limited by section 631.57 of the Florida Statutes to the limits of the underlying **[**10]** insurance policy, the claim was not covered due to a material misrepresentation on Pratt's insurance application, and the claim was time-barred. FIGA did *not* assert any defenses based on Pratt's purported lack of cooperation in the investigation or defense of the claim, failure to notify Dealers or FIGA regarding the accident, or his failure to notify FIGA of the wrongful death action.

In July of 1999, FIGA filed a motion for summary judgment asserting only that **Jones** had failed to submit the claim in a timely fashion. According to FIGA's motion, all claims were required to be filed **[*441]** with the receiver for Dealers Insurance by October 1, 1995. FIGA further argued that pursuant to the statute of limitations contained in the FIGA Act,

**Jones** was required to file any action against FIGA within one year of filing a claim with the receiver, or by October 1, 1996. *See* § 631.68, Fla. Stat. (1995). **Jones** responded by highlighting the dates of the material events which generated the action against FIGA, all of which **Jones** argued precluded the filing an action directly against FIGA on or before October 1, 1996. **Jones** advanced that counsel in the underlying wrongful **[**11]** death action had in fact submitted a proper proof of claim form to Dealers' receiver before the October 1, 1995, deadline. **Jones** also demonstrated that Pratt, the insured, was in fact added as a defendant to the wrongful death action in March of 1996, and clearly established that neither Dealers Insurance nor FIGA could be added as direct parties at that time because Florida's non-joinder statute prohibited such joinder in the underlying action. *See* § 627.4136(1), Fla. Stat. (1995) (claimants are required to first obtain a judgment against an insured individual as a condition precedent prior to the commencement of any legal action against the insurance company). **Jones** continued and demonstrated that FIGA denied coverage protection to Pratt in May of 1996, and that a final judgment was not entered against Pratt until May 16, 1997. Thereafter, **Jones** filed this action against FIGA seeking satisfaction of the underlying final judgment.

The trial court denied FIGA's motion for summary judgment in September 1999. **Jones** then requested the entry of a final summary judgment in her favor in April 2001, asserting that FIGA had wrongfully refused to fulfill its **[**12]** statutory duty to provide a defense in the underlying wrongful death action. **Jones** argued that the statutory caps on FIGA's monetary liability should not apply in the instant matter because FIGA did not satisfy its statutory duties, had refused to defend an action within the coverage of the insolvent insurer, and that FIGA should be required to pay interest on the judgment in the case. With regard to FIGA's misrepresentation defense, **Jones** demonstrated that FIGA had either ratified the insurance contract or was estopped from raising the misrepresentation defense because it retained the premiums paid under the contract with "full knowledge" of the facts it later attempted to claim constituted a misrepresentation. **Jones** requested that the trial court enter summary final judgment in her favor and ultimately enter a judgment against FIGA for the full amount of her damages as set forth in the outstanding judgment.

FIGA submitted a successive motion for summary judgment in June of 2001, arguing in its accompanying memorandum that the claim was barred because Pratt did not timely file a claim with Dealers' receiver, a position previously rejected by the trial court, and that the claim was **[**13]** not a "covered claim" due to a material misrepresentation Pratt made on his insurance application and then added an issue not previously pled that Pratt failed to cooperate in defending the claim. This was the first time FIGA asserted that the claim was not covered due to Pratt's failure to cooperate, and it was not part of the amended answer. FIGA also attempted to reassert that its liability was limited by the FIGA Act immunity provision, and that the Association was not liable for any penalties or interest.

The trial court entered a final summary judgment in favor of **Jones,** determining that FIGA had an "obligation and duty to defend its insured, MICHAEL PRATT," and that its failure to do so resulted in the entry of the final judgment in the underlying **[*442]** action. The trial court reduced the amount of the judgment to be entered against FIGA to $ 299,900 (within the FIGA statutory cap) plus statutory interest from the date of entry of the judgment against Pratt, for a total of $ 433,178.84. With very little or no analysis, the district court reversed the trial court's final judgment under a theory that the claims alleged were not cognizable under the FIGA Act. *See Jones*, 847 So. 2d at 1022. **[**14]** The district court reviewed the legislative policy foundations for the creation of FIGA as being a mechanism to avoid excessive delay in the payment of claims and the risk of financial loss to claimants or policyholders due to the insolvency of an insurer. *See id.* The district court also leaned heavily upon the concept that the Legislature "has treated FIGA differently from the insolvent insurance companies it pays claims for, by providing various limitations on claims FIGA is obligated to pay, a one-year statute of limitations, and immunity to FIGA." *Id.* After reviewing the text of immunity provision, the district court held, contrary to and in direct

conflict with established law, "Appellee's claims for damages, as alleged, are not covered obligations under the FIGA Act and are barred by FIGA's immunity protection." In providing FIGA absolute immunity, the court below relied upon and erroneously applied *Fernandez v. Florida Insurance Guaranty Ass'n, Inc.*, 383 So. 2d 974 (Fla. 3d DCA 1980), a decision addressing FIGA's responsibility for "bad faith" claims, and rendered a decision in direct conflict with *Florida Insurance Guaranty Ass'n v. Giordano*, 485 So. 2d 453 (Fla. 3d DCA 1986). **[**15]** *See infra* pp. 20-24.

Petitioner sought discretionary review of the district court's decision, which this Court granted. *See **Jones v. Fla. Ins. Guar. Ass'n, Inc.***, 861 So. 2d 429 (Fla. 2004) (table). This review followed.

*ANALYSIS*

*Cognizability of **Jones'** Claims*

According to the statute's express language, **HN4**the FIGA Act was intended to "[p]rovide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policyholders because of the insolvency of an insurer." § 631.51(1), Fla. Stat. (1995). The Act specifically provides and instructs that it shall be "liberally construed" to effect the purposes of the statute. *See* § 631.53. The act is designed to protect Florida citizens, not the insurance industry.

**HN5**The Act obligates FIGA to respond to covered claims that arise either prior to adjudication of the insurer's insolvency or arise within thirty days after determination of insolvency of the responsible carrier. *See* § 631.57(1)(a)(1). The Act limits FIGA's liability for each covered claim to the amount in excess of $ 100 and less **[**16]** than $ 300,000. *See* § 631.57(1)(a)(2). Most importantly, the Act specifies that FIGA shall be deemed the insolvent insurer to the extent of the insolvent insurer's obligation on covered claims:

(1) The association shall:

. . . .

(b) Be deemed the insurer to the extent of its obligation on the covered claims, and, to such extent, shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent.

§ 631.57(1)(b). "'Covered claim' means an unpaid claim . . . which arises out of, and is within the coverage, and not in excess of, the applicable limits of an insurance policy . . . ." § 631.54(3).

**HN6**It is well settled that an insurer's duty to defend its insured against a legal **[*443]** action arises when the complaint alleges facts that fairly and potentially bring the suit within policy coverage. *State Farm Fire & Cas. Co. v. CTC Dev. Corp.*, 720 So. 2d 1072, 1077 n.3 (Fla. 1998); *see also Nat'l Union Fire Ins. Co. v. Lenox Liquors, Inc.*, 358 So. 2d 533, 535 (Fla. 1977). The duty to defend must be determined from the allegations in the complaint. *See, e.g., Nat. Union Fire Ins. Co. v. Lenox Liquors, Inc.*, 358 So. 2d 533, 535 (Fla. 1977); **[**17]** *Biltmore Constr. Co. v. Owners Ins. Co.*, 842 So. 2d 947, 949 (Fla. 2d DCA 2003); *McCreary v. Fla. Residential Prop. & Cas. Joint Underwriting Ass'n*, 758 So. 2d 692, 695 (Fla. 4th DCA 1999); *Baron Oil Co. v. Nationwide Mut. Fire Ins. Co.*, 470 So. 2d 810, 813 (Fla. 1st DCA 1985).

The duty to defend is of greater breadth than the insurer's duty to indemnify, and the insurer must defend even if the allegations in the complaint are factually incorrect or meritless. *See,*

*e.g., Sunshine Birds & Supplies, Inc. v. United States Fid. & Guar. Co.*, 696 So. 2d 907, 910 (Fla. 3d DCA 1997); *Baron Oil*, 470 So. 2d at 814. Indeed, "when the actual facts are inconsistent with the allegations in the complaint, the allegations in the complaint control in determining the insurer's duty to defend." *Baron Oil*, 470 So. 2d at 814; *see Marr Invs. Inc. v. Greco*, 621 So. 2d 447, 449 (Fla. 4th DCA 1993); *Irvine v. Prudential Prop. & Cas. Ins. Co.*, 630 So. 2d 579, 579-80 (Fla. 3d DCA 1993) ("The duty is determined solely by the allegations against the insured, not by the actual **[\*\*18]** facts, nor the insured's version of the facts."). Any doubts regarding the duty to defend must be resolved in favor of the insured. *See Grissom v. Commercial Union Ins. Co.*, 610 So. 2d 1299, 1307 (Fla. 1st DCA 1992); *Baron Oil*, 470 So. 2d at 814.

In the instant case, the trial court entered final summary judgment in favor of **Jones,** determining that FIGA had "an obligation and duty to defend its insured, MICHAEL PRATT." This determination is not only amply supported by and in conformity with the only evidence in the record as informed by the above-stated principles of law, it is the proper application of Florida law and conclusively established. Count II of the complaint filed against Heath Gilliam and Michael Pratt d/b/a Spruill Auto Sales alleged that Anthony Dixon, an employee of Spruill Auto Sales, was permitted to drive the vehicle ultimately involved in the collision with Althea **Jones,** and that Dixon permitted Gilliam to drive the vehicle, thus extending Pratt's consent to Gilliam. The complaint further contended that Gilliam was negligent in the operation of the vehicle, causing a collision with the vehicle operated by Althea **Jones.** Finally, **[\*\*19]** the complaint alleged that "as the person with possession and control of that motor vehicle, Mike Pratt and Spruill Auto Sales are legally responsible for Mr. Gilliam's negligence." *See Ray v. Earl*, 277 So. 2d 73 (Fla. 2d DCA 1973); *Winters v. Phillips*, 234 So. 2d 716 (Fla. 3d DCA 1970).

The liability insurance coverage provisions of the policy provided that Dealers Insurance would pay "all sums the insured legally must pay as damages because of bodily injury or property damage to which this insurance applies caused by an accident resulting from garage operations." The policy very broadly defined "garage operations" to include the "ownership, maintenance, or use of the autos indicated in Part II as covered autos." Part II of the garage policy cross-referenced Item Two of the declarations page for determining which autos were "covered autos" under the policy. Item Two of the declarations page indicated by numerical code that "any auto" was a covered auto under the liability insurance coverage section of **[\*444]** the policy. The liability insurance coverage provisions further specified that Michael Pratt d/b/a/ Spruill Auto Sales was insured for any covered **[\*\*20]** auto, and that, subject to certain exceptions not implicated in the instant matter, "[a]nyone else is an insured while using with your permission a covered auto." Finally, the policy specified that it is exclusively Dealers" "right and . . . duty to defend any suit" seeking damages under the policy.

Upon comparing the allegations in the complaint with the insurance policy in effect at the time of the accident, it is absolutely clear that the complaint alleged facts that fairly and potentially brought the legal action within policy coverage, thus triggering Dealers' duty to defend Pratt. The decision in *Government Employees Insurance Co. v. Sellers*, 667 F. Supp. 850 (S.D. Fla. 1987), is instructive on this point. There, the district court dismissed GEICO's action for declaratory relief regarding whether one of two possible drivers of a vehicle involved in a collision had the insured's permission to drive the vehicle. *See id.* at 852. GEICO had argued that it would be unduly burdened in proceeding with the action if it ultimately was not liable under the policy. *See id.* at 851. In dismissing the action, the district court determined that **[\*\*21]** GEICO in essence sought relief from its duty to defend--relief that could not be granted because the claimant's state court claim "brings Geico, as a matter of law, within the rubric of what it would have to defend, regardless of the outcome of the case." *Id.* at 852.

Moreover, as previously stated, any doubt with regard to the duty to defend must be resolved in favor of the insured. *See Grissom*, 610 So. 2d at 1307; *Baron Oil*, 470 So. 2d at

814. This is not a case in which a lack of coverage or exclusion from liability emerges in any conceivable way from comparing the facts in the complaint with the text of coverage under the policy. Cf. *Nationwide Mut. Fire Ins. Co. v. Keen*, 658 So. 2d 1101 (Fla. 4th DCA 1995) (plaintiff's statement that he was operating a boat with a 40-horsepower engine relieved the insurer of the duty to defend because the boat was more powerful than coverage allowed); *State Farm Mut. Auto. Ins. Co. v. Culver*, 576 So. 2d 918 (Fla. 2d DCA 1991) (determining there was no duty to defend against complaint alleging that the claimant's vehicle was struck by a 1977 Monte Carlo where the **[\*\*22]** insured's policy covered a 1975 Monte Carlo and the insurance held by the insured's grandmother for a 1977 Monte Carlo lapsed after her death). Thus, this record conclusively established that Dealers clearly had the duty to defend Michael Pratt. When Dealers became insolvent, FIGA assumed that duty as if Dealers had not become insolvent and was deemed the insolvent insurer to the full extent of the policy coverage protection including the exclusive duty to defend. See § 631.57(1)(b), Fla. Stat. (1995).

With scant analysis, the district court simply reversed the trial court's entry of the final judgment, concluding that "Appellee's **[Jones']** claims for damages, as alleged, are not covered obligations under the FIGA Act and are barred by FIGA's immunity protection." *Jones*, 847 So. 2d at 1022 (citing *Fernandez v. Florida Ins. Guaranty Ass'n, Inc.*, 383 So. 2d 974 (Fla. 3d DCA 1980)). This conclusion is in conflict with established law and in error because it departs from the statutory construct of the FIGA Act and misinterprets and erroneously applies the only precedent upon which it relies.

The district court erred in **[\*\*23]** concluding that the immunity provisions of the FIGA Act bar **Jones'** claims. The FIGA Act provides:

**[\*445]** *HN7* There shall be no liability on the part of, and no cause of action of any nature shall arise against, any member insurer, the association or its agents or employees, the board of directors, or the department or its representatives for any action taken by them in the performance of their powers and duties under this part.

§ 631.66, Fla. Stat. As cited by the district court, the Third District in *Fernandez* interpreted *HN8* the immunity provision as barring *only* bad faith settlement claims against FIGA. However, *Fernandez* did not involve and does not stand for the proposition that FIGA cannot be held responsible for breaching its duties imposed by statute and flowing from the contract of the insolvent insurer, including the statutory duty to be deemed the insolvent insurer in the defense of covered claims. Indeed, even *Fernandez* recognized that responsibility under the circumstances presented here.

In *Fernandez*, FIGA succeeded a defunct insurance company as a party-defendant in a personal injury action. See 383 So. 2d at 975. **[\*\*24]** FIGA defended the action but only refused to settle the claim for the $ 10,000 policy limits, and the jury returned a $ 54,000 verdict against the insured. See id. The insured then initiated a classic bad faith failure to settle action against FIGA seeking recovery of the $ 44,000 excess, claiming that FIGA had exercised bad faith in refusing to settle the claim within the policy limits. See id. The Third District determined that the immunity provision barred the bad faith action because FIGA's refusal of the $ 10,000 settlement offer was an "action it took in the performance of [its] powers and duties under the statute to dispose of the covered claim in question." *Id.* at 975 (internal quotation marks omitted). The district court held, "An application of the plain terms of § 631.66, which neither require nor permit judicial construction, therefore compels the conclusion that no bad faith action lies against FIGA." *Id.*

The holding in *Fernandez* does not compel nor does it even support an identical conclusion in the instant matter. If it did and FIGA could totally ignore its statutory requirements, no Florida citizen could ever state a cause of action **[**25]** resulting therefrom. The court below clearly erroneously applied existing law concerning FIGA's immunity from bad faith claims into the present non bad faith simple coverage context. Here, **Jones** did not file a bad faith action against FIGA based upon its failure to settle in defending the underlying action as part of its obligations under the Act. To the contrary, **Jones** sought recovery based upon FIGA's refusal to satisfy the duty to defend and indemnify Pratt clearly held by Dealers Insurance and specifically imposed on FIGA by both the insurance contract and section 631.57 of the FIGA Act. Thus, the decisions in **Jones** and *Fernandez* involve similar but different factual scenarios, and the statutory/contractual duty to defend and indemnify claim is totally different and distinct from any action for bad faith failure to settle and is cognizable under Florida law. Despite these differences, the First District proceeded to incorrectly apply the rule of law set forth in the bad faith context of *Fernandez* to the factual situation in **Jones**.

The First District's decision is in express and direct conflict with the Third District's decision in *Florida Insurance Guaranty Ass'n v. Giordano*, 485 So. 2d 453 (Fla. 3d DCA 1986). **[**26]** The dissent is misdirected in its contention that there is no jurisdictional conflict with *Giordano*. In fact, an examination of that decision clearly demonstrates how the decision in **Jones** has created an express and direct conflict within Florida law that must be **[*446]** resolved. In *Giordano*, the widow of one killed in a gas explosion initiated a wrongful death action against an Illinois valve corporation which had conducted business in Florida and was insured by Reserve Insurance Company with a policy limit of $ 300,000. *See* 485 So. 2d at 454. Reserve defended the claim for four years until the company was declared insolvent and the cause of action was transferred to and assumed by FIGA. *See id.* After discovering that the valve company was an Illinois corporation, FIGA attempted to assert that the Illinois Guaranty Fund (IGF), with statutory coverage limits of $ 150,000, was the "primary" carrier, and that FIGA, with statutory coverage limits of $ 300,000, was only an "excess" carrier with no obligation to the insured and no duty to defend the action. *See id.* [3]

## FOOTNOTES

3 Subsequent to Reserve's insolvency, FIGA "made three contradictory statements" as to its position regarding coverage. *Giordano*, 485 So. 2d at 455 n.1. As noted by the district court, FIGA first asserted that it had no responsibility whatsoever to the insured valve company; FIGA later took the position that it was an excess carrier over IGF's limits; and, finally, FIGA informed the plaintiff's attorneys that it would provide $ 150,000 coverage "excess over IGF." *Id.*

**[**27]** IGF assumed responsibility for defense of the action. *See id.* Settlement negotiations ensued, of which FIGA was aware, but which were not directly authorized by FIGA. The parties reached a settlement agreement pursuant to which they stipulated to the entry of a $ 525,000 judgment to be assessed as follows: IGF ($ 150,000), Employer's Reinsurance ($ 225,000), and FIGA ($ 150,000). *See id.* at 455. The insured valve company assigned to the injured party, Giordano, its rights against FIGA for the Association's portion of the judgment plus attorney's fees, costs, interest, and punitive damages, just as has occurred in the present case. *See id.*

Thereafter, Giordano proceeded to file a two-count claim against FIGA (just as has occurred here) asserting (1) her rights as assignee for the enforcement of FIGA's statutory obligations and judgments entered on the settlement agreement; and (2) that FIGA's course of conduct had been willful, wanton, reckless and a denial of due process and equal protection. *See id.* at 455. The trial court dismissed the second count, but entered a summary final judgment in

favor of Giordano on the first claim, concluding **[\*\*28]** that FIGA had a duty to defend the insured valve company and a duty to pay the settlement. *See id.* Here, the same determination was made at the trial level but the underlying obligation had the dignity of a final judgment.

In *affirming* the trial court's determination with regard to FIGA's duties, the district court concluded that when FIGA stepped into the place of the insurance carrier, Reserve, upon insolvency, it was under a statutorily imposed duty to defend the insured. *Id.* at 456. The district court also affirmed the trial court's dismissal of the second count, determining:

> The allegations of this count, though couched in the language of tort and constitutional law, still make out an action for bad faith against FIGA. Under section 631.66, Florida Statutes (1981), however, no action for bad faith lies against FIGA.

*Id.* at 457 (citing *Fernandez v. Fla. Ins. Guar. Ass'n,* 383 So. 2d 974 (Fla. 3d DCA 1980)).

Thus, as was made clear in *Giordano,* a complaint alleging that FIGA has breached statutory or contractual duties owed to an insured to defend under the terms of an insurance **[\*\*29]** contract is cognizable even though a different form of action alleging that FIGA exercised bad faith in **[\*447]** handling the settlement of a claim may not be viable. The district court here erred to the extent that it conflated these two distinct concepts in holding that **Jones'** claims against FIGA are barred by FIGA's immunity provision. As Dealers' statutory successor, FIGA assumed the insurance company's contractual duties to defend and indemnify Pratt. *See Carrousel Concessions, Inc. v. Fla. Ins. Guar. Ass'n,* 483 So. 2d 513, 516 (Fla. 3d DCA 1986) (determining that pursuant to the terms of the insurance contract, FIGA had a duty to defend the insured until the applicable limit of its liability had been exhausted and to pay all costs incurred in the defense).

According to the dissent, *Jones* and *Giordano* do not expressly and directly conflict because in **Jones**, FIGA unilaterally concluded that the underlying claim was not covered under the insurance policy, and in *Giordano,* FIGA did not contest coverage. However, this analysis suffers from the same "cart before the horse" flaw that beset the district court below and creates the conflict this Court is constitutionally **[\*\*30]** empowered to address. As we explain in our opinion today, it is the nature of the underlying claim that drives the duty to defend analysis. The district court below simply concluded that "[a]ppellee's claims for damages, as alleged, are not covered obligations under the FIGA Act and are barred by FIGA's immunity protection." **Jones**, 847 So. 2d at 1022. Thus, the decision below holds and affords FIGA absolute blanket immunity from all legal actions and immunizes FIGA's decisions with regard to whether a claim initiated against an insured is covered by the operative insurance policy. This holding expressly and directly conflicts with the holding in *Giordano,* which recognized the validity of FIGA's responsibility and duty to defend claims against insureds, but determined that only bad faith claims against it are barred by statutory immunity. Thus, contrary to the dissent's assertions, our jurisdiction in this matter is clear, and resolution of the conflict between the First and Third districts is not only proper, but it is necessary for purposes of uniformity of Florida law. *See generally Wainwright v. Taylor,* 476 So. 2d 669, 670 (Fla. 1985) (noting **[\*\*31]** that the Court's concern regarding cases based on conflict jurisdiction is "the precedential effect of those decisions which are incorrect and in conflict with decisions reflecting the correct rule of law").

Returning to the merits of the instant case, in support of **Jones'** argument that the immunity

provision does not defeat her claim against FIGA, **Jones** argues that FIGA's immunity extends only to independent actions taken within and in accordance with its statutory duties, not to damages arising from the failure to perform those statutory duties to provide a defense as specifically required by the statute and the insurance contract for which FIGA becomes responsible. This follows the analysis undertaken by the Alaska Supreme Court in *Washington Insurance Guaranty Ass'n v. Ramsey*, 922 P.2d 237 (Alaska 1996). In that case, the plaintiff in the underlying tort action initiated an action against the Washington Insurance Guaranty Association (WIGA) for breach of the duty to reasonably settle the underlying claim. *See id.* at 239. The Alaska court determined that the WIGA Act [4] imposed a statutory duty on WIGA to reasonably settle claims and therefore **[\*\*32]** held that the immunity provision did not preclude an action for failure to settle a claim. *See id.* at 243. The court reasoned that any action taken by the Association in violation of its duties, such as the duty to **[\*448]** reasonably settle claims, was not an action taken pursuant to statutory authority warranting application of the immunity provision. *See id.* at 244. [5]

## FOOTNOTES

4 Similar to our FIGA Act, the Washington act is modeled on a national uniform act for insurance guaranty associations. *See id.* at 243.

5 The *Ramsey* court distinguished *Fernandez* on the basis that the decision did not address whether FIGA could be sued on its statutory obligations. The *Ramsey* court correctly opined that to the extent *Fernandez* was an action to enforce FIGA's statutory obligations, the Florida court had misinterpreted the statutory immunity provision. *See* 922 P.2d at 246.

FIGA attacks the decision in *Ramsey* as an outlier, contravening the well-reasoned **[\*\*33]** decisions in *T&N PLC v. Pennsylvania Insurance Guaranty Ass'n*, 800 F. Supp. 1259 (E.D. Pa. 1992); *Bills v. Arizona Property & Casualty Insurance Guaranty Fund*, 194 Ariz. 488, 984 P.2d 574 (Ariz. Ct. App. 1999); *Isaacson v. California Insurance Guaranty Ass'n*, 44 Cal. 3d 775, 750 P.2d 297, 244 Cal. Rptr. 655 (Cal. 1988); *Veillon v. Louisiana Insurance Guaranty Ass'n*, 608 So. 2d 670 (La. Ct. App. 1992); *Schreffler v. Pennsylvania Insurance Guaranty Ass'n*, 402 Pa. Super. 309, 586 A.2d 983 (Pa. Super. Ct. 1991); and *Vaughn v. Vaughn*, 23 Wn. App. 527, 597 P.2d 932 (Wash. Ct. App. 1979). However, proper analysis of each of these cases only supports our conclusion and confirms the holding in *Fernandez* that insurance guaranty associations are only immune from bad faith actions pertaining to claims handling, not actions such as that in the present case. *See T&N*, 800 F. Supp. at 1265 (holding state association immune from suit for bad faith handling of claim); *Veillon*, 608 So. 2d at 672 (affirming dismissal of claims against association for bad faith, negligence, **[\*\*34]** and breach of fiduciary duty arising from the failure to settle claim within policy limits); *Schreffler*, 586 A.2d at 985 (citing *Fernandez* and holding association immune from suit for bad faith failure to settle a claim); *Vaughn*, 597 P.2d at 934 (holding because state courts had determined that bad faith claims sound in tort rather than contract, bad faith damages are not "covered claims" under the state's guaranty act). Not a single one of these decisions directly contravenes *Ramsey*, or stands for the proposition that an action cannot be sustained against an insurance guaranty association for the breach of statutory or contractual duties under the contract for which the association is deemed the insolvent insurer.

The clear distinction between classic bad faith settlement actions and those arising from the breach of statutory duties is best highlighted in *Bills*. There, the insolvent insurer's assignee initiated an action against the guaranty association for negligence, breach of contract, and bad faith alleging that the association had refused to settle a wrongful death claim. *See* 984 P.2d at 576. The trial court **[\*\*35]** entered a partial summary judgment dismissing the

causes of action "sounding in tort," which included only the negligence and bad faith claims. In affirming that decision, the Arizona appellate court noted that the majority view rejects the viability of bad faith claims against insurance guaranty associations. *See id. at 581* (citing *T&N PLC, Fernandez, Veillon, Schreffler, Vaughn,* and *Isaacson*). The *Bills* court specifically determined that the decision in *Ramsey* was inapposite to determining the viability of bad faith claims because the plaintiff in that case, (Ramsey) "sued merely to enforce the guaranty fund's statutory obligations." *Id.* While the *Bills* court did not need to adopt the *Ramsey* court's analysis that an association's refusal to settle a claim is not an action taken pursuant to its statutory duties, it acknowledged that such reasoning was nonetheless inapplicable in a case where the plaintiff sought "noncontractual and nonstatutory damages under **[*449]** a common law bad faith theory." *Id.* Thus, <u>Bills</u> cannot be invoked for the proposition that the FIGA Act immunity provision defeats the instant claim.

Likewise, in *Isaacson* **[**36]** , the California Supreme Court held the state's guaranty association immune from liability under a variety of tort theories, [6] but specifically determined that the association could be subject to liability for payment of an adverse judgment for breaching its statutory duty to pay and discharge covered claims, circumstances identical to those in the case before us. *See* 750 P.2d at 300-01. The California court specifically stated that if the association were required to defend a covered claim arising under an insolvent insurer's insurance policy--a duty which is defined in terms of the underlying policy provisions--then it has breached its statutory duties under the state's guarantee act. *See id. at 308.*

### FOOTNOTES

[6] The plaintiff in the underlying negligence action sought reimbursement for the settlement amount under the state's unfair and deceptive trade practices act, and under the theories of intentional infliction of emotional distress and common law bad faith. *See* Isaacson, 750 P.2d at 300.

**[**37]** Setting aside the soundness and wisdom of the clear reasoning employed by the *Ramsey* court, the FIGA Act immunity provision does not defeat **Jones'** claim. Under the "total immunity" interpretation espoused by FIGA and seemingly endorsed by the district court and encouraged by the dissent, FIGA would be permitted to totally ignore the statutory and contractual obligations, to withdraw from representation undertaken by the insurer prior to insolvency, or unilaterally refuse to defend any claim arising after insolvency, with absolutely no legal repercussions or responsibility for its actions or recourse for the insured. Surely this cannot be the statutory plan. FIGA could, in its theory, just simply refuse to defend or pay a single claim, with total immunity from legal action. Such an overly broad interpretation of the immunity provision would undermine and emasculate a fundamental canon of statutory construction by effectively negating the balance of the FIGA Act, including the provisions imposing on FIGA the same rights and obligations of the insolvent insurer. *See* Acosta v. Richter, 671 So. 2d 149, 153-54 (Fla. 1996) (reiterating that statutes should be interpreted **[**38]** to give effect to every clause and accord meaning and harmony to all of their parts). FIGA would have no duty to do anything and no action would ever be available to provide relief, a result contrary to logic and common sense.

As evidenced by the decisions in *Giordano* and *Carrousel*, [HN9]Florida courts have not taken the position that actions against FIGA alleging a violation of statutory and contractual duties are not cognizable, or are in all instances barred by the FIGA Act immunity provision. The applicable statute itself clearly provides that FIGA may "be sued." § 631.57(2)(c), Fla. Stat. (1995). It was thus error for the district court to conclude that **Jones'** claims were not cognizable as a matter of law by operation of the FIGA Act's immunity provision.

### Coverage of **Jones'** Claims

FIGA also attempts to argue that its duty to defend extends only to "covered claims," and that it cannot be liable for a failure of the duty to defend in the instant case because the underlying wrongful death action was not covered under the policy. FIGA now contends that Pratt made a material misrepresentation on his application regarding whether others would be driving **[**39**]** the business's vehicles; was not the owner of the vehicle involved in the accident, which was being used to leave the scene of a felony at the time the **[*450]** accident occurred (which was not an issue in the pleadings); failed to cooperate in defense of the claim in violation of the terms of the policy (which was not an issue in the pleadings); and failed to present his claim within the statutory time limits.

FIGA seeks to deflect liability by asserting what are essentially coverage defenses to the underlying wrongful death claim. However, all of FIGA's arguments that **Jones** failed to present "covered claims" were either decided adversely to FIGA's position in the entry of the judgment in the underlying action or were properly rejected by the trial court.

It is well settled that *HN10*"where an indemnitor has notice of a suit against his indemnitee and is afforded an opportunity to appear and defend, a judgment therein rendered against the indemnitee, if without fraud or collusion, is conclusive against the indemnitor as to all material questions therein determined." *Grain Dealers Mut. Ins. Co. v. Quarrier*, 175 So. 2d 83, 86 (Fla. 1st DCA 1965); *see also Martino v. Fla. Ins. Guar. Ass'n*, 383 So. 2d 942, 944 (Fla. 3d DCA 1980) **[**40**]** *HN11*(FIGA is bound by default judgment entered against insolvent insurer due to the mutual or successive relationship created by the Legislature). By virtue of that rule, an insurer and FIGA here may be free to challenge properly pled issues pertaining to fraud in the procurement of the insurance policy or the insured's alleged breach of an essential condition of the policy. However, questions such as identity, negligence, and other factual issues, which were interwoven with and a necessary and integral part of the determination of judgment in the underlying action are precluded from further review and subsequent collateral attack. *See Quarrier*, 175 So. 2d at 86.

FIGA's coverage challenge implicates at least one factual issue that was determined by entry of the final judgment--ownership, possession, dominion or control of the vehicle at the time of the accident. FIGA contends factually that ownership of the vehicle was in question, and at the time of the accident the vehicle bore temporary license tags and was registered to an individual other than Michael Pratt. It must be remembered that the insured was in the automobile business and such factor was contemplated with **[**41**]** the broad coverage for which FIGA became responsible. The entry of the judgment in the underlying case binds FIGA to the factual determination that Pratt had an ownership, possession, or control interest in the motor vehicle involved in the collision with Althea **Jones** and was legally responsible for Gilliam's negligence in operating that vehicle. *See id.* Having refused to defend, FIGA cannot now attempt to circumvent and challenge that factual determination.

Even if FIGA could properly open this issue for review, any challenge would be meritless. The garage policy defined "covered auto" most broadly as "any auto." *See supra*, p. 16. The breadth of that language, coupled with the expansive definition of "garage operations," renders actual ownership of the vehicle in question totally irrelevant. Moreover, *HN12*Florida courts have held that the doctrine of implied consent imputes any grant of permission by those entrusted with the vehicle to the original permittor. *See, e.g., Ray v. Earl*, 277 So. 2d 73 (Fla. 2d DCA 1973); *Winters v. Phillips*, 234 So. 2d 716 (Fla. 3d DCA 1970).

The trial court properly rejected FIGA's other attempts to challenge the **[**42**]** insolvent insurer's responsibility to defend the insured and indemnify Pratt under the policy. The trial court expressly concluded that the FIGA statutory limitations did not bar the claim, and that the policy was not voidable **[*451]** on the basis of any purported misrepresentations on

the insurance application because the "undisputed facts show that [the insurance company] did not reasonably rely upon such misrepresentations in issuing and maintaining the policy." Both determinations are supported by the record.

With regard to FIGA's time limitations defense, the Association erroneously argues that Michael Pratt failed to present a claim to the receiver by the October 1, 1995, deadline. This record demonstrates that the claim was filed in September. FIGA further asserts that Pratt would have been time-barred from commencing any action against the Association, and that the same time bar operates against **Jones** as Pratt's assignee. However, even assuming that Pratt would be precluded from initiating an action against FIGA, the Association's argument fails. **Jones** has presented the instant action in her dual capacities as Pratt's assignee and as the personal representative of the estate of **[\*\*43]** Althea **Jones** and timely initiated the only action available against the insured, the only permissible defendant as a matter of law.

FIGA cannot sustain the position that the one-year FIGA statutory limitation for initiating claims against FIGA bars **Jones'** action. The record shows that **Jones'** counsel began exchanging letters with FIGA regarding this matter in the fall of 1995, and that **Jones** timely submitted a proof of claim form with the receiver. **Jones** timely amended the wrongful death complaint on March 15, 1996, to *HN13*⊼include the insured, Michael Pratt, d/b/a Spruill Auto Sales, as a named defendant, which was a necessary precursor to initiating any action against Dealers (or FIGA) under Florida's nonjoinder of insurers statute and satisfying the limitation period now asserted. *See* § 627.4136(1), Fla. Stat. (1995); § 631.68, Fla. Stat. (1995). It was not until May 1, 1996, that FIGA sent a letter to Pratt denying coverage; **Jones'** wrongful death counsel was not advised of the denial until May 16. A judgment was entered against the insured, Pratt, and a final judgment was entered on May 16, 1997. Based on these facts, **[\*\*44]** legal action was initiated against the insured before the October 1, 1996, deadline for filing claims. *HN14*⊼The statutes cannot be held to apply to a cause of action which had not yet accrued, and such argument is contrary to the terms of the statute, which requires the action to be filed against the insured *or* the association. *See* § 631.68, Fla. Stat. (1995).

As determined by the trial court, there is no evidence that any misrepresentation allegedly made by Pratt on the insurance application regarding authorization to operate the cars at Spruill affected Dealers' decision to issue and maintain the garage policy. Sam Allen, the senior claims examiner for FIGA who was responsible for responding to **Jones'** interrogatories in the underlying wrongful death action, testified at deposition that the only alleged misrepresentations made on that portion of the application were those regarding the driving records of Pratt and McClendon. Allen did not state, suggest or even hint that Pratt's naming of the individuals who had occasion to drive the cars was a misrepresentation or problem. Allen confirmed that Dealers in fact obtained correct information about the driving **[\*\*45]** records of Pratt and McClendon from the Department of Motor Vehicles before issuance of the policy, but issued the insurance contract and never attempted to rescind the policy based on that representation. Thus, the evidence in the record with regard to arguments of misrepresentation--whether it pertains to the owners' driving record or who was permitted to drive the business's cars--did not impact the insurance contract, **[\*452]** the issuance of the contract, or Pratt's coverage under the policy of insurance. The argument is a paper issue without factual support.

FIGA also contends that **Jones'** action was not a covered claim because Gilliam was using the vehicle to leave the scene of a felony and was in the process of failing to respond to a marked police vehicle when the accident occurred. FIGA raises this argument presumably to invoke a policy exclusion applicable to intentional acts. *See Wiggins v. Portmay Corp.*, 430 So. 2d 541, 542 (Fla. 1st DCA 1983) *HN15*⊼("Affirmative defenses do not simply deny the facts of the opposing party's claim. They raise some new matter which defeats an otherwise apparently valid claim."). *HN16*⊼Florida courts have held that a defense based on a

policy **[\*\*46]** exclusion ordinarily should be raised as an affirmative defense. *See St. Paul Mercury Ins. Co. v. Coucher*, 837 So. 2d 483, 487 (Fla. 5th DCA 2002). However, in the instant action, FIGA never pled or alleged any fact of impermissible use of the vehicle at the time of the accident as an affirmative defense to coverage. FIGA, therefore, has waived any claim to assert a defense similar to this affirmative defense. *See, e.g., JoJos Clubhouse, Inc. v. DBR Asset Mgmt., Inc.*, 860 So. 2d 503, 504 (Fla. 4th DCA 2003) *HN17*(affirmative defenses are waived if not pled); *St. Paul Mercury Ins.*, 837 So. 2d at 487 (same); *Langford v. McCormick*, 552 So. 2d 964, 967 (Fla. 1st DCA 1989) (same); *see also Goldberger v. Regency Highland Condo. Ass'n, Inc.*, 452 So. 2d 583, 585 (Fla. 4th DCA 1984) ("Failure to plead an affirmative defense waives that defense, and an appellate court will not consider it in reviewing a summary judgment for a plaintiff."). This afterthought, as with the misrepresentation argument, has no basis in this record for argument.

FIGA also attempts to insert a new issue as it contends that the wrongful **[\*\*47]** death action was not a covered claim because Pratt violated the terms of the policy by failing to report the accident, notify FIGA that an action had been filed against him, and cooperate in investigation and defense of the claim. As with the previous defense, Pratt's purported failures to provide the requisite notification and cooperation were never pled as affirmative defenses and are, therefore, waived. *See, e.g., Jojo's Clubhouse*, 860 So. 2d at 504; *St. Paul Mercury Ins.*, 837 So. 2d at 487 (same); *Langford*, 552 So. 2d at 967.

However, it must be noted that FIGA could not sustain these defenses even if they were properly pled. *HN18*To constitute a defense to insurance coverage, lack of cooperation must be prejudicial. *See Tri-State Ins. Co. of Minnesota v. Fitzgerald*, 593 So. 2d 1118 (Fla. 3d DCA 1992). FIGA cannot viably argue that it was prejudiced by Pratt's failure to notify the Association of the accident and **Jones'** pending legal action. FIGA was notified of the claim several weeks after **Jones** amended the wrongful death complaint to include Pratt as a named party, as a courtesy copy of the pleading was served on **[\*\*48]** FIGA by **Jones'** counsel. In deposition testimony, FIGA claims adjuster James Leezer confirmed that the Association had in fact received the copy of the complaint prior to denying Pratt's claim, had notice of the action, and had an opportunity to investigate and defend it. With regard to the other aspects of FIGA's defense--namely that Pratt failed to cooperate in FIGA's investigation of the accident and wrongful death action--the record again reveals that FIGA did not and could not affirmatively establish that Pratt himself was aware of the accident or the ongoing investigation such that his failures could be deemed a breach of the duty to cooperate.
 **[\*453]** Ultimately, even if Pratt did violate the contractual duty to cooperate, FIGA has failed to establish any prejudice whatsoever. FIGA had all information and simply made the unilateral decision that it would not defend the insured. These afterthought arguments have no foundation.

Based on the foregoing, we conclude that the district court erred in determining that FIGA had absolute immunity from legal action resulting from the Association's breach of the statutory and contractual duties owed to Pratt. It is clear from the record that FIGA **[\*\*49]** had an obligation to defend Pratt in the underlying wrongful death action. The trial court properly and correctly rejected FIGA's attempt to avoid its obligation by asserting hollow afterthoughts of non-coverage, which themselves were either procedurally barred, without a factual basis, or meritless. Having determined that FIGA violated its statutory and contractual obligations to defend and indemnify Pratt, the only question that remains pertains to the appropriate amount of any judgment that should be entered under these circumstances.

*FIGA's Duty to Pay Amounts in Excess of Policy Limits*

*HN19*The FIGA Act obligates FIGA to the extent of covered claims for that amount which is in excess of $ 100 but less than $ 300,000. *See § 631.57(1)(a)(2).* The $ 300,000 liability cap becomes applicable only if FIGA's obligation would otherwise exceed that amount. In all

other cases, liability is generally limited to the amount for which the insurer would have otherwise been responsible under the policy. *See* § 631.57(1)(a)(3). Attorney's fees may also be awarded pursuant to section 631.70 of the Florida Statutes when FIGA denies a covered claim by affirmative **[**50]** action other than delay. *See* § 631.70. The Act specifically provides that "in no event shall the association be liable for any penalties or interest." *See* § 631.57(1)(b).

The award in the instant matter totaled $ 433,178.84, and was comprised of two parts: a base award of $ 299,900 plus a $ 133,278.84 statutory interest award running from May 16, 1997, the date of the judgment against Pratt. The final summary judgment order also provided that the total amount would bear interest at the legal rate, presumably until payment. As explained in the following paragraphs, the proper award of damages in the instant matter could have only been a base award of $ 25,000, commensurate with Dealers' limit of liability in the underlying policy, plus interest on that amount as provided under the policy's supplementary payment provision, and statutory interest from the date of the judgment against FIGA until payment along with attorney fees due to FIGA's denial of coverage.

The precise text of section 631.57 of the FIGA Act provides:

> (1) *HN20*⚓The association shall:
>
> (a)1. Be obligated to the extent of the covered claims . . . .
>
> 2. The obligation under subparagraph 1. shall include only **[**51]** that amount of each covered claim which is in excess of $ 100 and less than $ 300,000 . . . .
>
> 3. *In no event shall the association be obligated to a policyholder or claimant in an amount in excess of the obligation of the insolvent insurer under the policy from which the claim arises.*

§ 631.57, Fla. Stat. (1995) (emphasis supplied). In a similar manner, *HN21*⚓the concept of a "covered claim" is defined and limited by the statutory definitional phrase "is within the coverage, and not in excess of, the applicable limits of an insurance policy." § 631.54(3), Fla. Stat. (1995). Further, FIGA is "obligated to the extent of the covered claims." § 631.57(1)(a)(1), Fla. Stat. (1995)

[*454] Thus,*HN22*⚓ the Act limits FIGA's liability to the policy limit not to exceed $ 300,000, no matter how high the insured's policy limits may be. While $ 300,000 is the upper bound, FIGA is only obligated to the same extent as the insurer under the policy. If the insurer's obligation amounted to only $ 101 under the policy, then FIGA's liability would be only $ 1. FIGA's responsibility and liability is directly linked to the insolvent **[**52]** insurer's contractual obligations. Although the defalcations of FIGA may cause and generate damages far greater than the contractual limit of coverage or the statutory maximum, the Legislature has not made any provision for recovery in excess of these amounts. This is precisely where the parties find themselves in this case.

As the Act makes clear, FIGA's liability must be adjudged from the perspective of the insurer's obligation under the policy giving rise to the claim. The Act does not allow for an award of an amount in excess of the policy provisions. Indeed, this was the conclusion reached by the Third District in *Rivera v. Southern American Fire Insurance Co.*, 361 So. 2d 193 (Fla. 3d DCA 1978), where the court affirmed dismissal of a bad faith claim against FIGA which alleged that the insolvent insurer, Southern American, had dealt in bad faith with the claimant. The claimants sought an amount $ 25,000 in excess of the policy limits, and the district court held, "FIGA is not liable for any amounts in excess of policy limits *and* is not

vicariously liable for tortious acts of members' insurers." *Id. at 194* (emphasis supplied). Although it **[\*\*53]** was FIGA itself that actually caused the damages in this case, not an insolvent insurer, the same statutory provision appears applicable.

Pratt's garage policy obligated Dealers' Insurance to pay $ 25,000 for any one accident or loss, *plus* any supplementary payments due. As noted by **Jones,** one of the supplementary payment provisions of the insurance policy obligated Dealers to pay interest owed on judgments entered. The relevant subpoint from the policy provides:

> PART IV -- LIABILITY INSURANCE
>
> . . . .
>
> B. WE WILL ALSO PAY.
>
> In addition to our limit of liability we will pay for the insured:
>
> . . . .
>
> 5. All interest accruing after the entry of the judgment in a suit we defend. Our duty to pay interest ends when we pay or tender our limit of liability.

*HN23* As provided under the Act, FIGA is deemed the "insurer" to the extent of covered claims and has the same obligations as the insolvent insurer as if the insurer had not been declared insolvent. *See* § 631.57(1)(b); *Fla. Ins. Guar. Ass'n v. Johnson*, 654 So. 2d 239, 241 (Fla. 4th DCA 1995) (determining that there was a statutory basis upon which to assess court costs in excess of policy limits because **[\*\*54]** FIGA "stands in the shoes" of the insolvent insurer). The obligations imposed on FIGA under section 631.57(1)(b) must be construed liberally to effect the purposes of the FIGA Act, *see* § 631.53, one of which is to avoid financial loss to claimants or policyholders because of the insolvency of the insurer. *See* § 631.51(1). Thus, it is consistent with, and indeed advances, the purposes of the FIGA Act to bind FIGA to the terms of the supplementary payment provision and hold the Association liable for interest on judgments entered to the same extent as Dealers would have been liable. The contract must be interpreted as though FIGA satisfied and performed the contractual provisions.

Indeed, courts in Florida have assessed costs in excess of limits of liability against **[\*455]** FIGA through supplementary payment provisions. In *Johnson*, the district court held FIGA responsible for court costs in excess of the underlying policy's liability limits. *See* 654 So. 2d at 240. The court applied the court costs through a supplementary payment provision that obligated the insolvent insurer to pay on behalf of a covered person reasonable expenses incurred in the litigation. **[\*\*55]** *Id.* at 240. The district court reasoned that the insurer had decided against settling the claim and that the resulting litigation expenses were therefore a responsibility to be covered. *See id.* In *Steele v. Kinsey*, 801 So. 2d 297 (Fla. 2d DCA 2001), the Second District reached the opposite conclusion, not on the basis that fees and costs in excess of policy limits could not be assessed against FIGA through supplementary payment provisions, but based on its conclusion that the language promising payment of expenses incurred at the insurer's request could not be reasonably interpreted to include litigation expenses. *See id.* at 300. [7]

## FOOTNOTES

[7] The *Kinsey* court certified a conflict with *Johnson*. This Court initially accepted the case,

but subsequently discharged jurisdiction as improvidently granted. See *Steele v. Kinsey*, *840 So. 2d 1023 (Fla. 2003)*.

*HN24*The language in section 631.57 providing that "[i]n no event shall the association be liable **[**56]** for any penalties or interest," § 631.57(1)(b), does not undermine the conclusion that FIGA is liable under the policy's supplementary payment coverage provision for interest accruing on an underlying judgment. Some Florida courts in a different context have interpreted the language of section 631.57 as precluding awards of interest directly against FIGA that predate entry of a judgment against the Association where no supplementary payment coverage benefit issue was involved. See *Fla. Ins. Guar. Ass'n v. Gustinger, 390 So. 2d 420, 421 (Fla. 3d DCA 1980)* (reversing award of interest against FIGA running from date of compensation award against insurer, which occurred prior to insurer's insolvency); *see also FIGA v. R.V.M.P. Corp., 874 F.2d 1528, 1532 (11th Cir. 1989)* (reversing award of prejudgment interest assessed against FIGA in a declaratory judgment action to assess FIGA's coverage liability); *Fla. Ins. Guar. Ass'n v. Jacques, 643 So. 2d 101, 103 (Fla. 4th DCA 1994)* ("Any interest sought before the trial court enter[s] judgment against FIGA constitutes prejudgment interest as to FIGA" and is not permitted under the Act); *Fla. Cmty. Health Ctr. v. Ross, 590 So. 2d 1037 (Fla. 1st DCA 1991)* **[**57]** (reversing the award of penalties and interest on compensation claims against FIGA where the Association presumably had been handling the claims for some period of time); *NCNB Nat'l Bank of Fla. v. Fla. Ins. Guar. Ass'n, 541 So. 2d 728, 731 (Fla. 1st DCA 1989)* (holding that the FIGA Act precluded assessment of interest accrued from the time the claims for unearned premiums arose); *Carballo v. Warren Mfg. Co., 407 So. 2d 603, 607 (Fla. 1st DCA 1981)* (striking award of prejudgment interest in worker's compensation case).

This line of cases does not, however, address or preclude the assessment of interest where, as here, the damages resulted from FIGA's abdication of its statutory and contractual duties, one of which was a supplementary payment coverage obligation to pay interest on judgments entered against the insured. To hold that FIGA is not responsible for interest accruing under the instant scenario would impermissibly negate that portion of the contract, *see City of Homestead v. Johnson, 760 So. 2d 80, 84 (Fla. 2000)* (stating that contracts must be interpreted to give effect to all portions), and undermine the **[*456]** section of the FIGA **[**58]** Act which provides that the Association assumes the obligations of the insurer as if that insurer had not become insolvent. See *Acosta, 671 So. 2d at 153-54* (reiterating that statutes should be interpreted to give effect to every clause and accord meaning and harmony to all of its parts). It would also undermine and eviscerate the directive that the statutory provisions be liberally construed to avoid financial loss to insureds. The argument and position asserted by FIGA would place FIGA in a far better position and the insured in one less advantageous upon FIGA's total failure to perform according to the statutory requirements than if it conducted itself as required by the applicable statutes. This would generate an absurd result contrary to the statutory mandate and one which we cannot condone. A contrary result would only serve to encourage FIGA to operate contrary to the statutory duties and undermine the legislative plan.

On this basis, FIGA would be responsible in the instant matter for the $ 25,000 limit of liability plus, pursuant to the supplementary payment coverage provision, any interest owed on the underlying judgment entered against insured. The interest **[**59]** owed would accrue until paid. However, given the statutory limit of FIGA's liability, the total amount owed including this supplementary payment coverage would be capped at $ 300,000 less $ 100, or $ 299,900.

One may argue that the supplementary payment provision at issue in the instant matter precludes an assessment of interest against Dealers, or FIGA by imputation, because it specifies that Dealers has a duty to pay interest only in the legal actions it defends. However,

any such interpretation would contravene well-established principles of contractual construction. As previously stated, *HN25* courts are required to read provisions of a contract harmoniously to give effect to all portions thereof. See *City of Homestead, 760 So. 2d at 84*. The supplementary payment provision goes hand in hand with the provision through which Dealers assumed the exclusive right and duty to defend Pratt. Permitting FIGA or Dealers to avoid the contractual obligation for reimbursement of the judgment flowing from an abdication of its duty to defend by adopting FIGA's interpretation of at best conflicting statutory provisions with regard to the supplementary payment coverage provision would **[\*\*60]** effectively negate the duty to defend clause, leaving the insured virtually unprotected.

Finally, FIGA would be liable for any post-judgment interest accruing on any judgments entered directly against FIGA. Although the subject has not been addressed by this Court, the district courts have determined that *HN26* FIGA is liable for interest assessed following a judgment against the Association. See, e.g, *Carballo, 407 So. 2d at 607*; *Gustinger, 390 So. 2d at 421* & n.2.


*Attorneys' Fees*

**Jones** moves for attorneys' fees incurred during proceedings before this Court as well as those before the First District, and asks that the First District's order denying fees be reversed. Section 631.70 of the Florida Statutes *HN27* provides that attorneys' fees shall not be applicable to any claim presented to FIGA, except where the Association denies a covered claim by affirmative action other than delay. As stated throughout the analysis of this case, we determine that FIGA impermissibly refused coverage and failed to satisfy its statutory and underlying contractual responsibility to defend Pratt in the underlying wrongful death case, and that **[\*\*61]** FIGA's claims attempting to contest **[\*457]** the existence of coverage in the instant matter lack merit. Consequently, we conclude that FIGA clearly denied a covered claim by affirmative action and that **Jones** is entitled to attorney fees in connection with this matter.

*CONCLUSION*

For the reasons stated herein, we quash the decision of the district court of appeal along with the decision to deny attorney fees. We remand the case to the district court with instructions to remand to the circuit court with further instruction to reinstate final summary judgment in favor of **Jones** and to recalculate the damage and interest award in accordance with the parameters set forth in this opinion. We also instruct the district court to enter an order awarding attorney fees and to remand the issue to the trial court for a determination of the amount of fees for the proceedings at the trial level, intermediate appeal, and before this Court.

It is so ordered.

PARIENTE, C.J., and ANSTEAD, LEWIS, and QUINCE, JJ., concur.

CANTERO, J., dissents with an opinion, in which WELLS and BELL, JJ., concur.

**DISSENT BY:** CANTERO

**DISSENT**

CANTERO, J., dissenting.

Although we initially granted review because of an apparent [**62] express and direct conflict between two district courts on the same question of law, see *Jones v. Fla. Ins. Guar. Ass'n*, 861 So. 2d 429 (Fla. 2004) (granting review), further analysis reveals no conflict. I would therefore discharge the petition for review as improvidently granted. *See, e.g., Bateman v. State*, 446 So. 2d 97, 97 (Fla. 1984) ("After reading the briefs on the merits and hearing oral argument, we conclude that the . . . decision before us does not expressly and directly conflict with [another district court decision].").

The majority concludes that the decision below, *Florida Insurance Guaranty Ass'n v. Jones*, 847 So. 2d 1020 (Fla. 1st DCA 2003), expressly and directly conflicts with *Florida Insurance Guaranty Ass'n v. Giordano*, 485 So. 2d 453 (Fla. 3d DCA 1986), on the same question of law. Majority op. at 1. That question, according to the majority, is whether the Florida Insurance Guaranty Association (FIGA) may be sued for failing to defend its insured against a claim that "alleges facts that fairly and potentially bring the suit within policy coverage." Majority op. at 13. The majority appears [**63] to conclude that the First District answered no in *Jones*, whereas the Third District answered yes in *Giordano*. Majority op. at 20-24. The majority, however, overlooks a crucial distinction between the two decisions.

In *Jones*, FIGA concluded that the claims against its insured were *not covered* by the FIGA Act. FIGA therefore refused to defend them. 847 So. 2d at 1021. After a default judgment was entered against the insured, the insured's assignee brought suit against FIGA for failing to defend the claims. *Id.* The district court disallowed recovery after concluding that the assignee's claims were "not covered obligations under the FIGA Act and [were] barred by FIGA's immunity protection." *Id.* at 1022 (citing *Fernandez v. Florida Insurance Guaranty Ass'n*, 383 So. 2d 974 (Fla. 3d DCA 1980)).

*Giordano*, the allegedly conflicting case, involved a different issue. In that case, FIGA did not dispute that the claim was covered. 485 So. 2d at 456. Rather, it refused to defend the claim because its insured was incorporated in Illinois. FIGA argued that "it was an 'excess' carrier over [the Illinois Guaranty [**64] Fund's] limits [*458] and that it would decide what [to] do once IGF paid its statutory limits." *Id.* at 455 n.1. The fact that FIGA conceded coverage was critical to the district court's conclusion that FIGA could be sued for refusing to defend its insured: "Since FIGA did not dispute that the wrongful death action was a 'covered claim,' then under the statute, FIGA had no discretion as to whether it would defend the insured. . . . FIGA was under a statutorily imposed duty to continue the defense of the insured." *Id.* at 456.

No express and direct conflict exists between *Jones* and *Giordano* because they considered different issues under different circumstances. *Jones* held that FIGA (1) had no statutory duty to defend certain claims that it identified as uncovered, and (2) was immune from liability for refusing to defend those claims. *Giordano*, in contrast, held that FIGA (1) has a "statutorily imposed duty" to defend concededly covered claims, and (2) may be held liable for refusing to do so. Neither district court would need to recede from its holding in order to reach the result in the other court's decision, because FIGA's concession [**65] of coverage in *Giordano* distinguishes the cases.

The majority defends its review of this case by asserting that what "creates the conflict" between *Jones* and *Giordano* is that the district court in *Jones* put "the cart before the horse." Majority op. at 23. By this, the majority apparently means that the district court allowed FIGA's own coverage determination to dictate whether it had a duty to defend, whereas the majority believes that "it is the nature of the underlying claim [not FIGA's coverage determination, or even the ultimate resolution of the claim] that drives the duty to defend analysis." *Id.*

I cannot locate this "cart before the horse" analysis anywhere in *Jones*. *Jones* states merely that the duty-to-defend claims against FIGA were "not covered obligations under the FIGA Act." 847 So. 2d at 1022. As the majority admits, there is "very little or no analysis" to explain this holding. Majority op. at 11. Perhaps, as the majority speculates, the district court allowed FIGA's coverage determination to drive its duty-to-defend analysis. Or perhaps the court focused properly on whether the underlying claims were "fairly and potentially .

**[\*\*66]** . . within policy coverage." Majority op. at 13. Staying within the four corners of the opinion, as we must for purposes of determining jurisdiction, it is impossible to know what drove the district court's analysis and therefore impossible to locate a conflict. *See Hardee v. State*, 534 So. 2d 706, 708 n.\* (Fla. 1998) ("[F]or purposes of determining conflict jurisdiction, this Court is limited to the facts which appear on the face of the opinion.").

The majority seems to rule out the possibility that the district court followed the proper test in *Jones*, because it concludes that it was "absolutely clear" from the complaint that the claims were potentially covered. Majority op. at 16. Thus, the majority assumes that the district court must have blindly deferred to FIGA's own coverage determination, effectively "immuniz[ing] FIGA's decisions with regard to whether a claim . . . is covered." Majority op. at 23. Again, this inference is based on facts beyond the four corners of the *Jones* opinion. Looking strictly at the opinion, it is entirely plausible that the district court applied the proper duty-to-defend standard, but simply concluded that the claims against **[\*\*67]** FIGA's insured were not "fairly and potentially . . . within policy coverage." Majority op. at 13. Such a conclusion would have been incorrect in the majority's view, but it would not supply a basis for conflict with *Giordano*, **[\*459]** because *Giordano* did not address the issue of potential coverage. Coverage was conceded.

As a court of limited jurisdiction, we do not have authority to correct every district court holding we think is wrong. *Stevens v. Jefferson*, 436 So. 2d 33, 36 (Fla. 1983) (Boyd, J., dissenting) (noting that the Florida Constitution reflects a "determination by the legislature and the people that this Court should not be able to review any decision it pleases"). In other words, we must get the right case before we can get the case right. This is not it. Because I conclude that this case falls outside our jurisdiction under article V, section 3(b)(3), Florida Constitution, I respectfully dissent.

WELLS and BELL, JJ., concur.

Source: Legal > States Legal - U.S. > Florida > Find Cases > FL Federal & State Cases, Combined ⓘ
Terms: jones v. FLGA, inc., 908 s. 2d 435 (Edit Search | Suggest Terms for My Search | Feedback on Your Search)
View: Full
Date/Time: Thursday, March 20, 2008 - 11:48 AM EDT

\* Signal Legend:
⬤ - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
✦ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
Ⓘ - Citation information available
\* Click on any *Shepard's* signal to Shepardize® that case.

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector

History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

https://www.lexis.com/research/retrieve?_m=721ed799bed09e29c7c03eb66408ba79&doc...    3/20/2008

Case 3:07-cv-06302-CRB     Document 22-4     Filed 03/25/2008     Page 28 of 54

**LexisNexis®**

About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

# EXHIBIT J

LexisNexis® *Total Research System*                Switch Client ┊ Preferences ┊ Sign Off ┊ ⁇ Help

| My Lexis™ ┊ Search ┊ Research Tasks ┊ Get a Document ┊ Shepard's® ┊ Alerts ┊ Total Litigator ┊ Transactional A

Source: Legal > States Legal - U.S. > Florida > Find Cases > FL Federal & State Cases, Combined ⓘ
Terms: **butler v. crosby** (Edit Search | Suggest Terms for My Search | Feedback on Your Search)

✔Select for FOCUS™ or Delivery
☐

*2005 U.S. Dist. LEXIS 35071, \**

SANFORD PAUL **BUTLER,** Petitioner, v. JAMES V. **CROSBY,** JR., Respondent.

Case No. 8:03-cv-1445-T-24TBM

UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF FLORIDA, TAMPA
DIVISION

2005 U.S. Dist. LEXIS 35071

October 21, 2005, Decided
October 21, 2005, Filed

**PRIOR HISTORY: Butler** v. State, 784 So. 2d 1120, 2001 Fla. App. LEXIS 5374 (Fla. Dist.
Ct. App. 5th Dist., 2001)

## CASE SUMMARY

**PROCEDURAL POSTURE:** Petitioner state prison inmate filed a petition for a writ of
habeas corpus pursuant to 28 U.S.C.S. § 2254 to challenge the conviction and sentence
entered by a state court after the inmate entered a nolo contendere plea, pursuant to the
terms of a plea agreement, to charges of burglary of a dwelling and grand theft.

**OVERVIEW:** The inmate claimed that his Fifth, Sixth and Fourteenth Amendment rights
were violated because the allegations by his appellate counsel in an Anders brief that no
issues had been preserved for appellate review in the state court denied him the benefit of
his negotiated nolo contendere plea, which was conditioned on five issues being preserved
for appeal. He also contended that his Fifth, Sixth, and Fourteenth Amendment rights were
violated when both trial and appellate counsel failed to timely assert a violation of his
speedy trial rights under Fla. R. Crim. P. 3.191. The court found that the state appellate
court's denials of the inmate's ineffective assistance of counsel claims were objectively
reasonable as counsel were not required to raise meritless issues. Further, the inmate
failed to show that any of the alleged five issues had merit and that the result of the
proceeding would have changed had the issues been included in appellate counsel's initial
brief. Additionally, the inmate explicitly waived his speedy trial rights, and his requests to
continue the case operated as a waiver of speedy trial.

**OUTCOME:** The petition for a writ of habeas corpus was denied, with prejudice.

**CORE TERMS:** speedy trial, state trial, speedy, suppress, pro se, waived, arrest,
preserved, sentence, ineffective assistance, notice, trial rights, time periods, continuance,
deficient, custody, public defender's, trial counsel, supplemental, ineffective, appearance,
burglary, pretrial, raising, theft, truck, jail, habeas corpus, suppression, federal law

## LEXISNEXIS® HEADNOTES                                          ⊟ **Hide**

Criminal Law & Procedure > Habeas Corpus > Procedure > Filing of Petition > General Overview 🔍

Criminal Law & Procedure > Habeas Corpus > Review > Antiterrorism & Effective Death Penalty Act 🔍

Governments > Legislation > Effect & Operation > Operability 🔍

**HN1⊥**Where a habeas petitioner files his petition after April 24, 1996, his case is governed by 28 U.S.C.S. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Review > Antiterrorism & Effective Death Penalty Act 🔍

Criminal Law & Procedure > Habeas Corpus > Review > Standards of Review > Deference 🔍

**HN2⊥**The Antiterrorism and Effective Death Penalty Act of 1996 establishes a more deferential standard of review of state habeas judgments in order to prevent federal habeas retrials and to ensure that state-court convictions are given effect to the extent possible under law. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Review > Antiterrorism & Effective Death Penalty Act 🔍

Criminal Law & Procedure > Habeas Corpus > Review > Standards of Review > Contrary & Unreasonable Standard > Clearly Established Federal Law 🔍

Criminal Law & Procedure > Habeas Corpus > Review > Standards of Review > Contrary & Unreasonable Standard > Contrary to Clearly Established Federal Law 🔍

Criminal Law & Procedure > Habeas Corpus > Review > Standards of Review > Contrary & Unreasonable Standard > Unreasonable Application 🔍

**HN3⊥**Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application, of clearly established federal law, as determined by the United States Supreme Court; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. 28 U.S.C.S. § 2254(d). Clearly established federal law is the governing legal principle, not the dicta, set forth by the United States Supreme Court at the time the state court issues its decision. Where no Supreme Court precedent is on point, or the precedent is ambiguous, it cannot be said that the state court's conclusion is contrary to clearly established governing federal law. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Review > Antiterrorism & Effective Death Penalty Act 🔍

Criminal Law & Procedure > Habeas Corpus > Review > Standards of Review > Contrary & Unreasonable Standard > Contrary to Clearly Established Federal Law 🔍

**HN4⊥**A state court decision is contrary to the United States Supreme Court's clearly established precedent within the meaning of 28 U.S.C.S. § 2254(d)(1) only if the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from the Supreme Court precedent. A state court does not have to cite the Supreme Court precedent, or even be aware of it, so long as neither its reasoning nor its result contradicts Supreme Court precedent. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Review > Antiterrorism & Effective Death Penalty Act 🔍

Criminal Law & Procedure > Habeas Corpus > Review > Standards of Review > Contrary & Unreasonable Standard > Unreasonable Application 🔍

**HN5⊥**A state court decision involves an unreasonable application of United States Supreme Court precedent if the state court identifies the correct governing legal

rule from Supreme Court cases but unreasonably applies it to the facts of the
particular inmate's case; or if the state court either unreasonably extends a legal
principle from Supreme Court precedent to a new context where it should not
apply; or unreasonably refuses to extend that principle to a new context where it
should apply. The unreasonable application inquiry requires the state court
decision to be more than incorrect or erroneous; it must be objectively
unreasonable. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Review > Antiterrorism & Effective Death Penalty Act
Criminal Law & Procedure > Habeas Corpus > Review > Standards of Review > Contrary & Unreasonable
Standard > Unreasonable Application
HN6 Whether a state court's decision is unreasonable must be assessed in light of the
record the state court had before it. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Review > Burdens of Proof
Criminal Law & Procedure > Habeas Corpus > Review > Standards of Review >
Presumption of Correctness
Evidence > Procedural Considerations > Burdens of Proof > Clear & Convincing Proof
HN7 A factual finding by a state court is presumed to be correct, and a petitioner must
rebut the presumption of correctness by clear and convincing evidence. 28
U.S.C.S. § 2254(e)(1). The statutory presumption of correctness applies only to
findings of fact made by the state court, not to mixed determinations of law and
fact. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Review > General Overview
HN8 A habeas petitioner who failed to develop the factual basis for a claim while in
state court as a result of the petitioner's lack of diligence is barred from doing so
in federal court (subject to the very narrow exceptions set out in 28 U.S.C.S. §
2254(e)(2)). More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Review > Standards of Review > Harmless Errors
Criminal Law & Procedure > Habeas Corpus > Review > Standards of Review >
Presumption of Correctness
HN9 A federal district court cannot presume that a state court ignores its own
procedural rules when the state court issues only a one-sentence denial of relief,
which is essentially a summary dismissal. Such a ruling does not suggest that the
state court resolved the issue on the federal claim presented. More Like This Headnote

Criminal Law & Procedure > Habeas Corpus > Review > Burdens of Proof
HN10 In the event constitutional error is found in a habeas proceeding, the relevant
harmless error standard is set forth in Brecht. The test is less onerous then the
harmless error standard enunciated in Chapman. The test is whether the error
had substantial and injurious effect or influence in determining the jury's verdict.
Under this standard, habeas petitioners may obtain plenary review of their
constitutional claims, but they are not entitled to habeas relief based on trial
error unless they can establish that it resulted in actual
prejudice. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel
Criminal Law & Procedure > Counsel > Effective Assistance > Tests
Criminal Law & Procedure > Trials > Defendant's Rights > Right to Counsel > Effective Assistance
HN11 To show a violation of the Sixth Amendment right to counsel, a petitioner must
satisfy a two-pronged inquiry. First, he must demonstrate that the attorney's

performance was deficient, meaning that counsel made errors so serious that counsel was not functioning as the counsel guaranteed the defendant by the Sixth Amendment. Second, he must prove prejudice, in that he must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome. The petitioner must prove both prongs of the test. Therefore, if he fails to establish either deficient performance or prejudice, a court need not address the other prong. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel
Criminal Law & Procedure > Counsel > Effective Assistance > Appeals
Criminal Law & Procedure > Counsel > Effective Assistance > Tests
Criminal Law & Procedure > Counsel > Effective Assistance > Trials
Criminal Law & Procedure > Trials > Defendant's Rights > Right to Counsel > Effective Assistance
HN12⚓ The standards of effective assistance set forth in Strickland apply to appellate counsel, as well as to trial counsel. More Like This Headnote

Criminal Law & Procedure > Appeals > Frivolous Appeals
Criminal Law & Procedure > Appeals > Records on Appeal
Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > General Overview
Criminal Law & Procedure > Appeals > Standards of Review > General Overview
HN13⚓ In Florida, the state district court of appeal conducts an independent review of the record in Anders cases pursuant to the constitutional mandate of Anders and the directives of the Florida Supreme Court in Causey. More Like This Headnote

Criminal Law & Procedure > Appeals > Frivolous Appeals
Criminal Law & Procedure > Appeals > Reviewability > Preservation for Review > General Overview
Criminal Law & Procedure > Appeals > Standards of Review > General Overview
HN14⚓ If appellate counsel has already brought possible errors to the attention of a court, then there will be no need to file an Anders brief. The requirement in Anders of submitting a brief stating that a public defender has found no reversible error even worthy of a good faith argument is intended to promote fair appellate review, not stifle it. This requirement is specifically meant to induce a court to pursue all the more vigorously its own review. More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Assistance of Counsel
Criminal Law & Procedure > Counsel > Effective Assistance > Appeals
Criminal Law & Procedure > Appeals > Frivolous Appeals
HN15⚓ Appellate counsel has no duty to raise issues on appeal which have little or no chances of success. Thus, appellate counsel is not required to raise meritless issues. The mere fact that such issues are preserved for review does not obligate appellate counsel to raise them on appeal, especially when the issues have little or no merit. More Like This Headnote

Criminal Law & Procedure > Counsel > Effective Assistance > General Overview
Criminal Law & Procedure > Trials > Defendant's Rights > Right to Counsel > Effective Assistance
Criminal Law & Procedure > Postconviction Proceedings > Motions to Set Aside Sentence
Criminal Law & Procedure > Postconviction Proceedings > Motions to Vacate Judgment
HN16⚓ An ineffective assistance of counsel claim generally can be asserted in a Fla. R. Crim. P. 3.850 motion. More Like This Headnote

Criminal Law & Procedure > Pretrial Motions > Speedy Trial > Statutory Right
  Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial
*HN17* See Fla. R. Crim. P. 3.191(a).

Criminal Law & Procedure > Pretrial Motions > Speedy Trial > Statutory Right
  Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial
*HN18* Fla. R. Crim. P. 3.191(d) defines the time period for commencement of the 175-
  day speedy trial period.  More Like This Headnote

Criminal Law & Procedure > Pretrial Motions > Speedy Trial > Statutory Right
  Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial
*HN19* See Fla. R. Crim. P. 3.191(d).

Criminal Law & Procedure > Pretrial Motions > Speedy Trial > General Overview
  Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial
*HN20* When a defendant requests a continuance prior to the expiration of the applicable
  speedy trial time period for the crime with which he is charged, the defendant
  waives his speedy trial right as to all charges which emanate from the same
  criminal episode.  More Like This Headnote

Criminal Law & Procedure > Pretrial Motions > Continuances
  Criminal Law & Procedure > Pretrial Motions > Speedy Trial > General Overview
  Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial
*HN21* Any defense request to postpone a case for any period of time, constitutes a
  motion for a continuance waiving speedy trial rule rights.  More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Speedy Trial
  Criminal Law & Procedure > Pretrial Motions > Speedy Trial > Constitutional Right
  Criminal Law & Procedure > Pretrial Motions > Speedy Trial > Statutory Right
  Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial
*HN22* The speedy trial rule is a procedural device only and not a constitutional right.
  Once the speedy trial rule has been waived, it is supplanted by the constitutional
  speedy trial period which is measured by tests of reasonableness and prejudice,
  not specific numbers of days.  More Like This Headnote

Constitutional Law > Bill of Rights > Fundamental Rights > Criminal Process > Speedy Trial
  Criminal Law & Procedure > Pretrial Motions > Speedy Trial > Constitutional Right
  Criminal Law & Procedure > Pretrial Motions > Speedy Trial > Statutory Right
  Criminal Law & Procedure > Trials > Defendant's Rights > Right to Speedy Trial
  Legal Ethics > Client Relations > Effective Representation
*HN23* Trial counsel may waive speedy trial without consulting a defendant even if it is
  against the client's wishes.  More Like This Headnote

**COUNSEL:** [*1] For Sanford Paul **Butler,** #484703, Petitioner, Pro se, Madison
Correctional Institution, Madison, FL.

For Secretary, Department of Corrections, Respondent: Michele Jana Taylor, Office of the
Attorney General, Tampa, FL.

**JUDGES:** SUSAN C. BUCKLEW, United States District Judge.

**OPINION BY:** SUSAN C. BUCKLEW

**OPINION**

***ORDER***

This cause is before the Court on Petitioner Sanford Paul **Butler (Butler's)** 28 U.S.C. § 2254 petition for writ of habeas corpus. **Butler** challenges his conviction and sentence entered by the Circuit Court for the Fifth Judicial Circuit, Hernando County, Florida.

PROCEDURAL HISTORY [1]

**FOOTNOTES**

[1] For additional factual detail, see attachment A for a Statement of the Case and Facts presented in Appellant's Initial Brief on Appeal.

On March 4, 1999, the State filed an Information charging **Butler** with committing one count of burglary of a dwelling and one count of grand theft. (Exh. 21, Vol. 1: R 8-9). [2] On June 19, 2000, **Butler** entered a nolo contendere plea to the charges as part of **[\*2]** a negotiated plea agreement. (Exh. 21, Vol. 1: R 118-120, 142-160; Exh.1). [3] **Butler** was represented by Assistant Public Defender Kirk Campbell. On that date, pursuant to the terms of the plea agreement, the state trial court adjudicated **Butler** guilty and sentenced him to thirteen years incarceration as to the burglary count and to five years incarceration as to the grand theft count. The five-year sentence ran concurrent to the thirteen year sentence. (Exh. 21, Vol. 1: R 123-132).

**FOOTNOTES**

[2] Respondent filed the record on appeal as Exhibit 21.

[3] Pages 142-160 of Exhibit 21 and Exhibit 1 contain copies of the transcript of the plea hearing.

Previously, on April 30, 1999, after the Public Defender's Office had been appointed to represent him, **Butler** had filed a pro se motion for discharge on speedy trial grounds pursuant to rule 3.191(n) of the Florida Rules of Criminal Procedure. (Exh. 21, Vol. 1 :R 20-25). Although the record is not complete in this area, it appears the state trial court denied **Butler's** pro se **[\*3]** motion for discharge because **Butler** was represented by counsel and the motion was unauthorized. On May 7, 1999, during pretrial proceedings, **Butler** specifically waived his speedy trial rights, and the pretrial conference was continued at the request of defense counsel until June 4, 1999. **Butler** renewed the waiver of speedy trial at each pretrial appearance after May 7, 1999. (Exh. 21, Vol. 1: R 43, 44, 45).

**Butler** filed a petition for writ of prohibition in the state district court of appeal challenging the state trial court's ruling on his speedy trial motion. On January 19, 2000, in Case No. 5D99-3610, the state district court of appeal dismissed the petition for writ of prohibition, citing *Salser v. State,* 582 So. 2d 12 (Fla. 5th DCA 1991), *rev. dismissed,* 613 So. 2d 471 (Fla. 1993). (Exh. 21, Vol. 1: R 88). On April 10, 2000, **Butler's** motion for rehearing was denied. (Exh. 21, Vol. 1 :R 111).

**Butler,** through trial counsel, also filed a motion to suppress his confession and a motion to suppress evidence obtained through an allegedly illegal stop. (Exh. 21, Vol. 1: R 74-77). The motions referred to statements **Butler** made to law enforcement officers **[*4]** during an interview in Pasco County, Florida, regarding offenses committed in Pasco and Hernando Counties. **Butler** filed a similar motion to suppress his confession in Pasco County, and, on February 24, 2000, the state trial court in Pasco County conducted a hearing on the motion to suppress. (Exh 21, Supp. Vol. III: R 190-346). At the close of the hearing, the state trial court in Pasco County denied the motion, finding:

THE COURT: Yes, sir.

> Mr. Pinkard, I find no confusion whatsoever over what was contained in the BOLO. And I find that the BOLO was fresh, come [sic] from less than two hours old from Hernando County, it was supplemented by the officers in Pasco County. It was very specific as to the truck. There was some difference about the number of occupants, but I don't think that matters. The truck was identified very specifically and the stop was made on that basis. And the stop was made with adequate suspicion of a crime having been committed, and that truck and the occupants having been involved in the crime. So it was a good stop.

> And considering the credibility of the witnesses, I find that Mr. **Butler** was not promised anything or threatened in any manner, and that **[*5]** his statements during the ride-abouts and all other times were made freely and voluntarily. And I'm going to deny your motion to suppress the statements.

(Exh. 21, Supp. Vol. III: R 345-346).

In the Hernando County case, which is the judgment at issue in the present federal habeas corpus petition, the state trial court determined that the Pasco County judge's ruling was the law of the case and denied **Butler's** request for a de novo hearing on the motion to suppress in the Hernando state trial court. (Exh. 21, Supp. Vol. II: R 179-180).

**Butler** filed a direct appeal of his conviction and sentence. On or about December 13, 2000, Jane C. Almy-Loewinger, the Assistant Public Defender appointed to represent **Butler** on appeal, filed an initial _Anders_ [4] brief. (Exh. 2) and argued the following issue: Whether the state trial court erred by accepting **Butler's** plea. The State filed a notice of intent not to file a response to Almy-Loewinger's motion to withdraw and the _Anders_ brief unless an arguable claim were found upon review of the record by the state district court of appeal. (Exh. 3). In accordance with the procedure in _Anders_ cases, the state district court of appeal **[*6]** issued an order allowing **Butler** to file a supplemental pro se brief calling to the court's attention any issues he felt should be considered in relation to his appeal. (Exh. 4). **Butler** filed a pro se supplemental brief raising five issues: (1) speedy trial time; (2) validity of the BOLO; (3) illegally obtained statements; (4) impermissibly suggestive identification; (5) denial of a de novo suppression hearing by the Hernando state trial court "in the county crime was alleged to have accrued in." (Exh. 5). The State filed notice of its intent not to file an answer brief in response to the pro se supplemental brief. (Exh. 6).

## FOOTNOTES

[4] _Anders v. California,_ 386 U.S. 738, 87 S. Ct. 1396, 18 L. Ed. 2d 493 (1967).

On April 10, 2001, in Case No. 5DOO-1955, the state district court of appeal per curiam affirmed **Butler's** conviction and sentence. (Exh. 7). _**Butler** v. State,_ 784 So. 2d 1120 (Fla. 5th DCA 2001)[table]. **Butler** did not seek discretionary review of the appeal with the Florida

Supreme Court.

On or about September 8, 2001, **Butler [*7]** filed a state petition for writ of habeas corpus alleging ineffective assistance of appellate counsel. (Exh. 9). **Butler** alleged that appellate counsel was ineffective for failing to investigate the record and argue the issues that had been preserved when **Butler** entered his plea. On November 9, 2001, the state district court of appeal denied the petition in Case No. 5D01-2802. (Exh. 10).

On or about December 5, 2001, **Butler** filed a second state petition for writ of habeas corpus, in Case No. 5D01-3694. (Exh. 11). The state district court of appeal denied the petition on January 23, 2002. (Exh. 12).

On January 17, 2002, **Butler** filed a Rule 3.850 motion for post-conviction relief, raising six grounds of ineffective assistance of trial counsel. (Exh. 13).The State filed a response on April 4, 2002. (Exh. 14). On April 8, 2002, the state trial court summarily denied the Rule 3.850 motion. (Exh. 15). **Butler** appealed the adverse ruling. He submitted a pro se initial brief (Exh.16) raising two issues. On September 10, 2002, in Case No. 5D02-2642, the state district court of appeal per curiam affirmed the state trial court's denial of relief. (Exh. 17). **Butler** filed a motion for rehearing **[*8]** (Exh. 18) that was denied by the state district court of appeal on October 11, 2002. (Exh. 19). The mandate issued on October 30, 2002. (Exh. 20).

**Butler** signed the present timely-filed federal petition on July 1, 2003, raising two grounds for relief. (Doc. No. 1).

STANDARD OF REVIEW

*HN1* Because **Butler** filed his petition after April 24, 1996, this case is governed by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA). *Penry v. Johnson,* 532 U.S. 782, 792, 121 S. Ct. 1910, 150 L. Ed. 2d 9 (2001); *Henderson v. Campbell,* 353 F.3d 880, 889-90 (11th Cir. 2003); *Maharaj v. Sec'y of Dept. of Corrections,* 304 F.3d 1345, 1346 (11th Cir. 2002). *HN2* The AEDPA "establishes a more deferential standard of review of state habeas judgments," *Fugate v. Head,* 261 F.3d 1206, 1214 (11th Cir. 2001), in order to "prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *see. Bell v. Cone,* 543 U.S. 447, 125 S. Ct. 847, 160 L. Ed. 2d 881, 2005 WL 123827 (U.S. 2005) (habeas court's standard for evaluating **[*9]** state-court ruling is highly deferential, which demands that state-court decisions be given benefit of the doubt)[citing 28 U.S.C.A. § 2254(d)]). AEDPA is relevant to a review of this Petition.

*HN3* Pursuant to AEDPA, habeas relief may not be granted with respect to a claim adjudicated on the merits in state court unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application, of clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); *Price v. Vincent,* 538 U.S. 634, 123 S. Ct. 1848, 1852-53, 155 L. Ed. 2d 877 (2003); *Clark v. Crosby,* 335 F.3d 1303, 1308 (11th Cir. 2003); *Harrell v. Butterworth,* 251 F.3d 926, 930 (11th Cir. 2001). "Clearly established Federal law" is the governing legal principle, not the dicta, set forth by the United States Supreme Court at the

time the state court issues its decision. *Lockyer v. Andrade,* 538 **[\*10]** U.S. 63, 71-72, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003). Where no Supreme Court precedent is on point, or the precedent is ambiguous, it cannot be said that the state court's conclusion is contrary to clearly established governing federal law. *Mitchell v. Esparza,* 540 U.S. 12, 124 S. Ct. 7, 10, 157 L. Ed. 2d 263 (2003); *Clark v. Crosby,* 335 F.3d at 1308-10; *Washington v. Crosby,* 324 F.3d 1263, 1265 (11th Cir. 2003).

*HN4* A state court decision is "contrary to" the Supreme Court's clearly established precedent within the meaning of § 2254(d)(1) only if the state court applies a rule that contradicts the governing law as set forth in Supreme Court case law, or if the state court confronts a set of facts that are materially indistinguishable from those in a decision of the Supreme Court and nevertheless arrives at a result different from Supreme Court precedent. *Mitchell v. Esparza,* 124 S. Ct. at 10 (citing *Williams v. Taylor,* 529 U.S. 362, 405-06, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000)). *See also Price v. Vincent,* 123 S. Ct. at 1853; *Lockyer v. Andrade,* 538 U.S. at 75-77. A state court does not have to cite the Supreme Court precedent, or even be aware of it, so long as **[\*11]** neither its reasoning nor its result contradicts Supreme Court precedent. *Early v. Packer,* 537 U.S. 3, 8, 123 S. Ct. 362, 154 L. Ed. 2d 263 (2002); *Mitchell v. Esparza,* 124 S. Ct. at 10; *Parker v. Secy of Dept. of Corrections,* 331 F.3d 764, 775-76 (11th Cir. 2003).

*HN5* A state court decision involves an unreasonable application of Supreme Court precedent if the state court identifies the correct governing legal rule from Supreme Court cases but unreasonably applies it to the facts of the particular inmate's case; or if the state court either unreasonably extends a legal principle from Supreme Court precedent to a new context where it should not apply; or unreasonably refuses to extend that principle to a new context where it should apply. *Bottoson v. Moore,* 234 F.3d 526, 531 (11th Cir. 2000). The "unreasonable application" inquiry requires the state court decision to be more than incorrect or erroneous; it must be objectively unreasonable. *Lockyer v. Andrade,* 538 U.S. at 75-77; *Williams,* 529 U.S. at 409-10; *Penry v. Johnson,* 532 U.S. at 791-792; *Woodford v. Visciotti* 537 U.S. 19, 25, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002); **[\*12]** *Mitchell v. Esparza,* 124 S. Ct. at 11-12; *Price v. Vincent,* 123 S. Ct. at 1853.

*HN6* Whether a state court's decision was unreasonable must be assessed in light of the record the court had before it. See *Holland v. Jackson,* 542 U.S. 649, 124 S. Ct. 2736, 2737-2738, 159 L. Ed. 2d 683 (2004) (citing *Yarborough v. Gentry,* 540 U.S. 1, 124 S. Ct. 1, 157 L. Ed. 2d 1 (2003)) (per curiam) (denying relief where state court's application of federal law was supported by the record); *Miller-El v. Cockrell,* 537 U.S. 322, 348, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003) (reasonableness of state court's factual finding assessed "in light of the record before the court"); *cf. Bell v. Cone,* 535 U.S. at 697, n. 4 (declining to consider evidence not presented to state court in determining whether its decision was contrary to federal law).

*HN7* A factual finding by a state court is presumed to be correct, and a petitioner must rebut the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1); *Henderson,* 353 F.3d at 890-91. The statutory presumption of correctness applies only to findings of fact made by the state court, not to mixed determinations **[\*13]** of law and fact. *Parker v. Head,* 244 F.3d 831, 836 (11th Cir. 2001).

*HN8* A petitioner who "failed to develop" the factual basis for a claim while in state court as a result of the petitioner's lack of diligence is barred from doing so in federal court (subject to the very narrow exceptions set out in § 2254(e)(2)). *Williams v. Taylor,* 529 U.S. 420, 433-34, 120 S. Ct. 1479, 146 L. Ed. 2d 435.

*No Presumption that State Court Ignored Its Procedural Rules*

HN9 This Court cannot presume that a Florida court ignores its own procedural rules when the Court issues only a one-sentence denial of relief, which is essentially a summary dismissal. Such a ruling does not suggest that the state court resolved the issue on the federal claim presented. See *Coleman,* 501 U.S. 722, 735-36, 111 S. Ct. 2546, 115 L. Ed. 2d 640(1991); *Kight v. Singletary,* 50 F.3d 1539, 1544-1545 (11th Cir. 1995) (applying procedural bar where state court's summary dismissal did not explain basis for ruling); *Tower v. Phillips,* 7 F.3d 206, 209 (11th Cir. 1993) (applying bar where state court did not rule on claims presented).

Finally, HN10 in the event constitutional error is found in a habeas proceeding, the relevant [*14] harmless error standard is set forth in *Brecht v. Abrahamson,* 507 U.S. 619, 113 S. Ct. 1710, 123 L. Ed. 2d 353 (1993). The test is "less onerous" then the harmless error standard enunciated in *Chapman v. California,* 386 U.S. 18, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). "The test is whether the error had substantial and injurious effect or influence in determining the jury's verdict. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Brecht,* 507 U.S. at 637. Although no constitutional error has occurred in **Butler's** case, any possible error would clearly be harmless beyond any reasonable doubt based on the facts and the record herein.

DISCUSSION

A review of the record demonstrates that, for the following reasons, **Butler's** petition must be **DENIED.**

GROUND ONE:

**Butler** claims his Fifth, Sixth and Fourteenth Amendment rights were violated because appellate counsel's allegations in the *Anders* brief that no issues had been preserved for appellate review denied **Butler** the benefit of his negotiated nolo contendere plea, which [*15] was conditioned on five issues being specifically preserved for appeal. 5

**FOOTNOTES**

5 A review of **Butler's** Initial Brief on Appeal demonstrates that appellate counsel knew that **Butler** had reserved the right to appeal. On page 2, the brief reads: "The Appellant pled no contest to both counts, waived a PSI, but reserved his right to Appeal." (Exh. 2).

HN11 In order to show a violation of the Sixth Amendment right to counsel, Butter must satisfy the two-pronged inquiry of *Strickland v. Washington,* 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). See *Bell v. Cone,* 535 U.S. 685, 698, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002)(courts should apply *Strickland* to claims that counsel failed to satisfy constitutional requirements at specific points). First, **Butler** must demonstrate that the attorney's performance was deficient, meaning that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland,* 466 U.S. at 687. Second, **Butler** must prove prejudice, in [*16] that he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. *Strickland,* 466 U.S. at 694. **Butler** must prove both prongs of *Strickland.* Therefore, if **Butler** fails to establish either deficient performance or prejudice, the court need not address the other prong. *Strickland,* 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim to . . . address both components of the inquiry if the defendant makes an insufficient showing on one. "If it is easier to dispose of an

ineffectiveness claim on the ground of lack of sufficient prejudice,...that course should be followed."); *Sims v. Singletary,* 155 F.3d 1297, 1305 (11th Cir. 1998). *HN12* The standards of effective assistance set forth in *Strickland* apply to appellate counsel, as well as to trial counsel. *Matire v. Wainwright,* 811 F.2d 1430, 1435 (11th Cir. 1987).

**Butler** correctly alleges that at the time of the plea, **[*17]** he specifically preserved five dispositive issues for appeal: (1) suppression of **Butler's** statements; (2) suggestive identification procedure; (3) BOLO (Be On the Lookout) issue; (4) pro se motion to discharge on speedy trial grounds; (5) denial of suppression hearing. (Exh. 21, Vol. 1: R 147-149). However, appellate counsel's election not to raise any or all of these issues did rise to the level of ineffective assistance.

**Butler** cannot show the requisite prejudice because **Butler** brought these issues to the state district court of appeal's attention in his pro se supplemental initial brief. (See Exh. 5). Not only was the state district court of appeal apprised of the fact that these issues were preserved, **Butler** presented argument in support of each of the five issues. **Butler's** complaint that his arguments carried little weight because of the "stigma" of the public defender's *Anders* brief is unavailing. *HN13* In Florida, the state district court of appeal conducts an independent review of the record in *Anders* cases pursuant to the constitutional mandate of *Anders* and the directives of the Florida Supreme Court in *State v. Causey,* 503 So. 2d 321 (Fla. 1987). **[*18]** In *Causey,* the Florida Supreme Court stated:

> *HN14* If appellate counsel has already brought possible errors to the attention of the court, then there would be no need to file an *Anders* brief. The requirement in *Anders* of submitting a brief stating that the public defender has found no reversible error even worthy of a good faith argument is intended to promote fair appellate review, not stifle it. This requirement was specifically meant to "induce the court to pursue all the more vigorously its own review." *Anders,* 386 U.S. at 745.

*Causey,* 503 So. 2d at 322.

Further and alternatively, **Butler** cannot demonstrate deficient performance or prejudice on appellate counsel's part for failing to raise any of the five issues because he has presented no argument to show that any of the issues has merit and that the result of the proceeding would have changed had the issue been included in appellate counsel's initial brief. *HN15* Appellate counsel has no duty to raise issues on appeal which have little or no chances of success. Thus, appellate counsel is not required to raise meritless issues. *See Card v. Dugger,* 911 F.2d 1494, 1520 (11th Cir. 1990). **[*19]** The mere fact that such issues were preserved for review does not obligate appellate counsel to raise them on appeal, especially when the issues have little or no merit. Accordingly, the state district court of appeal's denial of **Butler's** ineffective assistance of appellate counsel claim is objectively reasonable under the AEDPA standard of federal habeas review.

Ground one does not warrant habeas corpus relief.

GROUND TWO

**Butler** contends his Fifth, Sixth, and Fourteenth Amendment rights under the United States Constitution were violated when both trial and appellate counsel were ineffective for not timely asserting a violation of **Butler's** speedy trial rights, which in turn denied **Butler** the due process provided under the state speedy trial rule.

**Butler's** claims of ineffective assistance of trial and appellate counsel for failing to timely assert a violation of **Butler's** speedy trial rights also fail. **Butler** presented a similar claim in

ground two of his Rule 3.850 motion for post-conviction relief. The state trial court denied the claim on procedural grounds, finding that the speedy trial issue was preserved for appeal and should have been raised in that proceeding. While [HN16] an ineffective [*20] assistance of counsel claim generally can be asserted in a Rule 3.850 motion, the state trial court's denial of ground two of the post-conviction motion was objectively reasonable. **Butler** cannot show deficient performance or prejudice inasmuch as there was no violation of the state speedy trial rule.

Florida's speedy trial rule provides:

> [HN17] a) Speedy Trial without Demand...--Except as otherwise provided by this rule, and subject to the limitations imposed under subdivisions (e) and (f), every person charged with a crime shall be brought to trial within 90 days of arrest if the crime charged is a misdemeanor, or within 175 days of arrest if the crime charged is a felony. If trial is not commenced within these time periods, the defendant shall be entitled to the appropriate remedy as set forth in subdivision (p). The time periods established by this subdivision shall commence when the person is taken into custody as defined under subdivision (d). A person charged with a crime is entitled to the benefits of this rule whether the person is in custody in a jail or correctional institution of this state or a political subdivision thereof or is at liberty on bail or recognizance or [*21] other pretrial release condition. This subdivision shall cease to apply whenever a person files a valid demand for speedy trial under subdivision (b).

Fla. R. Crim. P. 3.191(a).

[HN18] Subdivision (d) of the rule defines the time period for commencement of the 175-day speedy trial period:

> [HN19] (d) Custody.--For purposes of this rule, a person is taken into custody
>
> (1) when the person is arrested as a result of the conduct or criminal episode that gave rise to the crime charged, or
>
> (2) when the person is served with a notice to appear in lieu of physical arrest.

Fla. R. Crim. P. 3.191(d).

In this case, contrary to **Butler's** assertion, [6] he was not arrested in the Hernando County case until February 11, 1999, while **Butler** was being held in the Pasco County Jail. (Exh. 21, Vol. 1: R 5-6). After his arrest, **Butler** was transported to the Hernando County Jail, and had his first appearance hearing on February 12, 1999. At that time the court determined there was probable cause to hold **Butler,** and the Public Defender's Office was appointed to represent him. (Exh. 21, Vol. 1: R 7). The State Attorney then filed the Information on March 3, 1999. (Exh 21, Vol. 1: R 8-9). **Butler [*22]** was arraigned on April 6, 1999, and entered a plea of not guilty. Approximately three months after his arrest, on May 7, 1999, **Butler** appeared for a status conference with his attorney, Assistant Public Defender Daniel Lewan. On that date, Mr. Lewan requested a continuance until June 4, 1999, for the pre-trial conference. Significantly, the court record indicates that **Butler** waived speedy trial. (Exh. 21, Vol. 1: R 40).

## FOOTNOTES

[6] Throughout the state proceedings, **Butler** has incorrectly asserted that the

commencement for the speedy trial time period was the date of his arrest on August 26, or December 16, 1997. **Butler** takes this information from the Arrest Affidavit/First Appearance Form completed by Detective Walker of the Hernando County Sheriff's Office. (Exh. 21, Vol. 1: R 1-4). However, a review of the form reflects that it was merely an investigative report which included an interview with **Butler** on August 26, 1997 (apparently while **Butler** was in the custody of Pasco County Jail). (Exh. 21, Vol. 1: R 3-4). **Butler** was not arrested in the Hernando County case at that time.

**[*23]** Mr. Lewan requested several more continuances, on June 4, 1999, July 8, 1999, August 6, 1999, September 10, 1999, October 8, 1999, November 5, 1999, December 2, 1999, January 6, 2000, February 28, 2000, April 6, 2000, May 4, 2000, and June 1, 2000. (Exh 21, Vol. 1: R 40, 42, 43, 44, 45, 51, 52, 59, 78, 83, 84, 113). The court records reflect that speedy trial was waived during **Butler's** court appearances in June, July, August, September, and October of 1999. (Exh 21, Vol. 1: R 40, 42, 43, 44, 45).

In *Stewart v. State,* 491 So. 2d 271, 272 (Fla. 1986), the Florida Supreme Court held that HN20 "when a defendant requests a continuance prior to the expiration of the applicable speedy trial time period for the crime with which he is charged, the defendant waives his speedy trial right as to all charges which emanate from the same criminal episode." *See also, State ex rel. Butler v. Cullen,* 253 So.2d 861 (Fla. 1971)(holding when a defendant moves for and is granted a continuance, the 180-day limitation set forth in Rule 3.191 (a)(1) is no longer applicable). HN21 Any defense request to postpone a case for any period of time, constitutes a motion for a continuance waiving **[*24]** speedy trial rule rights. *Blackstock v. Newman,* 461 So.2d 1021, 1022 (Fla. 3d DCA 1985). In *Blackstock,* the court noted: HN22 "The speedy trial rule is a procedural device only and not a constitutional right. Once the speedy trial rule has been waived, it is supplanted by the constitutional speedy trial period which is measured by tests of reasonableness and prejudice, not specific numbers of days." *Id.* Furthermore, HN23 trial counsel may waive speedy trial without consulting a defendant even if it is against the client's wishes. *See State v. Kruger,* 615 So. 2d 757, 759 (Fla. 4th DCA 1993).

Even if **Butler** had not explicitly waived his speedy trial rights under Fla. R. Crim. P. 3.191, his requests to continue the case operated as a waiver of speedy trial. Accordingly, there is no merit to his claim of speedy trial violation, and neither trial nor appellate counsel can be considered deficient for failing to raise this issue. The state courts' denials of **Butler's** ineffective assistance of trial and appellate counsel claims are neither contrary to, nor an unreasonable application of, the *Strickland* standard.

Ground two does not warrant habeas corpus **[*25]** relief.

Accordingly, the Court orders:

That **Butler's** petition for writ of habeas corpus is denied, with prejudice. The Clerk is directed to enter judgment against **Butler** and to close this case.

ORDERED at Tampa, Florida, on October 21, 2005.

SUSAN C. BUCKLEW

United States District Judge

ATTACHMENT A

STATEMENT OF THE CASE AND FACTS

The Appellant was charged in an Information filed in the Circuit Court of Hernando County, Florida on April 4, 1999, with burglary, in violation of Sections 810.02(1) & 810.02(3), Florida Statutes, and grand theft, in violation of Sections 812.014(1) & 812.014(2)(c)(1), Florida Statutes. (R 8-9, Vol. I) The probable cause affidavit alleged that on August 26, 1997, Albert Jordan came home to find the Appellant pulling out of his driveway in a 1985 red Ford pick-up with a white topper. When he entered his home, Mr. Jordan discovered a small color television, a radio and some fishing poles missing. He reported the theft to the police and gave them a description of the Appellant and his vehicle. Approximately 20 minutes later, after a BOLO was dispatched with this information, the Appellant was apprehended on 1-75 and S.R. 52. Mr. Jordan was escorted to **[\*26]** this location by a Hernando County Deputy and positively identified the Appellant and his vehicle. Mr. Jordan's property was found in the bed of the Appellant's truck. (R 2-4, Vol. I)

The State filed a Notice of Habitualization on May 4, 1999. (R 28, Vol. I). The State also filed a Motion To Stay Proceedings pending Appeal on January 12, 2000, and the motion was also granted on that date. (R 62, Vol. I) The Appeal was ultimately denied and dismissed. (R 65, Vol. I) The Appellant's first Motion to Suppress was filed on February 24, 2000, alleging that he was questioned about burglaries that occurred in both Pasco and Hernando counties, and was promised certain things during the interrogation that tainted the statements made by the Appellant; and therefore his confession was obtained in violation of the United States and Florida Constitutions. (R 74-75, Vol. I) The Appellant's second Motion to Suppress was also filed on February 24, 2000, alleging that the Appellant's arrest was illegal, as it followed an illegal stop and detention which lacked probable cause or reasonable suspicion of criminal activity. (R 76-77, Vol. I) The court signed an Order denying these motions and adopted Judge **[\*27]** Cobb's ruling from Pasco County, which addressed and denied the same issues. (R 116-117, Vol. I) The Appellant filed a Motion in Limine to suppress Mr. Jordan's out of court identification on June 17, 2000. (R 116-117, Vol. I) During the plea hearing held on June 19, 2000, the court announced that he would also adopt the Pasco County court's ruling on that issue as well. (R 148, Vol. I) The court took judicial notice of Judge Cobb's ruling on the suppression issues in Pasco County on February 24, 2000, at the plea hearing. (R 158, Vol. I)

The Appellant pled no contest to both counts, waived a PSI, but reserved his right to Appeal. (R 118-120, Vol. I) The court sentenced Appellant on June 19, 2000, to serve 13 years in prison on count I and 5 years in prison on Count II, both sentences to run concurrently. The State waived their right to habitualize the Appellant pursuant to the plea agreement. (R 155-157, Vol. I) As a condition of the Appellant's sentence, the court ordered that the Appellant have no contact with the victim, his property or his family. (R 157, Vol. I) Notice of Appeal was timely filed on July 7,2900. (R 161, Vol. I) (Cited *Verbatim* from the Initial Brief on Appeal, **[\*28]** Exh, 2, pp. 1-3)

Source: Legal > States Legal - U.S. > Florida > Find Cases > FL Federal & State Cases, Combined ⓘ
Terms: butler v. crosby (Edit Search | Suggest Terms for My Search | Feedback on Your Search)
View: Full
Date/Time: Thursday, March 20, 2008 - 11:53 AM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
Ｑ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ａ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any Shepard's signal to Shepardize® that case.

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional
Advisor | Counsel Selector

History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

 **LexisNexis**®    About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights
reserved.

# EXHIBIT K

LexisNexis® *Total Research System*                    Switch Client ┊ Preferences ┊ Sign Off ┊ [?] Help

*My Lexis™* ┊ Search ┊ Research Tasks ┊ Get a Document ┊ *Shepard's®* ┊ Alerts ┊ Total Litigator ┊ Transactional A
Source: Legal > States Legal - U.S. > Florida > Find Cases > FL Federal & State Cases, Combined [i]
Terms: **cousins rest. assoc. v. tgifriday's, inc. 843 so. 2d 980**  (Edit Search | Suggest Terms for My
       Search | Feedback on Your Search)

⨍Select for FOCUS™ or Delivery
□

*843 So. 2d 980, *; 2003 Fla. App. LEXIS 6172, **;*
*28 Fla. L. Weekly D 1066*

**COUSINS** RESTAURANT ASSOCIATES, a limited partnership, by and through its general and managing partner, **COUSINS** MANAGEMENT CORP., Appellant, v. TGI FRIDAY'S, INC., a Texas Corporation, Appellee.

CASE NO. 4D02-894

COURT OF APPEAL OF FLORIDA, FOURTH DISTRICT

**843 So. 2d 980**; 2003 Fla. App. LEXIS 6172; 28 Fla. L. Weekly D 1066

April 30, 2003, Opinion Filed

**SUBSEQUENT HISTORY:  [**1]**  Released for Publication May 16, 2003.

**PRIOR HISTORY:** Appeal from the Circuit Court for the Seventeenth Judicial Circuit, Broward County; J. Leonard Fleet, Judge; L.T. Case No. 96-13693 (08).
**Cousins Rest. Assocs.**, L.P. v. TGI Friday's, Inc., 789 So. 2d 457, 2001 Fla. App. LEXIS 8834 (Fla. Dist. Ct. App. 4th Dist., 2001)

**DISPOSITION:** REVERSED AND REMANDED.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Appellant prospective franchisee appealed from the denial of his motion for leave to amend his second amended complaint alleging tortious interference with an advantageous business relationship and intentional and negligent misrepresentation, and from the entry of summary judgment for appellee franchisor by the Circuit Court for the Seventeenth Judicial Circuit, Broward County (Florida).

**OVERVIEW:** The franchisee argued that the trial court erred when it denied the motion for leave to amend and entered summary judgment. The appellate court held that the trial court improperly based the denial of the franchisee's motion for leave to amend on the chronology of the franchisee's filings, and the notice of trial prior to the motion for leave to amend. The motion was the first request for leave to amend unrelated to a defense motion to dismiss. There was no determination that the franchisor would be prejudiced by the amendment or that the pursuit of the amendments would be futile. Counsel explained during the hearing that it had anticipated that the trial date would be set far enough into the future to allow time for the amendment. The franchisee sought to add claims based upon the same facts and circumstances underlying the existing complaint, and there was no need to continue the trial date. The denial of the motion for leave to amend deprived the franchisee from asserting other claims, which may or may not have survived the motion. The franchisee was entitled to its day in court, given the lack of abuse and

prejudice.

**OUTCOME:** The judgment was reversed.

**CORE TERMS:** leave to amend, tortious interference, summary judgment, restaurant, business relationship, trial date, advantageous, negligent misrepresentation, notice, abused, futile, amend, planned, site

**LEXISNEXIS® HEADNOTES**                                                    ⊟ **Hide**

Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Leave of Court

HN1 Fla. R. Civ. P. 1.190(a) provides that leave to amend shall be given freely when justice so requires. Trial courts' decisions on motions for leave to amend are reviewed under an abuse of discretion standard. Leave to amend should not be denied unless the privilege has been abused, there is prejudice to the opposing party, or amendment would be futile. More Like This Headnote

**COUNSEL:** Robert Zarco, Robert M. Einhorn and Himanshu M. Patel of Zarco Einhorn & Salkowski, P.A., Miami, for appellant.

Michael D. Joblove, Nina Greene Kersh and Amanda Jason of Genovese Joblove & Battista, Miami, for appellee.

**JUDGES:** MAY, J. STEVENSON and HAZOURI, JJ., concur.

**OPINION BY:** MAY

**OPINION**

[*981] MAY, J.

The plaintiff, **Cousins** Restaurant Associates, appeals a summary judgment entered against it in an action for tortious interference with an advantageous business relationship, and intentional and negligent misrepresentation. It argues the court erred when it denied the motion for leave to amend and entered summary judgment. We agree and reverse the summary judgment because we find that the trial court erred in denying the motion for leave to amend.

The complaint grew out of a failed business plan for the development and operation of a Friday's restaurant near the Sawgrass Mills Mall. The plaintiff planned to acquire property satisfactory to TGI Friday's, [**2] Inc., [TGIF] and enter into a management contract with TGIF to operate and manage the restaurant. Based upon TGIF's assurances, the plaintiff sent a letter of intent to the property owner, conditioning the purchase upon TGIF's approval of the selected site and entry into the management agreement. Needless to say, all did not go as planned. Subsequently, TGIF opened a company-owned restaurant within two-tenths of a mile from the plaintiff's originally proposed site.

The failure of the plan to reach its goal resulted in the plaintiff filing a complaint against TGIF. The first complaint alleged claims for breach of contract, breach of fiduciary duty, breach of covenant of good faith and fair dealing, a violation of section 817.416(2)(a), Florida

Statutes (Supp. 1996), and fraud. The trial court granted TGIF's motion to dismiss without prejudice.

In July, 1997, the plaintiff filed an amended complaint, alleging claims for tortious interference with an advantageous business relationship and intentional and negligent misrepresentation. The trial court granted TGIF's motion to dismiss the tortious interference claim without prejudice. The plaintiff sought leave **[**3]** to amend, which was resolved by an agreed order. In August, 1998, the plaintiff filed its second amended complaint, again alleging claims for tortious interference with an advantageous business relationship and intentional and negligent misrepresentation.

Two years of litigation transpired. In June, 2000, the plaintiff substituted counsel. In November and December, 2000, the plaintiff filed notices for jury trial expecting to receive a trial date several months into the future. On January 2, 2001, the court set trial for July 23, 2001. On January 29, 2001, the plaintiff moved to amend the complaint to include four (4) additional claims: tortious interference with an advantageous business relationship, [1] promissory estoppel, violation of the <u>Florida Deceptive and Unfair Trade Practices Act</u>, and breach of an oral contract. The court denied the motion.

## FOOTNOTES

[1] The Third Amended Complaint alleged two counts of tortious interference. Each count related to one of the two parcels of property considered for the location of the Friday's restaurant.

**[**4]** **[*982]** TGIF then filed a motion for summary judgment as to the plaintiff's second amended complaint. The trial court granted the motion and entered summary judgment. It is from this judgment and the court's denial of the motion for leave to amend that the plaintiff appeals.

<u>Florida Rule of Civil Procedure 1.190(a)</u> *HN1* provides that leave to amend "shall be given freely when justice so requires." Trial courts' decisions on motions for leave to amend are reviewed under an abuse of discretion standard. *<u>Video Indep. Med. Examination, Inc. v. City of Weston</u>, 792 So. 2d 680 (Fla. 4th DCA 2001)*. "Leave to amend should not be denied unless the privilege has been abused, there is prejudice to the opposing party, or amendment would be futile." *<u>Life Gen. Sec. Ins. Co. v. Horal</u>, 667 So. 2d 967, 969 (Fla. 4th DCA 1996)*. The trial court did not rely on any of these reasons.

This is not a case where the plaintiff filed repetitive motions for leave to amend and abused the privilege. In fact, this was the first request for leave to amend unrelated to a defense motion to dismiss. This is not a case where the court found that TGIF would be prejudiced by the amendment. This is **[**5]** not a case where the court reviewed the allegations and determined that their pursuit would be futile.

It is a case where the trial court believed that the plaintiff made an intentional misrepresentation to the court that "[it was] ready to go to trial on the pleadings as they then existed while possessed of the knowledge that [it was] not ready to go to trial on the pleadings as they then existed." It was the chronology of the plaintiff's filings, the notice of trial prior to the motion for leave to amend, that served as the court's basis for denial of the motion. This is not a recognized basis for denying the motion for leave to amend.

As counsel explained during the hearing, it had anticipated that the trial date would be set far enough into the future to allow time for the amendment. The plaintiff sought to add claims based upon the same facts and circumstances underlying the existing complaint. The plaintiff

advised the court that there would be no need to continue the trial date. And, the plaintiff was right. The trial date was set seven months into the future.

In reversing the summary judgment, we find no error in the court's ruling on the three claims for relief that **[**6]** existed when the motion for summary judgment was heard. However, the denial of the plaintiff's motion for leave to amend deprived the plaintiff from asserting other claims, which may or may not have survived the motion. We do not pass on the viability of those claims. They may ultimately fail to survive the defenses that TGIF is sure to raise. However, the plaintiff is entitled to its day in court, given the lack of abuse and prejudice evident on this record. We leave to the trial court the issue of the alleged futility of these claims. ²

## FOOTNOTES

2 We have not considered the court's ruling on the request for production. The court may reconsider this issue upon remand in light of this opinion.

REVERSED AND REMANDED.

STEVENSON and HAZOURI, JJ., concur.

Source:    Legal > States Legal - U.S. > Florida > Find Cases > FL Federal & State Cases, Combined ⓘ
Terms:    cousins rest. assoc. v. tgifriday's, inc. 843 so. 2d 980  (Edit Search | Suggest Terms for My Search | Feedback on Your Search)
View:    Full
Date/Time:  Thursday, March 20, 2008 - 12:09 PM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
Ⓠ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
✦ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any Shepard's signal to Shepardize® that case.

My Lexis™ | Search | Research Tasks | Get a Document | Shepard's® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help


LexisNexis®    About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT L

**LexisNexis**® *Total Research System*

Switch Client ¦ Preferences ¦ Sign Off ¦ [?] Help

*My Lexis™* ¦ Search ¦ Research Tasks ¦ Get a Document ¦ *Shepard's*® ¦ Alerts ¦ Total Litigator ¦ Transactional A

Source: Legal > States Legal - U.S. > Florida > Find Cases > **FL Federal & State Cases, Combined** [i]
Terms: **state farm fire & Casualty co. v. fleet fin. corp., 724 so. 2d 1218**  (Edit Search | Suggest Terms for My
Search | Feedback on Your Search)

✦Select for FOCUS™ or Delivery
☐

*724 So. 2d 1218, \*; 1998 Fla. App. LEXIS 15942, \*\*;*
*24 Fla. L. Weekly D 56*

**STATE FARM FIRE** AND **CASUALTY** COMPANY, Appellant, v. **FLEET** FINANCIAL
CORPORATION, et al., Appellee.

Case No. 98-612

COURT OF APPEAL OF FLORIDA, FIFTH DISTRICT

724 So. **2d 1218**; 1998 Fla. App. LEXIS 15942; 24 Fla. L. Weekly D 56

December 18, 1998, Opinion Filed

**SUBSEQUENT HISTORY: [\*\*1]**  Rehearing Denied January 13, 1999. Released for
Publication February 1, 1999.

**PRIOR HISTORY:** Appeal from the Circuit Court for Seminole County, O. H. Eaton, Jr.,
Judge.

**DISPOSITION:** REVERSED and REMANDED.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** In a declaratory judgment action, plaintiff insurer appealed an
order of the Seminole County Circuit Court (Florida) granting summary judgment to
defendant insured and defendant supplemental insurer, and denying plaintiff's motion to
amend the complaint to reflect a settlement agreement in the underlying lawsuit.

**OVERVIEW:** Plaintiff insurer filed a declaratory action, seeking an order explaining its
obligation to defend or indemnify defendant insured in an underlying federal lawsuit.
Defendant insured and defendant supplemental insurer's motion for summary judgment
was granted on grounds that the intervening settlement of the underlying suit deprived
the trial court of subject matter jurisdiction and left no justiciable controversy.
Simultaneously, plaintiff's motion to amend its complaint to reflect the settlement was
denied. Plaintiff appealed. The court held that granting plaintiff's motion to amend would
not have caused defendants prejudice and would not have been futile. The amended
complaint would have referenced the settlement agreement in the federal suit and would
have allowed the trial court to determine whether the agreement preserved plaintiff's right
to pursue its declaratory action. Because the trial court abused its discretion in denying
plaintiff's motion to amend its complaint, the order granting defendants' motion for
summary judgment and denying plaintiff's motion to amend was reversed.

**OUTCOME:** The order granting summary judgment to defendant insured and defendant
supplemental insurer and denying plaintiff insurer's motion to amend its complaint was

reversed, because the trial court abused its discretion in denying plaintiff's motion to amend. The amendment would not have prejudiced defendants and was not futile.

**CORE TERMS:** declaratory judgment action, amend, settlement agreement, summary judgment, federal lawsuit, settlement, opportunity to amend, issue of coverage, declaratory judgment, insurance carrier's, duty to defend, public policy, enabling, lawsuit, abused, buy, permission, indemnify, insured

**LEXISNEXIS® HEADNOTES**                                                  ⊟ **Hide**

Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > General Overview 🔍

Civil Procedure > Appeals > Standards of Review > Abuse of Discretion 🔍

HN1⬇ It is the public policy of Florida to freely allow amendments to pleadings so that cases may be resolved on their merits. All doubts should be resolved in favor of allowing amendment. Refusal to allow amendment of a pleading under Fla. R. Civ. P. 1.190(a) constitutes an abuse of discretion unless it clearly appears that allowing the amendment would prejudice the opposing party, the privilege to amend has been abused, or amendment would be futile. More Like This Headnote | *Shepardize:* Restrict By Headnote

**COUNSEL:** David H. Simmons and Patrick C. Howell of Drage, Debeaubien, Knight, Simmons, Romano & Neal, Orlando, for Appellant.

Lamar D. Oxford of Dean, Ringers, Morgan & Lawton, Orlando, for Appellee.

**JUDGES:** ANTOON, J., GOSHORN and THOMPSON, JJ., concur.

**OPINION BY:** ANTOON

**OPINION**

[*1218] ANTOON, J.

In this declaratory judgment action, the trial court *sua sponte* entered a final summary judgment against **State Farm** ⌄ **Fire & Casualty** Company (**State Farm** ⌄). We reverse because the court erred in failing to afford **State Farm** ⌄ an opportunity to amend its complaint prior to entering its summary judgment order.

United Services Automobile Association and USAA **Casualty** Insurance Company (USAA) sued **Fleet** Financial Corporation, Inc., and United Claims Corporation, Inc., (**Fleet**), in federal district court claiming that **Fleet** had operated a scheme designed to defraud USAA and other insurers. Specifically, USAA alleged that various rental car operators had contracted with **Fleet** to process insurance claims resulting from vehicles [**2] damaged while rented, and that **Fleet** had systematically inflated the claims.

While USAA's federal action was pending, **State Farm** ⌄ filed this declaratory judgment action in the circuit court seeking a determination as to whether it was obligated to defend or indemnify **Fleet** with regard to USAA's lawsuit. **State Farm** ⌄ insured **Fleet** under a comprehensive business policy, and Tudor Insurance Company ⌄ insured **Fleet** under an error and omission policy. **Fleet** filed an answer and affirmative defenses alleging that there

was no present controversy to be decided because USAA's federal lawsuit had been settled.

**State Farm** moved for summary judgment. The day the motion was set for hearing, **Fleet** served **State Farm** with a motion to strike or abate. Although not timely noticed for hearing, the trial court allowed **Fleet** to argue its motion to strike. **Fleet** argued that the trial court lacked jurisdiction over the **[*1219]** declaratory judgment action because USAA's federal lawsuit had been settled by the parties. **State Farm** responded by explaining that, although a settlement had been reached, the settlement agreement provided, among other things, that **State Farm** could reserve its right to continue its declaratory **[**3]** judgment action in the circuit court. **State Farm** ▾ also requested permission to amend its complaint so as to make reference to the settlement agreement. Upon consideration, the trial court denied **State Farm** ▾'s motion to amend stating:

I don't know, but most respectfully you-all can agree to whatever you want to, but that doesn't give me the power or authority to decide a case.

* * *

I'm sorry. I can't buy that. I simply cannot buy that you're entitled to settle a case on the condition that some judge decide that you didn't have a duty to defend. You know, you pay the money to get rid of the case, not to prolong the controversy.

The trial court thereafter entered final summary judgment in favor of **Fleet,** apparently persuaded that it lacked subject matter jurisdiction over the declaratory judgment action because the underlying federal lawsuit had been settled, and therefore, there was no justiciable controversy left pending. See Jacobs & Goodman, P.A. v. McLin, Burnsed, Morrison, Johnson & Robuck, P.A., 582 So. **2d** 98 (Fla. 5th DCA 1991); see also § 86.011, Fla. Stat. (1997).

**State Farm** contends that the disposition of the federal lawsuit did not divest the trial **[**4]** court of jurisdiction over this declaratory judgment action because the issue as to **State Farm** ▾'s duty to defend or indemnify **Fleet** remained unresolved. **State Farm** ▾ maintains that the terms of the parties' settlement agreement included an agreement that **State Farm** ▾ could continue to pursue this declaratory judgment action. Unfortunately, the parties' settlement agreement was not made a part of the record before the summary judgment hearing was conducted. At the hearing **State Farm** ▾ requested permission to amend its complaint to include a reference to the settlement agreement; however, this request was denied. We reverse this ruling.

*HN1*▾It is the public policy of Florida to freely allow amendments to pleadings so that cases may be resolved on their merits. All doubts should be resolved in favor of allowing amendment. See Gate Lands Co. v. Old Ponte Vedra Beach Condominium, 715 So. **2d** 1132 (Fla. 5th DCA 1998). Refusal to allow amendment of a pleading under rule 1.190(a) of the Florida Rules of Civil Procedure constitutes an abuse of discretion unless it clearly appears that allowing the amendment would prejudice the opposing party, the privilege to amend has been abused, or amendment would **[**5]** be futile. See Rosario v. Procacci Commercial Realty, Inc., 717 So. **2d** 148 (Fla. 5th DCA 1998).

Here, there was no showing that **Fleet** would suffer prejudice if **State Farm** ▾ were granted leave to amend its complaint, nor had the privilege to amend been abused. With regard to the question of futility, since the record did not contain a copy of the parties' settlement agreement, the trial court could not properly determine whether **State Farm** ▾ would have been able to **state** a cognizable cause of action for declaratory relief if allowed an opportunity to amend its complaint to include the parties' settlement agreement because the court did not know whether the agreement actually preserved **State Farm** ▾'s right to pursue the action. Accordingly, the trial court should have granted **State Farm** ▾'s motion to amend.

In closing, we note the ruling in <u>Allstate Insurance Co. v. Employers Liability Assurance Corp., Ltd., 445 F.2d 1278 (5th Cir. 1971)</u>, wherein an insurance company contributed toward a settlement of a lawsuit after the parties had agreed that the company could retain its right to proceed with a declaratory judgment on the issue of coverage. The Fifth Circuit honored the agreement **[**6]** between the parties, noting that the agreement was commendable because it facilitated prompt settlement of the underlying controversy thereby eliminating the interim expenditures of litigation. <u>Id. at 1280</u>. Accord <u>Edwards v. Sharkey, 747 F.2d 684 (11th Cir. 1984)</u>. This panel agrees with the Fifth Circuit's reasoning as well as the conclusion that voluntary payment to an injured party pursuant to a settlement agreement should not extinguish an **[*1220]** insurance carrier's right to maintain a declaratory judgment action regarding the issue of coverage. In our view, this procedure comports with Florida's public policy by enabling an injured party to be paid the damages due him while avoiding the time and expense of protracted litigation. It also yields a savings to defending insurance carriers by enabling them to resolve purely legal issues of coverage through the more expedient declaratory judgment procedure. However, we recognize that our conclusions on this issue constitute merely *dicta* in this case and emphasize that the holding here is simply that **State Farm** must be granted the opportunity to amend its complaint so that this issue can be properly addressed on the merits. See **[**7]** <u>Pinellas County, Florida v. Southwest Florida Water Management, 718 So. 2d 873</u>, 23 Fla. L. Weekly D2064 (Fla. 5th DCA 1998); <u>Golf Club of Plantation, Inc., v. City of Plantation, 717 So. 2d 166 (Fla. 4th DCA 1998)</u>; <u>Omasta v. Bedingfield, 689 So. 2d 409 (Fla. 5th DCA 1997)</u>.

REVERSED and REMANDED.

GOSHORN and THOMPSON, JJ., concur.

Source:   Legal > <u>States Legal - U.S.</u> > <u>Florida</u> > <u>Find Cases</u> > **FL Federal & State Cases, Combined** ⓘ
Terms:   state farm fire & Casualty co. v. fleet fin. corp., 724 so. 2d 1218  (<u>Edit Search</u> | <u>Suggest Terms for My Search</u> | <u>Feedback on Your Search</u>)
View:   Full
Date/Time:  Thursday, March 20, 2008 - 12:12 PM EDT

* Signal Legend:
● -  Warning: Negative treatment is indicated
[Q] -  Questioned: Validity questioned by citing refs
⚠ -  Caution: Possible negative treatment
◆ -  Positive treatment is indicated
(A) -  Citing Refs. With Analysis Available
(i) -  Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

<u>*My Lexis*™</u> | <u>Search</u> | <u>Research Tasks</u> | <u>Get a Document</u> | <u>*Shepard's*®</u> | <u>Alerts</u> | <u>Total Litigator</u> | <u>Transactional Advisor</u> | <u>Counsel Selector</u>
<u>History</u> | <u>Delivery Manager</u> | <u>Dossier</u> | <u>Switch Client</u> | <u>Preferences</u> | <u>Sign Off</u> | <u>Help</u>

 LexisNexis®    <u>About LexisNexis</u> | <u>Terms & Conditions</u> | <u>Contact Us</u>
<u>Copyright</u> © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.