# EXHIBIT D

LexisNexis® *Total Research System*

Switch Client | Preferences | Sign Off | [?] Help

*My Lexis™* | Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional A

Service: **Get by LEXSEE®**
Citation: **305 So. 2d 753, 755**

*305 So. 2d 753, \*; 1974 Fla. LEXIS 4106, \*\**

Saul GOODMAN, Petitioner, v. Richard H. OLSEN, Respondent

No. 45356

Supreme Court of Florida

305 So. 2d 753; 1974 Fla. LEXIS 4106

November 7, 1974

## CASE SUMMARY

**PROCEDURAL POSTURE:** On petition of certiorari petitioner sought reversal of the decision of the District Court of Appeal, Third District (Florida) which affirmed the jury verdict for respondent in an action arising out of breach of contract.

**OVERVIEW:** Petitioner banker and respondent lawyer entered into an agreement whereby petitioner was to advance a sum of money to respondent for the purchase of stock. One-half of the funds were characterized as a loan to respondent and each party was to own one-half of the shares. The loan was to be repaid by a certain date and respondent had further agreed to purchase the petitioner's shares at a certain rate. Petitioner brought action for breach of contract and respondent answered interposing a defense of usury. The lower appellate court affirmed, and petitioner sought this writ of certiorari. The court held the agreement could not within reason be considered usurious. The loan was interest free; indicating the parties anticipated a joint venture when they consummated the agreement. Applying New York law the court found that a loan was usurious where the money was advanced for the purpose of a joint venture. The court held under the facts of the case that the defense of usury was not available to respondent. The court reversed and reversed and remanded the action for a new trial.

**OUTCOME:** The court reversed and remanded for a new trial the jury verdict entered in the trial court in favor of respondent. The court held that the defense of usury was not applicable because the relationship between the parties was that of partnership or joint venture.

**CORE TERMS:** usurious, joint venture, stock, bonus, contingency, repaid, per share, choice of law, lex loci, legal interest, venture, shares of stock, acquisition, profitable, buy

## LEXISNEXIS® HEADNOTES      ⊟ **Hide**

Civil Procedure > Federal & State Interrelationships > Choice of Law > Forum & Place 📄
Contracts Law > Contract Interpretation > General Overview 📄
*HN1* ⬇ The general principle adopted by civilized nations is, that the nature, validity and

interpretation of contracts, are to be governed by the lex loci of the country where the contracts are made or are to be performed; but the remedies are to be governed by the lex fori. More Like This Headnote | *Shepardize:* Restrict By Headnote

Contracts Law > Defenses > Usury 📖

**HN2** The general rule in New York is that a loan is usurious where the lender is entitled to the return of the principal and the full legal rate of interest plus a bonus to be paid upon a contingency over which the borrower has no control. This contingent right to a bonus must be something of value and when added to the maximum interest results in a total interest in excess of the legal rate. However, an agreement to pay an amount which may be more or less than the legal interest, depending upon a reasonable contingency, is not ipso facto usurious, because of the possibility that more than the legal interest will be paid. Additionally, a loan has been deemed not usurious where the money is in fact advanced for the purpose of a joint venture or where there is no certainty that the bonus plus the stipulated interest will exceed the legally allowable rate of interest. More Like This Headnote | *Shepardize:* Restrict By Headnote

**COUNSEL: [**1]** Leo Greenfield of the Law Offices of Leo Greenfield, North Miami, and Frank Ragano, Tampa, for Petitioner.

John W. Prunty, of Prunty, Ross, DeLoach & Olsen, Miami, for Respondent.

**JUDGES:** McCain, Justice. Adkins, C.J., and Roberts, Ervin and Boyd, JJ., concur. Overton, J., dissents with opinion.

**OPINION BY:** McCAIN

**OPINION**

$ **[*754]** This cause is before the Court on a petition for writ of certiorari. We have jurisdiction pursuant to Article V, Section 3(b)(3), Florida Constitution.

The respondent, Olsen, an attorney from Florida, prepared and executed an agreement in New York in which he stated that as per a "joint venture" the petitioner, Goodman, was to advance the sum of $300,000 for the purchase of 50,000 shares of stock in Omega Equities, Incorporated, $150,000 of which was characterized as a loan to Olsen. Under the terms of the agreement, Goodman was to own 25,000 shares and Olsen was to own the other 25,000 shares which he pledged as collateral on the loan.

Olsen agreed to repay the $150,000 by a stipulated date, and further agreed to purchase the petitioner's 25,000 shares at $10.00 per share in the event that Goodman desired to sell on or before a stipulated date. In addition, **[**2]** Olsen agreed that in the event that he failed to pay the stipulated purchase price, he would be liable for any sum up to $10.00 per share upon the sale of Goodman's shares.

After the execution of this agreement by Olsen, Goodman gave Olsen a check in the amount of $300,000 and Olsen purchased the stock. Olsen had repaid approximately $60,000 of the $150,000 when this action was commenced in Dade County, Florida.

Goodman filed suit seeking not only the $90,000 balance remaining on the loan but further sought damages for breach of contract for failing to buy back the 25,000 shares of stock at

$10.00 per share. Olsen defended by alleging that he had refused to buy back the stock only after he was advised that the contract was usurious.

The jury returned a verdict in favor of Olsen and upon appeal to the District Court of Appeal, Third District, that judgment was affirmed per curiam.

Before determining whether any error has been committed, it is first necessary to determine whether the Florida or New York usury statute is applicable. Then the agreement must be scrutinized to determine, under that choice of law, whether the agreement is usurious, and finally, if necessary, what **[**3]** remedies are applicable.

As to the first question, concerning the choice of law this Court in <u>Wingold v. Horowitz, 292 So. 2d 585, 586 (1974)</u>, citing **[*755]** from <u>Brown v. Case, 80 Fla. 703, 86 So. 684 (1920)</u>, stated:

> "The rule thus laid down by the Supreme Court of the United States was recognized by the Supreme Court of Florida as early as 1856.
>
> " *HN1* 'The general principle adopted by civilized nations is, that the nature, validity and interpretation of contracts, are to be governed by the lex loci of the country where the contracts are made or are to be performed; but the remedies are to be governed by the lex fori.' <u>Perry v. Lewis, 6 Fla. 555</u>."

Therefore, it is necessary to ascertain whether the agreement is usurious under the New York usury statute, since the validity of the agreement is governed by the lex loci contractus.

*HN2* The general rule in New York is that a loan is usurious where the lender is entitled to the return of the principal and the full legal rate of interest plus a bonus to be paid upon a contingency over which the borrower has no control. This contingent right to a bonus must be something of value and when added to the maximum interest **[**4]** results in a total interest in excess of the legal rate. <u>Webster v. Roe, 212 A.D. 756, 210 N.Y.S. 366 (1925)</u>; aff'd, <u>241 N.Y. 570, 150 N.E. 559 (N.Y.1925)</u>; <u>Moore v. Plaza Commercial Corp., 9 A.D.2d 223, 192 N.Y.S.2d 770 (1959)</u>, aff'd, <u>8 N.Y.2d 813, 202 N.Y.S.2d 321, 168 N.E.2d 390 (N.Y.1960)</u>; et seq.

However, an agreement to pay an amount which may be more or less than the legal interest, depending upon a reasonable contingency, is not *ipso facto* usurious, because of the possibility that more than the legal interest will be paid. <u>Hartley v. Eagle Ins. Co., 222 N.Y. 178, 118 N.E. 622 (1918)</u>; <u>In re Bechtoldt's Estate, 159 Misc. 725, 289 N.Y.S. 838</u> (Surr.Ct., Clinton Co., 1936).

Additionally, a loan has been deemed not usurious where the money is in fact advanced for the purpose of a joint venture ( <u>Salter v. Havivi, 30 Misc. 2d 251, 215 N.Y.S.2d 913</u> (Sup.Ct., N.Y.Co., 1961) or where there is *no certainty* that the bonus plus the stipulated interest will exceed the legally allowable rate of interest. <u>Richardson v. Hughitt, 76 N.Y. 55 (1879)</u>; <u>Cusick v. Ifshin, 70 Misc. 2d 564, 334 N.Y.S.2d 106</u>, aff'd, <u>73 Misc. 2d 127, 341 N.Y.S.2d 280</u> (Sup.Ct.App.Term, 1973).

Under the terms **[**5]** of the written agreement, sub judice, the statement that the agreement is a "joint venture" is not absolutely determinative of the issue, although this language contained in the agreement is an important factor to be considered in the determination of its character. The answer lies in the intent of the parties rather than the choice of language.

Notwithstanding, it is clear from the intent of the parties as reflected in their actions after the consummation of the agreement, that the parties intended a "joint venture", that is: to carry out a single business enterprise for profit, for which purpose they combined their money, efforts and skills. The record clearly shows that Goodman was or had been a banker, had money, was interested in profitable investments and had been previously associated with Olsen, who had expertise in business administration and corporate acquisitions. Additionally, Olsen initially brought to the attention of Goodman the possibility of acquisition of the Omega stock for a profitable investment.

The facts of this case are analogous with those in Orvis v. Curtiss, 157 N.Y. 657, 52 N.E. 690 (1899), rev'g 12 Misc. 434 (Dist.Ct.N.Y.City 1895). In the Orvis [**6] case, H. comes to S. and represents: The business of trading in old, rare musical instruments is a very lucrative one but it takes a lot of capital which I do not have. You have the money and I have the know-how, setup and contacts. I am asking you to come into business with me. I guarantee that you won't lose anything. You will [*756] first be repaid every cent you advance with 6% interest, and when the last item of our collection is sold, after first deducting the legitimate expenses, we will split the net profits.

Under this fact situation, the Court in Orvis held that these facts defined a partnership or joint venture and that the defense of usury was not applicable.

The only variance in the case at bar is that in addition to the Orvis minimum factors, Olsen made additional guarantees in order to induce Goodman to consummate the agreement.

Albeit, even assuming arguendo that the agreement under review was not a joint venture under New York law, the fact that the purchase-back clause, with only the possibility of damage to Olsen, created a contingency. As such, there was no certainty that the bonus to Goodman would accrue. For example, if Olsen had repaid [**7] his $150,000 and the stock increased in value, then Olsen would not have been indebted to Goodman for anything. Indeed, Olsen would have been "home free and ahead of the game." Hence, the agreement can not within reason be considered usurious. See: Cusick v. Ifshin, supra.

Finally, the last factor indicating that the parties anticipated a joint venture when they consummated the agreement is that the loan to Olsen of the $150,000 was interest free; indicating that Goodman intended to derive any and all gain not from his partner (unless the venture possibly failed) but rather from the strength of their investment.

Therefore, under the cited New York authorities, the acceptance of the interposition of the defense of usury and instructions to the jury thereon in this action tried in Florida was error.

Since the defense of usury in the trial of this cause went to the heart of the action, and since the determination of the issues and liabilities of the parties are primarily questions of fact (with the assumption there are or may be defenses other than usury to be interposed), the cause is hereby reversed and remanded for a new trial.

It is so ordered.

ADKINS, C.J., and ROBERTS, [**8] ERVIN and BOYD, JJ., concur.

OVERTON, J., dissents with opinion.

**DISSENT BY:** OVERTON

**DISSENT**

OVERTON, Justice (dissenting).

In my opinion, jurisdiction has been improperly granted. There is no conflict. I would discharge the writ and affirm the Circuit Court and the Third District Court of Appeal.

Service: **Get by LEXSEE®**
Citation: **305 So. 2d 753, 755**
View: Full
Date/Time: Sunday, March 30, 2008 - 11:03 AM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
🅀 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
✚ - Positive treatment is indicated
🄰 - Citing Refs. With Analysis Available
🅸 - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's®* | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

 LexisNexis®     About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT E

LexisNexis® *Total Research System*

Switch Client | Preferences | Sign Off | ? Help

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional A

Source: Legal > States Legal - U.S. > Florida > Find Cases > FL Federal & State Cases, Combined i
Terms: **pastor v. the union centak life insurance co., 184 f. supp. 2d 1301**  (Edit Search | Suggest Terms for My
Search | Feedback on Your Search)

↰Select for FOCUS™ or Delivery
☐

*184 F. Supp. 2d 1301, \*; 2002 U.S. Dist. LEXIS 2819, \*\*;*
*15 Fla. L. Weekly Fed. D 139*

OTTO **PASTOR,** Plaintiff, vs. THE **UNION** CENTRAL **LIFE INSURANCE** CO., Defendant.

CASE NO. 01-3993-CIV-GOLD-SIMONTON

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA

**184 F. Supp. 2d 1301**; 2002 U.S. Dist. LEXIS 2819; 15 Fla. L. Weekly Fed. D 139

January 31, 2002, Decided
February 6, 2002, Filed

**SUBSEQUENT HISTORY:** Affirmed by **Pastor** v. **Union** Cent. **Life** Ins. Co., 2005 U.S. App.
LEXIS 20555 (11th Cir. Fla., May 2, 2005)

**DISPOSITION:** **[\*\*1]** **Union** Central's motion to dismiss granted without prejudice.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff, a policyholder, sued defendant, an **insurance**
company, for statutory bad faith pursuant to Fla. Stat. ch. 624.155. The **insurance**
company moved to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6).

**OVERVIEW:** In support of its motion to dismiss, the **insurance** company argued that the
Florida law relied on by the policyholder did not apply and since the policyholder was
relying only on the state statute, the claim had to be dismissed. The court agreed with the
**insurance** company. Under the doctrine of lex loci contractus, which had to be applied
pursuant to Florida's choice of law rules, New Jersey law governed the policyholder's bad
faith claim. The **insurance** contract was executed and delivered in New Jersey when the
policyholder was a resident of that state. The court rejected the policyholder's argument
that the choice of law analysis based on Florida common law was inappropriate because
the state legislature had included a choice of law directive in the statute. The
policyholder's argument ignored the principle that, in order for the legislature to abolish or
limit a common law rule, such as lex loci contractus, it had to indicate such change clearly,
or else the rule of common law stood. Fla. Stat. ch. 624.11(1) did not clearly and plainly
specify that the legislature intended to abrogate the common law lex loci contractus rule.

**OUTCOME:** The **insurance** company's motion to dismiss was granted without prejudice.
The policyholder could file an amended complaint in compliance with the order.

**CORE TERMS:** insurer, lex loci contractus, choice of law, insured, bad faith, good faith,
insurance contract, common law, coverage, contractual, common law, cause of action,

insurance policies, insurance policies, transact, surgery, applicable provisions, citation omitted, duty to settle, settle, adhere, depression, disabled, substantive law, diversity jurisdiction, fails to state, factual allegations, disability benefits, settle claims, settle a claim

## LEXISNEXIS® HEADNOTES                                        ⊟ **Hide**

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims
Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

**HN1** ♣ To warrant dismissal of a complaint under Fed. R. Civ. P. 12(b)(6), it must be clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. Determining the propriety of granting a motion to dismiss requires courts to accept all the factual allegations in the complaint as true and to evaluate all inferences derived from those facts in the light most favorable to the plaintiff. The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low. Unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief, the complaint should not be dismissed on grounds that it fails to state a claim upon which relief can be granted. More Like This Headnote

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims
Civil Procedure > Dismissals > Involuntary Dismissals > Failures to State Claims

**HN2** ♣ To survive a motion to dismiss for failure to state a claim, a plaintiff must do more than merely label his claims. Moreover, when on the basis of a dispositive issue of law no construction of the factual allegations will support the cause of action, dismissal of the complaint is appropriate. More Like This Headnote

Insurance Law > Bad Faith & Extracontractual Liability > Remedies > Penalties

**HN3** ♣ Fla. Stat. ch. 624.155 creates a statutory civil remedy for any person against an insurer. More Like This Headnote

Insurance Law > Bad Faith & Extracontractual Liability > Settlement Obligations > General Overview
Insurance Law > Claims & Contracts > Good Faith & Fair Dealing > General Overview

**HN4** ♣ See Fla. Stat. ch. 624.155.

Civil Procedure > Jurisdiction > Jurisdictional Sources > General Overview
Civil Procedure > Federal & State Interrelationships > Erie Doctrine

**HN5** ♣ As a federal court exercising diversity jurisdiction, a court must examine the law of the forum state, which includes its choice of law rules. If the state supreme court has not issued a definitive answer on an issue before the court, it must adhere to the decisions of the state's intermediate appellate courts. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Federal & State Interrelationships > Choice of Law > Forum & Place
Contracts Law > Contract Interpretation > General Overview
Insurance Law > Claims & Contracts > Choice of Law

**HN6** ♣ When resolving conflict of laws issues in contract actions, the Florida Supreme Court unambiguously has indicated its intent to adhere to the traditional rule of lex loci contractus. Under this doctrine, absent a contractual choice of law provision, a contract is governed by the law of the state in which the contract is made, i.e., where the last act necessary to complete the contract is done. More Like This Headnote | *Shepardize:* Restrict By Headnote

Insurance Law > Bad Faith & Extracontractual Liability > Settlement Obligations > General Overview
Insurance Law > Claims & Contracts > Good Faith & Fair Dealing > General Overview

*HN7* The nature of the cause of action against an insurer for a refusal to settle in good faith within the policy limits is ex contractu, rather than in tort.  More Like This Headnote

Insurance Law > Bad Faith & Extracontractual Liability > Settlement Obligations > General Overview
Insurance Law > Claims & Contracts > Good Faith & Fair Dealing > Duty to Defend

*HN8* The contractual duty of the insured to defend justifies an implication that the insurer will exercise ordinary care and good faith in so proceeding. Accordingly, when an insurer under such a policy contract undertakes to defend an action against the insured and becomes involved in negotiations for settlement, the law imposes the duty that it act therein in good faith. It follows that the cause of action for an excess, where one arises from bad faith, is bottomed on the contract, and that the nature of an action thereon is ex contractu rather than tort. The fact that the proofs offered to establish an insurer's bad faith in this connection may include or consist of showing an act of negligence will not take the cause of action out of the contract category.  More Like This Headnote |
*Shepardize:* Restrict By Headnote

Insurance Law > Claims & Contracts > Policy Interpretation > General Overview

*HN9* Florida adheres to the traditional rule that the legal effects of terms of the **insurance** policy and rights and obligations of persons insured thereunder are to be determined by the law of the state where the policy was issued.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Contracts Law > Third Parties > General Overview
Insurance Law > Claims & Contracts > Good Faith & Fair Dealing > Payments
Torts > Business Torts > Bad Faith Breach of Contract > General Overview

*HN10* The language used in Fla. Stat. ch. 624.155(b) (1)-(3) to describe the insurer's statutory duties makes it clear that, as in common law third party claims, the good faith obligation in first party claims stems from an insurer's duties under the **insurance** contract--the duty to settle claims with due regard to an insured's interests; making payments to an insured as set forth in the coverage; and promptly settling claims when the obligation to settle is clear under the **insurance** policy coverage. Because an action for statutory bad faith sounds in contract, not tort, the doctrine of lex loci contractus determines the applicable law.  More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Federal & State Interrelationships > Choice of Law > Forum & Place
Governments > Courts > Common Law
Governments > Legislation > Interpretation

*HN11* In order for the legislature to abolish or limit a common law rule, such as lex loci contractus, it must indicate such change clearly, or else the rule of common law stands. A court, therefore, must presume that a statute was not intended to alter the common law other than by what was clearly and plainly specified in the statute.  More Like This Headnote

**COUNSEL:** Brenton N. Ver Ploeg, Esq., Stephen A. Marino, Jr., Esq., Ver Ploeg & Lympkin, P.A., Miami, FL, for Otto **Pastor,** PLAINTIFF.

Keith D. Post, Esq., Gallwey, Gillman, Curtis, Vento & Horn, P.A., Miami, FL, for The **Union** Central **Life Insurance** Co., DEFENDANT.

**JUDGES:** ALAN S. GOLD, UNITED STATES DISTRICT JUDGE. SIMONTON.

**OPINION BY:** ALAN S. GOLD

**OPINION**

**[*1302] ORDER GRANTING MOTION TO DISMISS**

**THIS CAUSE** is before the court upon defendant **Union** Central **Life Insurance** Co. ▾'s ("**Union** Central") motion to dismiss (DE # 5). The plaintiff, Otto **Pastor** ("**Pastor**"), has filed a one-count complaint against **Union** Central for statutory bad faith under Fla. Stat. § 624.155. The court has diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332. According to **Union** Central, **Pastor's** complaint must be dismissed in its entirety because Florida law does not apply to this case, and **Pastor** seeks relief only under a Florida statute. Alternatively, **Union** Central argues that **Pastor's** complaint must be dismissed in whole or in part for three reasons: (1) the complaint fails to state a claim for punitive damages, **[**2]** (2) a claim for bad faith litigation cannot be sustained, and (3) the Florida statute at issue is void for vagueness. After carefully considering the parties' arguments and the applicable case law, the court grants **Union** Central's motion to dismiss.

**Standard for Motion to Dismiss**

*HN1*▾To warrant dismissal of a complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure, it must be "clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S. Ct. 2229, 2232, 81 L. Ed. 2d 59 (1984)). Determining the propriety of granting a motion to dismiss requires courts to accept all the factual allegations in the complaint as true and to evaluate all inferences derived from those facts in the light most favorable to the plaintiff. *See Hunnings v. Texaco, Inc.*, 29 F.3d 1480, 1483 (11th Cir. 1994). The threshold of sufficiency that a complaint must meet to survive a motion to dismiss is exceedingly low. *See Ancata v. Prison Health Svcs., Inc.*, 769 F.2d 700, 703 (11th Cir. 1985) **[**3]** (citation omitted); *Jackam v. Hospital Corp. of America Mideast, Ltd.*, 800 F.2d 1577, 1579 (11th Cir. 1983). "Unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," the complaint should not be dismissed on grounds that it fails to state a claim upon which relief can be granted. *M/V Sea Lion V v.* **[*1303]** *Reyes*, 23 F.3d 345, 347 (11th Cir. 1994) (citation omitted). Nevertheless, *HN2*▾to survive a motion to dismiss, a plaintiff must do more than merely "label" his claims. *Blumel v. Mylander*, 919 F. Supp. 423, 425 (M.D. Fla. 1996). Moreover, when on the basis of a dispositive issue of law no construction of the factual allegations will support the cause of action, dismissal of the complaint is appropriate. *Marshall County Bd. of Educ. v. Marshall County Gas Dist.*, 992 F.2d 1171, 1174 (11th Cir. 1993).

**The Facts**

1

**FOOTNOTES**

1 The following facts are derived from the allegations contained in **Pastor's** complaint.

[**4]  In 1979 and 1981, **Pastor** purchased two disability **insurance** policies from **Union** Central, his employer at the time. On July 14, 1993, **Pastor** underwent curative surgery for prostate cancer. **Pastor** was hospitalized for an extended period after the surgery due to post-surgical complications. In November of 1993, **Pastor** began to suffer from depression. This condition was exacerbated by the death of his brother and mother while **Pastor** continued to recover from his surgery. By the time **Pastor** recovered from the surgery in January of 1994, his depression had reached the stage where it rendered him incapable of engaging in the sort of personal contact necessary to perform the duties of his occupation as an **insurance** salesman for **Union** Central. *See* Compl. at P 15. **Pastor's** psychiatrist prepared an attending physician's statement for **Union** Central to this effect.

From the onset of **Pastor's** cancer and throughout his affliction with depression, **Union** Central allegedly adopted a hostile and adversarial position to **Pastor's** claim for benefits. *See* Compl. at P 16. According to **Pastor**, even before he underwent the medical examinations ordered by **Union** Central, the **insurance** company claimed [**5]  that **Pastor** was not disabled, and it attempted to build a case to terminate **Pastor's** benefits, rather than embarking upon a legitimate investigation. *See* Compl. at P 19. For example, in an effort to buttress its premature determination that **Pastor** was not disabled, **Union** Central hired The Psych Team, whose employees possessed no medical education or background, to allegedly create evidence to justify denial of **Pastor's** claim. *See* Compl. at P 20. The Psych Team conducted covert surveillance of **Pastor** and suspended its surveillance when it began to collect evidence that actually supported **Pastor's** claim. *See* Compl. at P 22. **Union** Central also accused **Pastor** of selling **insurance** while concealing sales by using his daughter, a licensed **insurance** broker, as a front. *See* Compl. at P 23. Additionally, **Union** Central allegedly discarded some of its records regarding its investigation of **Pastor's** claim. *See* Compl. at P 23.

**Union** Central terminated **Pastor's** claim payments on February 13, 1995, retroactive to January 15, 1995. It also terminated **Pastor's** agency contract for failing to return to work. From this point forward, **Union** Central refused to consider additional evidence [**6] regarding **Pastor's** claim.

On August 23, 1995, **Pastor** brought suit against **Union** Central in Dade County Circuit Court. Throughout the litigation, **Union** Central allegedly employed tactics designed to maximize the expense and pressure on **Pastor** and his counsel by demanding large volumes of documents from **Pastor** and third parties. *See* Compl. at P 27. **Union** Central also accused **Pastor,** his friends, and his family of **insurance** fraud.

The trial for **Pastor's** state action lasted three days. On January 15, 1995, **Pastor** obtained a judgment in Dade County Circuit Court against **Union** Central, declaring him disabled as of January 15, 1995, [*1304] and continuously from that date through the time of trial. **Union** Central paid the judgment in August of 2001. **Pastor** claims that this six-year period of litigation and **Union** Central's conduct throughout the course of the investigation and litigation constitutes a violation by **Union** Central of Florida's law outlawing an **insurance** company's failure to settle a claim in good faith.

## Analysis

The central issue in this motion to dismiss is the applicability of Fla. Stat. § 624.155. *HN3* ✦This provision creates a statutory civil remedy for any person against [**7]  an insurer:

  *HN4*✦when such a person is damaged:

. . . .

(b) By the commission of any of the following acts by the insurer:

1. Not attempting in good faith to settle claims when, under all the circumstances, it could and should have done so, had it acted fairly and honestly toward its insured and with due regard for her or his interests;

2. Making claims payments to insureds or beneficiaries not accompanied by a statement setting forth the coverage under which payments are being made; or

3. Except as to liability coverages, failing to promptly settle claims, when the obligation to settle a claim has become reasonably clear, under one portion of the **insurance** policy coverage in order to influence settlements under other portions of the **insurance** policy coverage.

Fla. Stat. § 624.155(1)(b). **Union** Central utilizes a traditional choice of law analysis in support of its position that the Florida statute does not apply to this case, which involves an **insurance** contract that was executed in New Jersey. **Pastor** contends that a choice of law analysis based on Florida common law is inappropriate because the Florida legislature has included a choice of law directive in the statute.  **[\*\*8]** Although this case presents a close question, the court agrees with **Union** Central that traditional choice of law analysis is appropriate and that Florida law does not apply to this case.

## I. Choice of Law: General Principles

Federal jurisdiction in this case is based on diversity of citizenship, and Florida is the forum state. *HN5* As a federal court exercising diversity jurisdiction, this court must examine the law of the forum state, which includes its choice of law rules, to determine whether Fla. Stat. § 624.155 is applicable here. See *McMahan v. Toto*, 256 F.3d 1120, 1131 (11th Cir. 2001) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S. Ct. 1020, 1021, 85 L. Ed. 1477 (1941)); *Fioretti v. Mass. Gen. Life Ins. Co.*, 53 F.3d 1228, 1235 (11th Cir. 1995). If the Florida Supreme Court has not issued a definitive answer on an issue before this court, it must adhere to the decisions of the state's intermediate appellate courts. See *Fioretti, 53 F.3d at 1236 n. 28* (citations omitted).

## II. The Doctrine of *Lex Loci Contractus*

If this case had involved **Pastor's** claim against **Union [\*\*9]** Central for recovery of his disability benefits under the **insurance** contracts (the issue litigation in the state court), it is clear that New Jersey law would govern the controversy. This is because, *HN6* when resolving conflict of laws issues in contract actions, the Florida Supreme Court unambiguously has indicated its intent to adhere to the traditional rule of *lex loci contractus*. See *Sturiano v. Brooks*, 523 So. 2d 1126, 1129 (holding that *lex loci contractus* doctrine governs disputes involving automobile **insurance**) (Fla. 1988); *Goodman v. Olsen*, 305 So. 2d 753, 755 (Fla. 1974) (same, for contracts in general); *see also Fioretti*, 53 F.3d at 1235 (discussing *lex loci contractus* rule in Florida). Under this doctrine, absent a contractual  **[\*1305]** choice of law provision, a contract is governed by the law of the state in which the contract is made, *i.e.*, where the last act necessary to complete the contract is done. See *Sturiano*, 523 So. 2d at 1129 (discussing *lex loci contractus* doctrine); *Equitable Life Ass. Soc'y of the U.S.A. v. McRee*, 75 Fla. 257, 78 So. 22, 24 (1918) (same); *see also Fioretti*, 53 F.3d at 1235 **[\*\*10]** (discussing *lex loci contractus* doctrine and stating that it applies to **life insurance** policies, as well as automobile **insurance** policies). Because the **insurance** contracts in this case were delivered to **Pastor** in New Jersey while he was a resident of that state, New Jersey law would govern a dispute regarding the terms of the contracts. See

*Fioretti*, 53 F.3d at 1235 (finding that dispute over **life insurance** policies was governed by New Jersey's substantive **insurance** law where agreement was executed in New Jersey); *Bloch v. Berkshire Ins. Co.*, 585 So. 2d 1137 (Fla. 3d DCA 1991) (finding that dispute over **insurance** contract was governed by New York law where contract was delivered to claim in New York, where he resided).

The applicability of *lex loci contractus* to this case, however, is not automatic because a contractual claim for disability benefits is not at issue. Instead, **Pastor** has brought a claim against **Union** Central for the alleged violation of its duty to settle a claim under a contract in good faith. While **Pastor** contends that such a claim sounds in tort, **Union** Central contends that it sounds in contract. The Supreme Court of Florida **[**11]** resolved this issue in *Nationwide Mutual **Insurance** Co. v. McNulty*, 229 So. 2d 585 (Fla. 1970), where it stated that *HN7*the nature of the cause of action against an insurer for a refusal to settle in good faith within the policy limits is *ex contractu*, rather than in tort. In *McNulty*, an insured judgment debtor sought to recover against his insurer for excess of the judgment obtained by a third party. *Id.* at 585. The plaintiff based its complaint on negligence and common law bad faith refusal to settle. ² *See id.* According to the Florida Supreme Court:

> *HN8*The contractual duty of the insured to defend justifies an implication that the insurer will exercise ordinary care and good faith in so proceeding. Accordingly, when an insurer under such a policy contract undertakes to defend an action against the insured and becomes involved in negotiations for settlement, the law imposes the duty that it act therein in good faith. It follows that the cause of action for an 'excess,' where one arises from bad faith, is bottomed on the contract, and that the nature of an action thereon is ex contractu rather than in tort. *The fact that the proofs offered **[**12]** to establish an insurer's bad faith in this connection may include or consist of showing an act of negligence will not take the cause of action out of the contract category.*

*Id.* at 586 (emphasis added). *See also LaTorre v. Conn. Mut. **Life** Ins. Co.*, 38 F.3d 538, 540 (11th Cir. 1994) *HN9*("Florida adheres to the traditional rule that the legal effects of terms of the **insurance** policy *and rights and obligations of persons insured thereunder* are to be determined by the law of the state where the policy was issued.") (emphasis added).

### FOOTNOTES

2 When *McNulty* was decided, the Florida legislature had not yet enacted Fla. Stat. § 624.155.

Like the insurer in *McNulty*, **Union** Central's contractual duty to pay **Pastor** disability proceeds arises out of the **insurance** contracts. Just as the insurer in *McNulty* had an implied duty from its contracts to defend its insureds in good faith, **Union** Central has an implied duty to **[*1306]** settle, investigate, and pay the insureds' claims in good faith.

**[**13]** **Pastor** contends that *McNulty* is inapplicable to this case because it involved a third party's common law claim for good faith, whereas this case involves a first party's statutory claim for good faith. Such an argument presents a distinction without a difference, for Fla. Stat. § 624.155 does nothing more than extend the common law remedy of third parties to **insurance** contracts to first parties. There is nothing to support **Pastor's** contention that common law and statutory good faith actions should be characterized

differently simply because they are brought by different parties. Both types of actions are similar because they arise from an insurer's implied obligations under a contract. In fact, **HN10** the language used in Fla. Stat. § 624.155(1)(b)(1)-(3) to describe the insurer's statutory duties makes it clear that, as in common law third party claims, the good faith obligation in first party claims stems from an insurer's duties under the **insurance** contract-- the duty to settle claims with due regard to an insured's interests; making payments to an insured as set forth in the coverage; and promptly settling claims when the obligation to settle is clear under the "**insurance** policy coverage". **[\*\*14]** Because an action for statutory bad faith sounds in contract, not tort, the doctrine of *lex loci contractus* determines the applicable law in this case.

In *Allstate **Insurance** Co. v. Clohessy*, 32 F. Supp. 2d 1328 (M.D. Fla. 1998), a district court in the Middle District of Florida arrived at the same conclusion. ³ Like **Pastor,** the insured in *Clohessy*, filed a bad faith claim against his insurer pursuant to Fla. Stat. § 624.155. The court engaged in choice of law analysis under Florida law, held that the *lex loci contractus* doctrine controlled, and found that, under that rule, Florida law governed the claim. The court rejected the argument that the first party statutory bad faith claim was akin to a tort suit. Instead, it stated, "The bad faith counterclaim is essentially asking this court to find that [the insured] has breached its obligations and duties under the policy. Such a finding or analysis by this Court necessarily involves interpreting the provisions of the contract as well as what actions or inactions on behalf of [the insured] constitute grounds for a bad faith finding." *Id.* at 1331. According to the court, Florida law, **[\*\*15]** and therefore Fla. Stat. § 624.155, applied under the *lex loci contractus* rule because the contract was executed in Florida. Here, the same rule compels the finding that New Jersey law applies because the **insurance** contract was executed in New Jersey. As such, Fla. Stat. § 624.155 does not govern **Union** Central's duties in this case.

## FOOTNOTES

3 Neither the Florida Supreme Court nor the intermediate appellate courts have had an opportunity to decide whether Fla. Stat. § 624.155 sounds in tort or contract, or whether that provision applies to an **insurance** contract executed outside of Florida.

In opposition to **Union** Central's motion to dismiss, **Pastor** contends that the above-cited decisions are irrelevant and that the court need not employ choice of law analysis because the Florida legislature has included a choice of law provision in the **Insurance** Code that is to govern all **insurance** companies conducting business in Florida. Section 624.11(1) of the Florida Statutes provides, "No person shall transact **insurance** in **[\*\*16]** this state . . . without complying with the applicable provisions of this code." According to **Pastor,** this language indicates the legislature's intent to bind all insurers to every provision of the **Insurance** Code.

**Pastor's** argument is flawed in many respects. First, it is important to note that Fla. Stat. § 624.11(1) qualifies the governance of the **Insurance** Code with the **[\*1307]** phrase "the applicable provisions of this code." Whether Fla. Stat. § 624.115 is applicable to this case is the question that the court is attempting to address in this choice of law analysis. If the result of a court's choice of law exercise is that Florida law applies, then Fla. Stat. § 624.115 will be "applicable" under § 624.11(1), and an insurer will have to comply with the Code. However, if the provision is not "applicable" because the law of another state controls, then the insurer will not have to comply with the Florida **Insurance** Code.

More importantly, **Pastor's** position ignores the principle that, **HN11** in order for the legislature to abolish or limit a common law rule, such as *lex loci contractus*, it "must indicate such change clearly, or else the rule of common law stands." *Wal-Mart Stores, Inc. v.*

*McDonald*, 676 So. 2d 12, 17 (Fla. 1st DCA 1996). **[\*\*17]** The court, therefore, must presume that a statute "was not intended to alter the common law other than by what was clearly and plainly specified in the statute." *Ady v. Am. Honda Fin. Corp.*, 675 So. 2d 577, 581 (Fla. 1996). Section 624.11(1) does not "clearly and plainly specify" that the legislature intended to abrogate the common law *lex loci contractus* rule. In comparison, the legislature made such an intent clear in the statute at issue in *Sanchez v. Sanchez de Davila*, 547 So. 2d 943 (Fla. 3d DCA 1989). In *Sanchez*, the court held that the statute under review codified the applicable choice of law rule because it stated, "The law of this state . . . shall govern all aspects . . . regardless of the citizenship, residence, location, or domicile of any other party." *Id.* at 945 (quoting Fla. Stat. § 655.55). Similarly, in *BDO Seidman, LLP v. British Car Auctions, Inc.*, 802 So. 2d 366, 2001 WL 1335013 (Fla. 4th DCA 2001), the abrogation of the statutory common law rule was clear, where the statute stated that the provision at issue applied to "any civil action for damages filed in the courts of this **[\*\*18]** state." 802 So. 2d 366, [WL] at *1 (quoting Fla. Stat. § 768.79(1)).

If the Florida legislature had intended to abandon the *lex loci contractus* rule for **insurance** disputes, it could have done so by stating that the Code would apply in "any civil action for damages filed in the courts of this state," as it did in *BDO Seidman*, or that the "law of this state" would govern all aspects of **insurance**, regardless of the place of the execution of the contract, as it did in *Sanchez*. Absent such a clear expression, this court will not construe Fla. Stat. § 624.11(1) as an abrogation of the common law choice of law rules.

Finally, the statutory interpretation proposed by **Pastor** would be in derogation of the common law policies surrounding the *lex loci contractus* rule and, therefore, must be strictly construed. *Cf. Talat Enters., Inc. v. Aetna Cas. & Sur. Co.*, 753 So. 2d 1278, 1283 (Fla. 2000) (stating that Fla. Stat. § 624.155 must be strictly construed because it is in derogation of common law). The fundamental policy concern of Florida's longstanding *lex loci contractus* rule in **insurance** cases is that parties should not be permitted to modify contracts simply by **[\*\*19]** moving to another state. *See Sturiano v. Brooks*, 523 So. 2d 1126, 1129-30 (Fla. 1988). As the Florida Supreme Court has explained:

> Parties have a right to know what the agreement they have executed provides. To allow one party to modify the contract simply by moving to another state would substantially restrict the power to enter into valid, binding, and stable contracts. There can be no doubt that the parties to **insurance** contracts bargained and paid for the provisions in the agreement, including those provisions that apply the statutory law of that state.

*Id.* That is, when **Pastor** and **Union** Central executed their contracts in New Jersey, **[\*1308]** they expected that New Jersey law would control. At the time they entered into these agreements, **Union** Central could not have anticipated that it might one day be bound by Florida's statutory good faith obligation. Application of the *lex loci contractus* rule gives certainty to the question of what law will govern in the event that an insurer fails to carry out the implied contractual obligation of good faith. Otherwise, under **Pastor's** interpretation of Florida's **Insurance** Code, an insured conceivably could **[\*\*20]** bring a bad faith claim under the law of any state having a provision similar to Fla. Stat. § 624.11(1) and where the insurer transacts business. For example, an insurer who enters into a contract with an insured in California and who transacts business in California, Florida, New York, and New Jersey, potentially can be liable to the insured for a bad faith violation under the law of all four states if each of these states has enacted a provision like Fla. Stat. § 624.11(1), which provides, "No person shall transact **insurance** in this state . . . without complying with the applicable provisions of this code".

Additionally, if this court were to adopt **Pastor's** position, the district court's application of state law would become unnecessarily complicated in cases such as this. Although the two

questions are intimately related, disputes involving the payment of claims potentially would be determined by the law of the state where the contract was executed (here, New Jersey), while the bad faith claim would be determined by the law of another state (here, Florida). Florida's rule of *lex loci contractus* seeks to avoid such a fragmented result. *Cf. McMahan v. Toto*, 256 F.3d 1120, 1133 (11th Cir. 2001) **[\*\*21]** (stating that Supreme Court of Florida would not apply Florida substantive law to one aspect of a case that was otherwise governed by substantive law of another state).

## III. Conclusion

Under the doctrine of *lex loci contractus*, which must be applied here pursuant to Florida's choice of law rules, New Jersey governs **Pastor's** bad faith claim. In his complaint, **Pastor** seeks relief only under Fla. Stat. § 624.115. Because Florida law is inapplicable to this dispute, **Pastor's** complaint must be dismissed for failure to state a claim. [4] Accordingly, it is hereby:

## FOOTNOTES

[4] Because the choice of law issue is dispositive of **Union** Central's motion, the court does not address **Union** Central's remaining arguments in support of dismissal.

## ORDERED AND ADJUDGED THAT:

1. **Union** Central's motion to dismiss (DE # 5) is GRANTED WITHOUT PREJUDICE.

2. By February 25, 2002, **Pastor** may file an amended complaint in compliance with this order. Failure to file a timely complaint will result in a dismissal of this case.

**[\*\*22]** DONE AND ORDERED in Chambers at Miami, Florida, this 31 day of January, 2002.

ALAN S. GOLD

UNITED STATES DISTRICT JUDGE

Source:  Legal > States Legal - U.S. > Florida > Find Cases > **FL Federal & State Cases, Combined** ⓘ
Terms:  pastor v. the union centak life insurance co., 184 f. supp. 2d 1301  (Edit Search | Suggest Terms for My Search | Feedback on Your Search)
View:  Full
Date/Time:  Sunday, March 30, 2008 - 11:02 AM EDT

* Signal Legend:
● -  Warning: Negative treatment is indicated
Ⓠ -  Questioned: Validity questioned by citing refs
⚠ -  Caution: Possible negative treatment
◆ -  Positive treatment is indicated
Ⓐ -  Citing Refs. With Analysis Available
ⓘ -  Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

Advisor | Counsel Selector

History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help

 **LexisNexis®**

About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

EXHIBIT F

LexisNexis® *Total Research System*

Service: **Get by LEXSEE®**
Citation: **585 So. 2d 1137**

*585 So. 2d 1137, *; 1991 Fla. App. LEXIS 9088, **;*
*16 Fla. L. Weekly D 2443*

EDWARD J. BLOCH, Appellant, v. BERKSHIRE INSURANCE COMPANY, Appellee

Case No. 91-859

Court of Appeal of Florida, Third District

585 So. 2d 1137; 1991 Fla. App. LEXIS 9088; 16 Fla. L. Weekly D 2443

September 17, 1991, Filed

**SUBSEQUENT HISTORY:  [**1]**  Released for Publication October 3, 1991.

**PRIOR HISTORY:** An Appeal from the Circuit Court for Dade County, Amy N. Dean, Judge.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Appeal from judgment of the Circuit Court for Dade County (Florida) granting summary judgment in favor of appellee in action to reinstate insurance policy.

**OVERVIEW:** Appellant was insured under a life insurance policy issued by appellee, which provided for waiver of premiums during total disability. Appellant was rendered disabled within the meaning of the policy in a traffic accident. Appellant canceled policy after becoming disabled and later learned of premiums waiver provision and sued for reinstatement of the policy. The trial court entered summary judgment in favor of appellee accepting argument that appellant could have or should have learned of the waiver of premium provision by reading policy. The appellate court reversed, finding that appellant had a misapprehension about extent of disability and premiums waiver provision and that such fact would not preclude benefits to appellant that he was entitled to at time of accident, but rather equity would grant relief, restoring insured benefit already paid for and preventing unjust enrichment of appellee.

**OUTCOME:** The appellate court reversed summary judgment in favor of appellee, finding that appellant's mistake would not preclude benefits to appellant that he was entitled to at time of accident, but rather equity would grant relief, restoring insured benefit already paid for and preventing unjust enrichment of appellee.

**CORE TERMS:** insured, insurer's, insurance policy, waiver of premiums, premium, summary judgment, disability, disabling, coverage, surgery, present case, disabled, amount attributable, cancellation, favorable, reduction, mistaken, movant, final judgment, reinstatement

**LEXISNEXIS® HEADNOTES**                                          ⊟**Hide**

Civil Procedure > Summary Judgment > Burdens of Production & Proof > General Overview 🔍
    Civil Procedure > Summary Judgment > Standards > General Overview 🔍

HN1 ⬇ It is axiomatic that the movant for summary judgment bears the burden of showing the nonexistence of any disputed issue of material fact, and that the movant is entitled to summary judgment as a matter of law. The court must, therefore, read the record in the light most favorable to the non moving party, and must construe the facts according to the rules of decision of New York. More Like This Headnote | *Shepardize: Restrict By Headnote*

    Contracts Law > Breach > General Overview 🔍
    Contracts Law > Defenses > Ambiguity & Mistake > General Overview 🔍
    Contracts Law > Formation > Ambiguity & Mistake > General Overview 🔍

HN2 ⬇ Under New York law, it is well settled that a court of equity will relieve by ordering the cancellation or rescission of an agreement upon the ground of a mistake of fact material to one party alone where there is no prejudice to the other contracting party by reason of a change of position. More Like This Headnote | *Shepardize: Restrict By Headnote*

**COUNSEL:** Michael P. Gable, for appellant.

Steel Hector & Davis and Gregory N. Anderson and Robert Harris, for appellee.

**JUDGES:** Nesbitt, Cope and Gersten, JJ.

**OPINION BY:** PER CURIAM

**OPINION**

[*1137] Edward J. Bloch appeals a summary final judgment for the defendant insurer, Berkshire Life Insurance Company ▾, in an action to reinstate an insurance policy. We reverse.

As to the choice of law issue, we agree with the trial court that this insurance contract, which was delivered to Bloch in New York where he then resided, was regulated by New York, rather than Florida, law. See *Reliable Life Insurance Co. v. Trimble, 502 So.2d 1303, 1304 (Fla. 1st DCA 1987); Continental Insurance Co. v. Howe, 488 So.2d 917, 918 (Fla. 3d DCA), review denied, 494 So.2d 1151 (Fla. 1986); see also Sturiano v. Brooks, 523 So.2d 1126, 1129-30 (Fla. 1988).*

On the merits, however, we reverse. Bloch was the insured under a life insurance policy issued by appellee Berkshire Life Insurance Company in 1977. The annual premium was [**2] approximately $ 7,000. The policy provided for waiver of premiums during total disability.

On November 1, 1987, Bloch was in a traffic accident. Surgery was attempted for his injuries, but yielded little improvement. Bloch is disabled within the meaning of the policy.

[*1138] During December, 1987, Bloch canceled the insurance policy. After he learned, in the summer of 1988, that the insurance policy had a waiver of premiums provision, Bloch sued for reinstatement of the policy. The trial court entered summary judgment, accepting the insurance company's argument that Bloch could have or should have learned of the waiver of premium provision by reading the policy.

*HN1* It is, of course, axiomatic that the movant for summary judgment bears the burden of showing the nonexistence of any disputed issue of material fact, and that the movant is entitled to summary judgment as a matter of law. *Wills v. Sears, Roebuck & Co.,* 351 So.2d 29, 30 (Fla. 1977); Fla. R. Civ. P. 1.510(c). We must, therefore, read the record in the light most favorable to the plaintiff, Bloch, and must construe the facts according to the rules of decision of New York.

Construing the record in that light, the **[**3]** summary judgment should not have been *HN2* entered. Under New York law, "it is well settled that a court of equity will relieve by ordering the cancellation or rescission of an agreement upon the ground of a mistake of fact material to one party alone where there is no prejudice to the other contracting party by reason of a change of position . . . ." *Seidman v. New York Life Insurance Co.,* 162 Misc. 560, __, 296 N.Y.S. 55, 56 (N.Y. Sup. Ct.), aff'd, 253 A.D. 804, 2 N.Y.S.2d 634 (N.Y. App. Div. 1937), aff'd, 279 N.Y. 620, 17 N.E.2d 680 (N.Y. 1938); *accord Broadway-111th Street Associates v. Morris,* 160 A.D.2d 182, 184-85, 553 N.Y.S.2d 153, 155 (N.Y. App. Div. 1990); *American Motorists Insurance Co. v. Reich,* 237 N.Y.S.2d 369, 371 (N.Y. Sup. Ct. 1963).

*Seidman* is factually very close to the present case. There, the court said, "it is clear from the evidence that the plaintiff was totally disabled within the terms of the policy at the time the application to reduce was made and acted upon, and that he was mistaken both as to the extent of **[**4]** his disability and as to the precise coverage of the policy." 162 Misc. 560, __, 296 N.Y.S. at 56. The policy in that case had been held by the insured for approximately eight years prior to the disabling event. In that case the insured, after the disabling event, requested a reduction of the disability provision (with a resultant reduction in premium), at a time when the insured was entitled to have the premiums waived entirely. The court held that "the parties may be restored to the status quo ante without prejudice to the insurer. The defendant [insurer] is merely divested of an advantage which in good conscience and law it is not entitled to retain." 162 Misc. 560, __, 296 N.Y.S. at 57.

Construing the facts of the present case in the light most favorable to Bloch, he suffered a disabling accident on November 1, 1987. He initially expected his condition to improve and had surgery in December, 1987. At some point around the time of the scheduled surgery, he submitted the notice of cancellation to the insurer. The insurer paid him the cash surrender value of the life insurance policy. [1] The anticipated benefits of the surgery **[**5]** never materialized, and it is undisputed that Bloch is disabled within the definition of the policy. These circumstances are parallel to those in the *Seidman* case.

### FOOTNOTES

1 Bloch agrees that as a condition of reinstatement of the insurance policy, he must repay to the insurer the value received by him, with interest.

The insurer contends that under New York law, Bloch was required to read and note the contents of his insurance policy. *See Metzger v. Aetna Insurance Co.,* 227 N.Y. 411, __, 125 N.E. 814, 816 (N.Y. 1920). Not only is that case clearly distinguishable, [2] it is also clear that the New York courts have recognized an exception for an insured's mistake of the type presented here.

### FOOTNOTES

2 In *Metzger* the insured had a mistaken belief that he had purchased coverage he had not in fact purchased. Here, the insured had purchased the relevant coverage and was

entitled to the benefit of the coverage already paid for.

**[\*\*6]**  The logic of the New York position appears clear. Part of the policy premium was an amount attributable to the waiver **[\*1139]** of premium provision. [3] In *Seidman,* and in the present case, the premiums were paid for a period of years. When the disabling accident occurred, that triggered an entitlement to the waiver of premium benefit under the policy. The fact that there was a misapprehension by the insured about the extent of the disability and the premium waiver provision will not oust the insured of benefits. Instead, equity will grant relief, thereby restoring to the insured a benefit he had already paid for, while preventing unjust enrichment of the insurance company. *See* 162 Misc. 560,    , 296 N.Y.S. at 57.

## FOOTNOTES

[3] In the present case there was a specified amount attributable to the waiver of premium provision.

On the record here presented, the insurer's motion for summary judgment should have been denied. We therefore reverse the summary final judgment and remand for further proceedings **[\*\*7]** consistent herewith.

Service: **Get by LEXSEE®**
Citation: **585 So. 2d 1137**
View: Full
Date/Time: Sunday, March 30, 2008 - 11:05 AM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
🄠 - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
🄐 - Citing Refs. With Analysis Available
🄘 - Citation information available
* Click on any *Shepard's* signal to *Shepardize*® that case.

 About LexisNexis | Terms & Conditions  | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

EXHIBIT G

**LexisNexis®** *Total Research System*          Switch Client ┊ Preferences ┊ Sign Off ┊ ? Help

*My Lexis*™ ┊ Search ┊ Research Tasks ┊ Get a Document ┊ *Shepard's*® ┊ Alerts ┊ Total Litigator ┊ Transactional A

Service: **Get by LEXSEE®**
Citation: **38 F.3d 538, 540**

*38 F.3d 538, *; 1994 U.S. App. LEXIS 32672, **;*
*8 Fla. L. Weekly Fed. C 826*

Esther LaTORRE, Plaintiff-Appellee, v. CONNECTICUT MUTUAL LIFE INSURANCE CO.,
Defendant-Appellant.

No. 93-3365.

UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

38 F.3d 538; 1994 U.S. App. LEXIS 32672; 8 Fla. L. Weekly Fed. C 826

November 18, 1994, Decided

**PRIOR HISTORY: [**1]** Appeal from the United States District Court For the Northern
District of Florida. (No. 92-40149-WS). William Stafford, Judge.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Defendant life insurance company appealed from a decision of
the United States District Court for the Northern District of Florida, which granted
summary judgment to plaintiff in an action to recover under an insurance policy.

**OVERVIEW:** Plaintiff's husband, insured, applied to defendant insurance company for a
life insurance policy. The policy stated that defendant could not contest the policy after
two years for any reason except nonpayment of the premium. When insured died, the
premiums were paid and plaintiff made a claim to collect under the policy. Defendant
denied the claim because the insured had failed to get a physical, and, as the two-year
period of time had not elapsed, defendant could deny for any reason. Defendant claimed
the two years ran from the date the formal policy was issued and the trial court held that
an argument could be made that the policy ran from payment of the first premium, and
not date of formal issue, thus her husband would be covered. The trial court stated that all
ambiguities should be resolved in favor of the insured and the appellate court affirmed.

**OUTCOME:** Defendant life insurance company's appeal was denied and the appellate court
affirmed summary judgment in favor of plaintiff in an action to recover under an insurance
policy.

**CORE TERMS:** conditional, insured, premium, coverage, incontestability clause,
contestability, insurance policy, ambiguity, suicide, date of issue, beneficiary, applied-for,
summary judgment, incontestability, insurability, issuance, notice, life insurance, contest,
died, insurance contract, misrepresentations, omissions, insurer, ies, policy of insurance,
death benefits, deny coverage, contracts of insurance, entire contract

## LEXISNEXIS® HEADNOTES                                      ⊟ **Hide**

Civil Procedure > Summary Judgment > Appellate Review > Standards of Review
Civil Procedure > Appeals > Standards of Review > De Novo Review
*HN1* An appellate court should review the district court's grant of summary judgment de novo and apply the same standards as those controlling the district court. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Discovery > Methods > General Overview
Civil Procedure > Summary Judgment > Standards > Genuine Disputes
Civil Procedure > Summary Judgment > Standards > Legal Entitlement
*HN2* Summary judgment is proper pursuant to Fed. R. Civ. P. 56(c), if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. More Like This Headnote | *Shepardize:* Restrict By Headnote

Civil Procedure > Jurisdiction > Diversity Jurisdiction > General Overview
*HN3* In diversity cases, a federal court applies the law of the forum in which it sits. More Like This Headnote | *Shepardize:* Restrict By Headnote

Contracts Law > Defenses > Ambiguity & Mistake > General Overview
Contracts Law > Formation > Ambiguity & Mistake > General Overview
Insurance Law > Claims & Contracts > Policy Interpretation > Ambiguous Terms > General Overview
*HN4* Under Florida law, ambiguities in insurance contracts must be resolved in favor of the insured. More Like This Headnote | *Shepardize:* Restrict By Headnote

**COUNSEL:** For Defendant-Appellant: ROBERT R. McDONALD, GREENBERG, TRAURIG, HOFFMAN, LIPOFF, ROSEN & QUENTEL, Tallahassee, FL.

For Plaintiff-Appellee: James T. Harrison, Jr., Tallahassee, FL.

**JUDGES:** Before HATCHETT and BLACK, Circuit Judges, and YOUNG, * Senior District Judge.


* Honorable George C. Young, Senior U.S. District Judge for the Middle District of Florida, sitting by designation.

**OPINION BY:** HATCHETT

**OPINION**


[*538] HATCHETT, Circuit Judge:

Appellant, Connecticut Mutual Life Insurance Company (Connecticut Mutual), appeals the decision of the district court granting summary judgment to Esther LaTorre (The Beneficiary) in an action to recover under an insurance policy. We affirm.

FACTS

On February 8, 1989, Mario LaTorre, a New York resident, applied to Connecticut Mutual Life Insurance Company for a life insurance policy. The application contained the following provision: "If a premium is paid with this application, the Company's

liability is stated in a Conditional Advance Premium Receipt." After completing Parts One and Two of the application and upon payment of the annual premium, Mario LaTorre **[\*539]** received a Conditional Advance Premium Receipt dated February 8, 1989. The receipt provided that coverage would begin "at the later of the completion of the Application Part **[\*\*2]** I and Part II including the completion of any physical examination required when the Part II is first completed." The district court found that neither party contended that Mario LaTorre was required to submit to a physical examination. Therefore, the district court assumed that he received limited coverage under the applied for policy on February 8, 1989. The conditional receipt provided that terms of the applied-for policy would govern Connecticut Mutual's liability, "except as limited by this receipt." The receipt contained several limiting provisions, but did not mention an incontestability clause.

On February 22, 1998, Connecticut Mutual issued the formal insurance policy to Mario LaTorre. It contained an incontestability clause providing that Connecticut Mutual "cannot contest this policy, except for nonpayment of premium after it has been in force during the lifetime of the Insured for a period of two years from the Date of Issue." The policy also established February 22, 1989, as the date of issue.

Mario LaTorre died on February 15, 1991. At the time of his death, more than two years had passed since he completed the application, paid his first premium, and received the conditional **[\*\*3]** receipt; but, he died less than two years after Connecticut Mutual issued the formal policy of insurance. Connecticut Mutual exercised its purported right to contest coverage under the policy and refused to pay the policy benefits on the grounds that Mario LaTorre had allegedly failed to disclose on his application that he suffered from acquired immune deficiency syndrome (AIDS). Connecticut Mutual claimed that the incontestability clause did not become effective until the date of issue established by the formal policy, February 22, 1989; therefore, the two year contestability period had not yet lapsed when Mario LaTorre died. Thus, Connecticut Mutual asserted the right to deny coverage based on Mario LaTorre's alleged misrepresentations and omissions.

PROCEDURAL HISTORY

The beneficiary filed a declaratory judgment action in a Florida state court to determine the right to payment under the policy. Pursuant to 28 U.S.C. § 1441(a), Connecticut Mutual removed the action to federal district court where the beneficiary subsequently filed a motion for summary judgment. The district court determined that the contestability period should be measured from **[\*\*4]** the date of issuance of the conditional receipt. The district court noted that its finding was consistent with New York law requiring that the application, conditional receipt, and policy be read together as one contract. The district court also ruled that the ambiguity concerning whether the incontestability clause went into effect on February 8, 1989, the date of issuance of the conditional receipt, or February 22, 1989, the date of issue in the formal policy, should be construed against Connecticut Mutual. Because Mario LaTorre's death occurred more than two years after February 8, 1989, the district court held that Connecticut Mutual was barred from using his alleged misrepresentations and omissions as a basis for contesting the beneficiary's claim for death benefits.

CONTENTIONS

Connecticut Mutual contends that the two year incontestability clause became effective on the date of issue stated in the formal policy rather than the date the application for the policy was completed and the conditional receipt issued.

The beneficiary contends that the incontestability clause became effective on the date Mario LaTorre received the Conditional Advance Premium Receipt, and that the **[\*\*5]** application, taken as a whole, embodies an ambiguity as to the effective date of the incontestability clause. Moreover, because Mario LaTorre had no way to resolve this apparent ambiguity, the

ambiguity should be interpreted against Connecticut Mutual.

ISSUE

The sole issue on appeal is whether the two year incontestability clause became effective on the date of issue stated in the **[*540]** policy rather than the date the application for the policy was completed and a conditional advance premium receipt received.

DISCUSSION

*HN1* We review the district court's grant of summary judgment *de novo* and apply the same standards as those controlling the district court. *Canadyne-Georgia Corp. v. Continental Ins. Co.,* 999 F.2d 1547, 1554 (11th Cir.1993). *HN2* Summary judgment is proper pursuant to Federal Rules of Civil Procedure 56(c) "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). **[**6]**

*HN3* In diversity cases, a federal court applies the law of the forum in which it sits. *Cambridge Mut. Fire Ins. Co. v. City of Claxton,* 720 F.2d 1230, 1232 (11th Cir.1983). Thus, in resolving this case, the district court properly looked to Florida law. Florida adheres to the traditional rule that the legal effects of terms of the insurance policy and rights and obligations of persons insured thereunder are to be determined by the law of the state where the policy was issued. *Wilson v. Insurance Co. of North America,* 415 So. 2d 754, 755 (Fla.2d Dist.Ct.App.1982). Since Mario LaTorre purchased the policy of insurance in New York, the substantive law of that state governs the resolution of this dispute. [1] Under New York's insurance code, with certain exceptions not relevant here, all life insurance policies must provide in substance:

FOOTNOTES

[1] The parties have not cited, nor did the district court find, any New York cases that are precisely on point.

    (3) that the **[**7]** policy shall be incontestable after being in force during the life of the insured for a period of two years from its date of issue ...

    (4) that the policy, together with the application therefor if a copy of such application is attached to the policy when issued, shall constitute the entire contract between the parties....

N.Y.Ins.Law § 3203(a)(3)-(4) (McKinney 1989). The phrase "date of issue," as used in the incontestability provision, is not defined in the statute.

In *American National Ins. Co. v. Motta,* 404 F.2d 167 (5th Cir.1968), the Fifth Circuit resolved a similar issue which arose under Florida law. In *Motta,* the insured committed suicide more than two years after receiving a conditional receipt, but less than two years after the policy issue date. The policy provided that the it "shall be incontestable after two years from the Policy Issue Date." It also provided that "death of the Insured from suicide within two years from the Policy Issue Date ... shall limit the Company's liability...." *Motta,* 404 F.2d at 168. The policy also established a policy issue date. The applicable Florida law in *Motta* **[**8]** required each life insurance policy to have an incontestability clause

establishing a contestability period of two years from the date of issue. Florida law also provided that the life insurance policy together with an attached application constituted the entire contract between the parties. The insurance company in *Motta* sought to deny the claim, relying on language in the policy's suicide clause which expressly tied the suicide exclusion period to the policy issue date. The company argued that the two year suicide exclusion period ran from the designated issue date and not from the earlier date of the conditional receipt. Because Motta had committed suicide less than two years from the policy issue date, the company claimed it could deny the claim.

The Fifth Circuit found that the suicide exclusion clause became effective on the date the conditional receipt was issued. The court thought Florida's statutory requirement that all insurance policies contain a two year contestability period, mandated this result. In the court's view, the two year contestability period commenced when the risk of loss attached to the insurer: the date when the insured paid a premium and received the **[**9]** conditional receipt. The court **[*541]** found that the purpose of the contestability provision of the statute was to forbid the extension of a contestable clause for a period greater than two years from the date risk of loss attached. *Motta,* 404 F.2d at 169. The court, therefore, concluded that the effective dates of the policy's suicide and incontestability clauses would have to be the same. The court reasoned that to allow the suicide exclusion period to run from the policy issue date would have the effect of establishing two contracts rather than one. The second contract under the formal policy would contain the suicide clause; the first contract, under the conditional receipt, would not. The court concluded that such an outcome would be in direct conflict with Florida law which required every life insurance policy to contain a two year incontestability clause, but also required that the life insurance policy, along with the accompanying application for insurance, be construed as a single contract.

The Fifth Circuit also found an ambiguity in Motta's insurance contract and noted *HN4*⬆that under Florida law ambiguities in insurance contracts must be resolved in **[**10]** favor of the insured. The court noted that the conditional receipt given to Motta stated that it was "subject to the terms of the policy." The receipt, however, was not clear as to which terms from the applied-for policy would apply to the insured during the period between the application and issuance of the policy. The court concluded that the suicide and incontestability periods in Motta's policy had to begin to run on the date coverage commenced and not on the date the policy was issued, and thus barred the company from denying coverage.

The Fifth Circuit's reasoning in *Motta* persuades us. New York law requires that ambiguities in contracts of insurance be resolved in favor of the insured and against the insurer. *Lavanant v. General Accident Ins. Co. of America,* 79 N.Y.2d 623, 584 N.Y.S.2d 744, 747, 595 N.E.2d 819, 822 (1992). Here, as in *Motta,* the insurance contract contains an ambiguity. The application, incorporates the conditional receipt which provided that the terms of the applied-for policy, "except as limited by the receipt," became effective the day the application was completed, February 8, 1989. The **[**11]** conditional receipt did not contain any limiting language concerning the incontestability clause. ² In contrast, under the terms of the formal policy that was part of the same contract, the contestability period began to run on the date the formal policy was issued, February 22, 1989. Consequently, the policy made the incontestability provision effective on one date, while the application appeared to make that same provision effective on another date. Therefore, Mario LaTorre, at the time he received the conditional receipt, had no way of knowing that the incontestability clause did not become effective on that date, or that Connecticut Mutual, should subsequent litigation ensue, would seek to deny coverage on the grounds that the clause became effective at a future date that was to be determined solely by the vagaries of Connecticut Mutual's underwriting approval process. He could have been under the eminently reasonable belief, given the conditional receipt's failure to state otherwise, that the contestability period was one of the terms of the applied-for policy that became effective upon his receipt of the conditional receipt. New York's highest court described the test of whether **[**12]** an

insurance policy is ambiguous in the following terms: "The question is simply whether the average man in applying for insurance and reading the language of the policy at the time it was written *would* ascribe the meaning to that language which the insurance company ... urges." *Bronx Savings Bank v. Weigandt,* 1 N.Y.2d 545, 154 N.Y.S.2d 878, 883, 136 N.E.2d 848, 851 (1956) (emphasis added). We are satisfied that an ordinary applicant would not know how to interpret the contract's seemingly inconsistent provisions.

### FOOTNOTES

2 The application did, however, expressly limit the amount of Connecticut Mutual's coverage liability until the applied-for policy was issued.

Connecticut Mutual contends that the conditional receipt is not part of the policy but is merely "a bridge until such time as the policy is issued." Connecticut Mutual's solution does resolve the ambiguity concerning the effective date of the incontestability clause, but creates two separate and distinct **[\*\*13]** contracts **[\*542]** of insurance. We reject such an approach as being in contravention of New York's apparent public policy interest in having one contract govern its insurance transactions.

CONCLUSION

We therefore construe the ambiguity as to the date when the contestability period commenced against Connecticut Mutual and hold that the two year contestability period at issue in this case commenced on the date coverage began under the conditional receipt, February 8, 1989. We note that this finding is consistent with New York law which requires not only that the application, conditional receipt, and policy be read together as one contract, but also that the resulting contract contain an incontestability clause providing for a two year contestability period. Our decision implements the spirit of the New York statute while construing the several documents as one contract. *See Motta,* 404 F.2d at 169.

The insured's death having occurred more than two years after February 8, 1989, Connecticut Mutual was barred from using the insured's alleged misrepresentations and omissions as a basis for contesting the beneficiary's claim for death benefits.

The judgment of the district **[\*\*14]** court is affirmed.

AFFIRMED.

**CONCUR BY:** BLACK

### CONCUR

BLACK, Circuit Judge, specially concurring:

I concur in the result.

**DISSENT BY:** GEORGE C. YOUNG

### DISSENT

GEORGE C. YOUNG, Senior District Judge, dissenting:

The insured in this case, Mario D. LaTorre, applied for a $ 100,000 life insurance policy with disability income insurance. At the time of the application he paid a $ 158.00 premium for the life insurance and $ 211.42 for the disability income insurance. The appellant, Connecticut Mutual Life Insurance Company, ⌐issued a Conditional Advance Premium Receipt at the time of the payment on February 8, 1989. Thereafter, on February 22, 1989 the company issued its policy which contained an incontestability provision as follows:

> We cannot contest this Policy, except for nonpayment of premium after it has been in force during the lifetime of the insured for a period of two years from the Date of Issue.

On February 15, 1991 the insured died, more than two years after the Conditional Advance Premium Receipt had been issued, but less than two years after the issue date of the policy. The company refused to pay the insurance to the insured's beneficiary because it is alleged that Mr. LaTorre had failed to disclose on his [**15] application that he had Acquired Immune Deficiency Syndrome (AIDS).

The Conditional Advance Premium receipt issued by the company to the insured at the time of the application for the policy on February 8, 1989 provided:

> The purpose of this receipt is to provide a LIMITED amount of insurance coverage while we review the Application and other information to decide if we can issue the policy(ies) applied for. Because this receipt gives protection to persons whether or not insurable on a standard basis, we LIMIT coverage while we evaluate the Application and before the coverage under this receipt ends as specified below. This receipt does not commit us to issue any policy(ies) other than according to our usual underwriting standards. Nor are we obligated to provide insurance benefits where health or other conditions affecting insurability have been misrepresented.

> . . . . .

> WHEN COVERAGE ENDS--Coverage ends on the EARLIEST of the following dates:

> 1. Sixty days after the date of this receipt if any evidence of insurability we requested has not been given to us, or

> 2. The date we issue the policy(ies) as applied for, or

> 3. Thirty days after we issued a policy [**16] offering insurance on a basis different from that applied for or, if SOONER, [*543] upon your acceptance or rejection of any such offer, or

> 4. The date we reject the Application. Rejection is effective when you or the proposed insured receive oral notice. If the notice is mailed, rejection will be effective upon the earlier of: the date you receive such notice or; 5 days after such notice is mailed.

In this case the insured, Mario D. LaTorre, was issued a limited conditional coverage pursuant to the terms of the Conditional Advance Premium Receipt. As set forth above, this coverage ended either sixty (60) days after the date of the receipt if evidence of insurability requested

by the insurer had not been produced, or the date the policy was issued, or the date the application was rejected, or thirty (30) days after the issuance of a policy on different terms than those applied for. The result was that there were two contracts: first, one for temporary coverage pending a determination of insurability by the company, and secondly, the policy applied for. In this respect, there is a difference from the finding of *American National Insurance Company v. Motta*, 404 F.2d 167 (5th Cir.1968), **[**17]** wherein the court found that neither party intended a two-contract arrangement and that therefore the two-year period of contestability commenced with the date of application for insurance.

The insurance policy issued to Mr. LaTorre provided that the "Policy Date" was February 22, 1989, and further provided the "Date of Issue" was February 22, 1989, and that the the "Final Expiration Date" was February 22, 2024. By the specific terms of the Conditional Advance Premium Receipt, the limited coverage provided by that receipt had ended. LaTorre had ten days after the receipt of the policy to return it to the company and have the premiums paid returned to him.

I find no ambiguity in the terms as above set forth and believe that the two-year period within which the company could contest its obligation to pay commenced on February 22, 1989, and that, therefore, the summary judgment granted by the district court should be reversed and the case remanded for further proceedings.

Accordingly, I respectfully DISSENT.


Service: **Get by LEXSEE®**
Citation: **38 F.3d 538, 540**
View: **Full**
Date/Time: Sunday, March 30, 2008 - 11:06 AM EDT

* Signal Legend:
● - Warning: Negative treatment is indicated
▣ - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
Ⓐ - Citing Refs. With Analysis Available
ⓘ - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

*My Lexis*™ | Search | Research Tasks | Get a Document | *Shepard's*® | Alerts | Total Litigator | Transactional Advisor | Counsel Selector
History | Delivery Manager | Dossier | Switch Client | Preferences | Sign Off | Help



About LexisNexis | Terms & Conditions | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

# EXHIBIT H

**RULE 1.442.  PROPOSALS FOR SETTLEMENT**

   **(a)  Applicability.** This rule applies to all proposals for settlement authorized by Florida law, regardless of the terms used to refer to such offers, demands, or proposals, and supersedes all other provisions of the rules and statutes that may be inconsistent with this rule.

   **(b)  Service of Proposal.** A proposal to a defendant shall be served no earlier than 90 days after service of process on that defendant; a proposal to a plaintiff shall be served no earlier than 90 days after the action has been commenced. No proposal shall be served later than 45 days before the date set for trial or the first day of the docket on which the case is set for trial, whichever is earlier.

   **(c)  Form and Content of Proposal for Settlement.**

   (1)  A proposal shall be in writing and shall identify the applicable Florida law under which it is being made.

   (2)  A proposal shall:

      (A)  name the party or parties making the proposal and the party or parties to whom the proposal is being made;

      (B)  identify the claim or claims the proposal is attempting to resolve;

      (C)  state with particularity any relevant conditions;

      (D)  state the total amount of the proposal and state with particularity all nonmonetary terms of the proposal;

      (E)  state with particularity the amount proposed to settle a claim for punitive damages, if any;

      (F)  state whether the proposal includes attorneys' fees and whether attorneys' fees are part of the legal claim; and

(G) include a certificate of service in the form required by rule 1.080(f).

(3) A proposal may be made by or to any party or parties and by or to any combination of parties properly identified in the proposal. A joint proposal shall state the amount and terms attributable to each party.

**(d) Service and Filing.** A proposal shall be served on the party or parties to whom it is made but shall not be filed unless necessary to enforce the provisions of this rule.

**(e) Withdrawal.** A proposal may be withdrawn in writing provided the written withdrawal is delivered before a written acceptance is delivered. Once withdrawn, a proposal is void.

**(f) Acceptance and Rejection.**

(1) A proposal shall be deemed rejected unless accepted by delivery of a written notice of acceptance within 30 days after service of the proposal. The provisions of rule 1.090(e) do not apply to this subdivision. No oral communications shall constitute an acceptance, rejection, or counteroffer under the provisions of this rule.

(2) In any case in which the existence of a class is alleged, the time for acceptance of a proposal for settlement is extended to 30 days after the date the order granting or denying certification is filed.

**(g) Sanctions.** Any party seeking sanctions pursuant to applicable Florida law, based on the failure of the proposal's recipient to accept a proposal, shall do so by serving a motion in accordance with rule 1.525.

**(h) Costs and Fees.**

(1) If a party is entitled to costs and fees pursuant to applicable Florida law, the court may, in its discretion, determine that a proposal was not made in good faith. In such case, the court may disallow an award of costs and attorneys' fees.

(2) When determining the reasonableness of the amount of an award of attorneys' fees pursuant to this section, the court shall consider, along with all other relevant criteria, the following factors:

(A) The then-apparent merit or lack of merit in the claim.

(B) The number and nature of proposals made by the parties.

(C) The closeness of questions of fact and law at issue.

(D) Whether the party making the proposal had unreasonably refused to furnish information necessary to evaluate the reasonableness of the proposal.

(E) Whether the suit was in the nature of a test case presenting questions of far-reaching importance affecting nonparties.

(F) The amount of the additional delay cost and expense that the party making the proposal reasonably would be expected to incur if the litigation were to be prolonged.

**(i) Evidence of Proposal.** Evidence of a proposal or acceptance thereof is admissible only in proceedings to enforce an accepted proposal or to determine the imposition of sanctions.

**(j)  Effect of Mediation.** Mediation shall have no effect on the dates during which parties are permitted to make or accept a proposal for settlement under the terms of the rule.

### Committee Notes

**1996 Amendment.** This rule was amended to reconcile, where possible, sections 44.102(6) (formerly 44.102(5)(b)), 45.061, 73.032, and 768.79, Florida Statutes, and the decisions of the Florida Supreme Court in *Knealing v. Puleo*, 675 So. 2d 593 (Fla. 1996), *TGI Friday's, Inc. v. Dvorak*, 663 So. 2d 606 (Fla. 1995), and *Timmons v. Combs*, 608 So. 2d 1 (Fla. 1992). This rule replaces former rule 1.442, which was repealed by the *Timmons* decision, and supersedes those sections of the Florida Statutes and the prior decisions of the court, where reconciliation is impossible, in order to provide a workable structure for proposing settlements in civil actions. The provision which requires that a joint proposal state the amount and terms attributable to each party is in order to conform with *Fabre v. Marin*, 623 So. 2d 1182 (Fla. 1993).

**2000 Amendment.** Subdivision (f)(2) was added to establish the time for acceptance of proposals for settlement in class actions. "Filing" is defined in rule 1.080(e). Subdivision (g) is amended to conform with new rule 1.525.

# EXHIBIT I

**Online**
# Sunshine

Select Year: 2007 Go

# The 2007 Florida Statutes

| Title XLV | Chapter 768 | View Entire Chapter |
|-----------|-------------|---------------------|
| TORTS | NEGLIGENCE | |

**768.79 Offer of judgment and demand for judgment.--**

(1)  In any civil action for damages filed in the courts of this state, if a defendant files an offer of judgment which is not accepted by the plaintiff within 30 days, the defendant shall be entitled to recover reasonable costs and attorney's fees incurred by her or him or on the defendant's behalf pursuant to a policy of liability insurance or other contract from the date of filing of the offer if the judgment is one of no liability or the judgment obtained by the plaintiff is at least 25 percent less than such offer, and the court shall set off such costs and attorney's fees against the award. Where such costs and attorney's fees total more than the judgment, the court shall enter judgment for the defendant against the plaintiff for the amount of the costs and fees, less the amount of the plaintiff's award. If a plaintiff files a demand for judgment which is not accepted by the defendant within 30 days and the plaintiff recovers a judgment in an amount at least 25 percent greater than the offer, she or he shall be entitled to recover reasonable costs and attorney's fees incurred from the date of the filing of the demand. If rejected, neither an offer nor demand is admissible in subsequent litigation, except for pursuing the penalties of this section.

(2)  The making of an offer of settlement which is not accepted does not preclude the making of a subsequent offer. An offer must:

(a)  Be in writing and state that it is being made pursuant to this section.

(b)  Name the party making it and the party to whom it is being made.

(c)  State with particularity the amount offered to settle a claim for punitive damages, if any.

(d)  State its total amount.

The offer shall be construed as including all damages which may be awarded in a final judgment.

(3)  The offer shall be served upon the party to whom it is made, but it shall not be filed unless it is accepted or unless filing is necessary to enforce the provisions of this section.

(4)  An offer shall be accepted by filing a written acceptance with the court within 30 days after service. Upon filing of both the offer and acceptance, the court has full jurisdiction to enforce the settlement agreement.

(5)  An offer may be withdrawn in writing which is served before the date a written acceptance is filed. Once withdrawn, an offer is void.

(6)  Upon motion made by the offeror within 30 days after the entry of judgment or after voluntary or involuntary dismissal, the court shall determine the following:

(a)  If a defendant serves an offer which is not accepted by the plaintiff, and if the judgment obtained by the plaintiff is at least 25 percent less than the amount of the offer, the defendant shall be awarded reasonable costs, including investigative expenses, and attorney's fees, calculated in accordance with the guidelines promulgated by the Supreme Court, incurred from the date the offer was served, and the court shall set off such costs in attorney's fees against the award. When such costs and attorney's fees total more than the amount of the judgment, the court shall enter judgment for the defendant against the plaintiff for the amount of the costs and fees, less the amount of the award to the plaintiff.

(b)  If a plaintiff serves an offer which is not accepted by the defendant, and if the judgment obtained by the plaintiff is at least 25 percent more than the amount of the offer, the plaintiff shall be awarded reasonable costs, including investigative expenses, and attorney's fees, calculated in accordance with the guidelines promulgated by the Supreme Court, incurred from the date the offer was served.

For purposes of the determination required by paragraph (a), the term "judgment obtained" means the amount of the net judgment entered, plus any postoffer collateral source payments received or due as of the date of the judgment, plus any postoffer settlement amounts by which the verdict was reduced. For purposes of the determination required by paragraph (b), the term "judgment obtained" means the amount of the net judgment entered, plus any postoffer settlement amounts by which the verdict was reduced.

(7)(a)  If a party is entitled to costs and fees pursuant to the provisions of this section, the court may, in its discretion, determine that an offer was not made in good faith. In such case, the court may disallow an award of costs and attorney's fees.

(b)  When determining the reasonableness of an award of attorney's fees pursuant to this section, the court shall consider, along with all other relevant criteria, the following additional factors:

1.  The then apparent merit or lack of merit in the claim.

2.  The number and nature of offers made by the parties.

3.  The closeness of questions of fact and law at issue.

4.  Whether the person making the offer had unreasonably refused to furnish information necessary to evaluate the reasonableness of such offer.

5.  Whether the suit was in the nature of a test case presenting questions of far-reaching importance affecting nonparties.

6.  The amount of the additional delay cost and expense that the person making the offer reasonably would be expected to incur if the litigation should be prolonged.

(8)  Evidence of an offer is admissible only in proceedings to enforce an accepted offer or to determine the imposition of sanctions under this section.

History.--s. 58, ch. 86-160; s. 48, ch. 90-119; s. 1175, ch. 97-102.

Copyright © 1995-2008 The Florida Legislature • Privacy Statement • Contact Us

EXHIBIT J

## § 1404. Change of venue

 **(a)** For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

**(b)** Upon motion, consent or stipulation of all parties, any action, suit or proceeding of a civil nature or any motion or hearing thereof, may be transferred, in the discretion of the court, from the division in which pending to any other division in the same district. Transfer of proceedings in rem brought by or on behalf of the United States may be transferred under this section without the consent of the United States where all other parties request transfer.

**(c)** A district court may order any civil action to be tried at any place within the division in which it is pending.

**(d)** As used in this section, the term "district court" includes the District Court of Guam, the District Court for the Northern Mariana Islands, and the District Court of the Virgin Islands, and the term "district" includes the territorial jurisdiction of each such court.