# EXHIBIT "1"

1

```
                    IN THE CIRCUIT COURT, NINTH
                    JUDICIAL CIRCUIT, IN AND FOR
                    ORANGE COUNTY, FLORIDA
                    CASE NO.: 04-CA-007746
```

FIREMAN'S FUND INSURANCE COMPANY, a
Foreign corporation a/s/o BASIC RESOURCES, INC.,
And GEORGE REED, INC., a foreign corporation,,

     Plaintiff,

Vs.



GENCOR INDUSTRIES, INC., a FOREIGN CORPORATION,

     Defendant.

* * * * * * * * * * * * * * * * * * * * * * * * * *

TRANSCRIPT OF PROCEEDINGS

VOLUME 1 (Pages 1 - 142)

JURY TRIAL BEFORE
THE HONORABLE RENEE A. ROCHE
CIRCUIT COURT JUDGE

* * * * * * * * * * * * * * * * * * * * * * * * * *

| | |
|---|---|
| DATE TAKEN: | JANUARY 22, 2007 |
| TIME: | COMMENCED AT: 9:00 A.M.<br>ADJOURNED AT: 5:00 P.M. |
| PLACE: | ORANGE COUNTY COURTHOUSE<br>COURTROOM 19C<br>ORLANDO, FLORIDA |
| REPORTED BY: | LISA F. ISENHOUR, RPR<br>Court Reporter and Notary Public |

* * * * * * * * * * * * * * * * * * * * * * * * * *

```
 1  APPEARANCES:
 2          JON D. DERREVERE, ESQUIRE
            JEFFREY BURNSIDE, ESQUIRE
 3          Derrevere, Hawkes & Black
            470 Columbia Drive, Building "B"
 4          West Palm Beach, Florida  33409
            (561) 684-3222
 5
                Attorneys for Plaintiff
 6
 7
            PATRICK J. MURPHY, ESQUIRE
 8          Murphy & Neale, P.A.
            550 Fairway Drive, Suite 203
 9          Deerfield Beach, Florida  33441
            (954) 525-5509
10
                Attorney for Defendant
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

C O N T E N T S

VOLUME 1 OF 8
(Pages 1 through 142)

JURY SWORN

OPENING STATEMENTS:

By Mr. Derrevere                                        27
By Mr. Murphy                                           53

PLAINTIFFS' WITNESSES:

TESTIMONY OF WENDELL REED

By Video Deposition

Direct Examination by Mr. Derrevere                     74
Cross Examination by Mr. Evoy                          114

```
 1                          C O N T E N T S

 2
                              VOLUME 2 OF 8
 3                        (Pages 143 through 333)

 4                        PLAINTIFFS' WITNESSES:

 5    TESTIMONY OF WENDELL REED (Cont'd)

 6         By Video Deposition

 7         Cross Examination by Mr. Evoy              146
           Redirect Examination by Mr. Derrevere      156
 8         Recross Examination by Mr. Evoy            160

 9    TESTIMONY OF CALVIN DIXON

10         By Video Deposition

11         Direct Examination by Mr. Murphy           164
           Cross Examination by Mr. Derrevere         237
12

13    TESTIMONY OF LAWRENCE W. TIPTON

14         By Video Deposition

15         Direct Examination by Mr. Derrevere        273
```

1  manufacture rock, sand and gravel, concrete and asphalt
2  paving materials, and we contract for their placement as
3  well as selling these products to others.
4      Q.  **Has George Reed been doing that for 50-some**
5  **years?**
6      A.  Well, we started out just oiling roads 55
7  years ago and gradually expanded into doing what we do
8  today.  But the last 30 or 40 years we've been major
9  highway contractors in the Central Valley area and the
10 foothills.
11     Q.  **Now, when you say the 'Central Valley area,'**
12 **because we're trying this case in Orlando, could you**
13 **tell us what the geography of California is?**
14     A.  Well, Central Valley is San Joaquin,
15 Stanislaus, Calaveras, Amador, Tuolumne County, are the
16 counties that we're primarily doing business in now.
17 We're expanding into Merced and Mariposa Counties as we
18 speak.
19     Q.  **Okay.  Can you tell us some of the -- some of**
20 **the cities that are in those areas?**
21     A.  Modesto, Stockton, Sonora, San Andreas are the
22 primary cities in this area, and Merced is south of
23 here.
24     Q.  **Okay.  Now, we are here about a Gencor batch**
25 **plant that I think was located out near Lodi in**

1  Clements? Am I right?
2      A.  Right near Clements, which is just east of
3  Lodi about 15 miles.
4      Q.  **Now, was that the first asphalt plant that
5  George Reed operated, or had you operated hot plants
6  before?**
7      A.  We've had a number of hot plants. We've been
8  operating hot plants for many, many years. We still
9  have a major plant out on River Road near Modesto, or
10 Escalon, be north of Modesto.
11     Q.  **Yes, sir.**
12     A.  And west of Sonora at Table Mountain, which is
13 near Jamestown. And we got plants at Tahoe and Northern
14 California and Redding. We've had hot plants for many,
15 many years.
16     Q.  **What's the purpose of having hot plants in
17 different locations?**
18     A.  The transport of the materials is expensive,
19 so by the time you transport -- it's a hot material
20 also, so it's perishable, so you can probably transport
21 efficiently 40 or 50 miles maximum.
22     Q.  **Now, is this the asphalt that we see on
23 roadways basically?**
24     A.  Well, it's asphalt pavement made with asphalt.
25 It's blended with aggregates to make it an asphalt

1   A.   February 8, 2000.

2   Q.   Does that refresh your recollection of those
3   timeframes?

4   A.   Yes.

5   Q.   In general -- and obviously the contract
6   itself points out specifically what it is that Gencor
7   was going to do and what George Reed was going to do,
8   but in general, what was Gencor selling to George Reed?

9   A.   Well, a complete hot plant --

10  Q.   Yes, sir.

11  A.   -- with hot bins, storage bins, two 250-ton
12  hot storage bins and the scale to go under those bins,
13  the asphalt storage components, the feed system, the
14  baghouse for dust control, and the complete plant.

15  Q.   All right. Now, was it the intention of
16  George Reed that Gencor was going to erect these things?

17  A.   They were going to furnish the components.
18  We, with our staff or subcontracts, were going to erect
19  the plant.

20  Q.   Now, beyond the erection, was there some
21  understanding that the Gencor folks were going to come
22  back and do something with either wiring or computer
23  logic, that kind of stuff?

24  A.   Well, startup, which was to see that
25  everything functioned. And in the startup there were

1  various things that were not wired correctly, some of
2  the pumps and motors, and these were things that they
3  corrected.
4      Q.  Okay.
5      A.  And they worked on the -- it's a computerized
6  control system to run the plant.
7      Q.  Okay.
8      A.  And that did not function properly, and they
9  were doing the startup on that.
10     Q.  Okay.  Fairly soon after -- let me ask you,
11 how soon was it after this February 2000 timeframe that
12 the process started of the manufacturing of these
13 components; do you know?
14     A.  Probably almost immediately.  Some of the
15 components they would have had in stock, and it was
16 manufacturing the plant, the tower section, and then
17 assembling the screen, which they buy from somebody else
18 and then put together.  And they probably started almost
19 immediately, because we wanted to have the plant up and
20 running before the end of May.
21     Q.  Why before the end of May?
22     A.  Well, because that's when our season -- when
23 the weather becomes dry and our jobs are bid and work
24 can commence.
25     Q.  Now, when you say the end of May, do you mean

1  the end of May 2000 or the end of May 2001?
2      A.  I'd have to refresh my memory as to when they
3  started delivering, but I think it was 2000, but I'm not
4  sure.
5      Q.  Let me show you what we've marked as Exhibit
6  No. 2, and this is a draft, apparently, of a timeline,
7  re: Dryer explosion, and it's marked as document
8  Number 354.  And I will tell you and counsel that that
9  comes from Exhibit 1-C from Mr. Souza's deposition and
10 documents that were previously produced by George Reed.
11         Have you seen that document before?
12     A.  I'm not sure that I have, but it does look
13 familiar.
14     Q.  All right.  Do you remember who Tom Walsh was?
15     A.  Yes.  He was our safety engineer and our
16 insurance controller.
17     Q.  All right.  Does this look like a document
18 that Tom prepared?
19     A.  Probably.
20     Q.  All right.  Fair enough.
21         The contract signing is indicated as 2/10/00,
22 so February the 10th of 2000, and that's within a couple
23 days of what we see on the document, is it not?
24     A.  Yes.
25     Q.  Okay.  It looks like initial delivery of parts

from Gencor is the last week of June 2000?

A. That was probably the completion of the delivery. There were many, many loads, and it took a period of time to assemble all those parts, to actually assemble them on the site.

Q. Gotcha.

And then it indicates 10/16/00 for excavate footings for plant. Do you know why it took from June of 2000 to October of 2000 to get the excavations done?

A. Well, first of all, it has to be earthquake, seismic, so we had to get the engineering done on the footing designs. So we couldn't actually start to form and pour those until such time as we had the design approved by the agencies, which would be the county.

Q. I understand.

Does that refresh your recollection as to whether you were looking at May of 2000 or May of 2001 for the opening?

A. Probably 2001, but -- yeah."

(Sound muted on portion of video proceedings after which the following proceedings were had:)

MR. DERREVERE: Your Honor, can we explain that we muted some of it out?

THE COURT: Yeah. There are parts of this that are not going to be played for the jury on

1  major components or all the components to --
2      A.   Right.  We were doing phase work, you know.
3  You assemble what you can as you get them.
4      Q.   And these were your employees that were
5  responsible for the erection of the plant?
6      A.   Right.
7      Q.   After the incident in question, who rebuilt
8  the plant?
9      A.   Our employees.
10     Q.   Did you also continue to use Gencor employees
11 after the incident?
12     A.   For startup, yes.  They were familiar with and
13 designed the plant, were familiar with the computers,
14 the wiring, all of the other things that our people were
15 only becoming familiar with.  Inasmuch as they designed
16 the plant and the components and provided the directions
17 for assembly, why we had to rely upon them.
18     Q.   So you still -- is it fair to say you still
19 had confidence in Gencor and you utilized their services
20 for the startup?
21     A.   To a lesser degree as being the only
22 alternative available.
23     Q.   But nonetheless they still performed --
24 performed the services for you?
25     A.   Yes.

130

1  accident?
2      A.   Yeah.  I -- I don't know.
3      Q.   Okay.  How close to being operational were
4  you, if you know, on the day of the incident on
5  April 18th?  How far away were you?
6      A.   We were there.  Had the plant not blown up, we
7  would have been operating the next day.  Had they been
8  able to get the controls to work and function properly
9  and get the plant to operate as it was supposed to, as
10 it was designed to operate, we would have been
11 operational.
12     Q.   What's your understanding of the problems with
13 the controls that prompted the Gencor employee to be
14 there in the first place?
15     A.   They issued a standard startup procedure book
16 that tells you the sequencing that the computer is
17 supposed to start.  Various motors start in sequence,
18 not all at once.  And then you're purging the system,
19 which means your exhaust fan blows all of the air
20 through the system to eliminate any chance of an
21 explosion, and then you fire after all these things are
22 done in their proper sequence according to their
23 procedure manual.
24          The computerized program is sequenced to do it
25 according to that sequence.  And it's -- what it appears

1  all the other problems had been resolved, and they
2  thought it was ready to fire and ready to go.
3       Q.   With regard to these prior problems which are
4  not abnormal in setting up a facility such as this, was
5  there a Gencor employee at the facility every day, or
6  would your employees deal with those issues?
7       A.   Mostly the Gencor people were there trying to
8  deal with the wiring problems. And I believe they were
9  there every day, but I wasn't there, so I'm not
10 positive.
11      Q.   Is it possible, though, that some of your
12 employees of George Reed company would also be involved
13 in either troubleshooting or trying to fix some of these
14 electrical or wiring problems?
15      A.   They would probably be helping the Gencor
16 people after the Gencor people isolated what the problem
17 was. But as far as the computer control system, our
18 people would not be conversant with doing any repairs on
19 that at all or any maintenance on it. We would always
20 use outside experts, and they were the experts.
21      Q.   How long did you stay at the scene that day or
22 actually --
23      A.   An hour maybe.
24      Q.   -- the day after, April 19th?
25      A.   Maybe an hour.

```
                              IN THE CIRCUIT COURT, NINTH
                              JUDICIAL CIRCUIT IN AND FOR
                              ORANGE COUNTY, FLORIDA
                                 CASE NO.: 04-CA-007746
```

FIREMAN'S FUND INSURANCE COMPANY, a
foreign corporation, a/s/o BASIC RESOURCES, INC.,
and GEORGE REED, INC., a foreign corporation,

       Plaintiffs,

vs.

GENCOR INDUSTRIES, INC., a foreign corporation,

       Defendant.

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

TRANSCRIPT OF PROCEEDINGS

 VOLUME 2 of 8 (Pages 143 - 333)

JURY TRIAL BEFORE
THE HONORABLE RENEE A. ROCHE
CIRCUIT COURT JUDGE

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| DATE TAKEN: | TUESDAY, JANUARY 23, 2007 |
| TIME: | COMMENCED AT 8:30 A.M.<br>CONCLUDED AT 5:00 P.M. |
| PLACE: | ORANGE COUNTY COURTHOUSE<br>COURTROOM 19C<br>ORLANDO, FLORIDA |
| REPORTED BY: | MARY ANN SCHUMACHER, CSR<br>Court Reporter and Notary Public |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

144

1    APPEARANCES:
2              JON D. DERREVERE, Esquire
               JEFFREY BURNSIDE, Esquire
3              Derrevere, Hawkes & Black
               470 Columbia Drive, Building "B"
4              West Palm Beach, Florida   334309
               561-684-3222
5
                    Attorneys for Plaintiff
6

7
               PATRICK J. MURPHY, Esquire
8              Murphy & Neale, P.A.
               550 Fairway Drive, Suite 203
9              Deerfield Beach, Florida   33441
               954-525-5509
10
                    Attorneys for Defendant
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

C O N T E N T S

VOLUME 2 of 9

(Pages 143 through 333)

PLAINTIFF'S WITNESSES:

TESTIMONY OF WENDELL REED

    By Video Deposition

    Cross Examination by Mr. Evoy        146
    Redirect Examination by Mr. Derrevere  156
    Recross Examination by Mr. Evoy     160

TESTIMONY OF CALVIN DIXON

    By Video Deposition

    Direct Examination by Mr. Murphy    164
    Cross Examination by Mr. Derrevere   237

TESTIMONY OF LAWRENCE W. TIPTON

    By Video Deposition

    Direct Examination by Mr. Derrevere  273

1  components.
2       Q.  All right.  Now, when there is a reference
3  in February 21, 2001 to Mike Stavig, this service rep
4  from Gencor, assisted in asphalt oil piping, hot oil
5  heater, initial setup, does that give you an indication
6  of where the plant was as of February 2001?
7       A.  This would be the hot oil storage system
8  and the hot oil heater system, which is a component of
9  the plant, but not part of the plant power section itself.
10      Q.  All right.  Then we get to February 27, 2001,
11 temperature probe assembly, probe location, duct work.  Do
12 you know what that is?
13      A.  We had to be assembling the main plant and
14 the bag house and the burner --
15      Q.  All right.
16      A.  -- some of the other components.  So we must
17 have been assembling many of the other components in that
18 time frame.
19      Q.  Okay.  By April 6, 2001, there is an
20 indication John Craigo from Gencor was there, "Burner
21 stated to be okay and operational."  What did that tell
22 you about the status of what was there?
23      A.  They must have tried and fired the burner
24 apparently.
25      Q.  Okay.  Does everything have to be there --

1   A.   No.

2   Q.   -- at that point?

3   A.   No, just that part of the components has to
4   be up and running and the exhaust fan to go with it.

5   Q.   Fair enough. Okay. You had indicated that
6   the plant would have been operating the next day.

7   A.   Within a day or two.

8   Q.   Okay. Did you know that on the day of the
9   event that there was about 12,000 pounds of cutback made
10  and 7,000 pounds of batch made?

11  A.   Cutback would be material that you can make
12  and store, it's not perishable. So they were using that
13  just as a trial run to try and shake the plant down.
14  And yeah, they made a couple batches apparently.

15  Q.   What does that indicate to you, in terms of
16  where the system is in terms of being ready to go on line?

17  A.   Everything was working and functioning and
18  was ready to fire and run on line and make hot mix, which
19  would be a perishable material.

20  Q.   Now, you talked about the estimates that
21  are included in the -- in the work that Mr. Souza has
22  generated. And I think that the breakdown was in Exhibit
23  Number 3 to his deposition. And you can see those figures
24  for the hot plant itself and then cost increases and
25  profit loss.