IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FIREMAN'S FUND INS., <br><br> Plaintiff, <br><br> v. <br><br> GERLING AMERICAN INS., <br><br> Defendant. | No. C 07-06302 CRB <br><br> **ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT** |

This case compels the Court to determine whether an explosion at an asphalt plant caused by an employee of Gencor, Defendant's insured, is covered under the terms of the Commercial General Liability (CGL) policy between Gencor and Defendant Gerling American Insurance Co. Because the property damage caused by the explosion is excluded under the policy's "damage to your work" exclusion, the defendant's motion for summary judgment is granted and the plaintiff's motion is denied.

**BACKGROUND**

This action arises out of an exposition at the George Reed asphalt plant located near Lodi, California, which occurred on April 18, 2001. As established in the Florida state court trial between Fireman's Fund Insurance Company (FFIC) and Gencor, George Reed purchased from Gencor the components for a 12,000 pound hot asphalt batch plant in 2000. See Reporter's Transcript (RT) 84:5-14. Pursuant to the contract, Gencor delivered the

components and provided troubleshooting and service at startup, but George Reed physically erected the plant. See RT 84:15-85:9.

By June of 2000, had Gencor completed delivery of the plant components. See RT 87:2-5. By April of 2001, George Reed had essentially completed assembly and was prepared to bring the plant online. See RT 350:1-12. A representative from the State of California certified on April 12 that the plant was ready for operation. See RT 292:14-18. However, on that same day, Gencor sent employee Calvin Dixon to service the plant and bring it online. See RT 182:25-183:2. Dixon worked "all over the plant," RT 175:5, performing various tasks. Specifically, Dixon worked through problems with the plant's hot oil heater, cold feed bins, and "bag house." See RT 183-84. Dixon also attempted to remedy problems with the plant's temperature control system. See RT 251:25-252:17. In an effort to correct that problem, Dixon attempted a "dry run" from the control center, during which he electronically bypassed the exhaust fans and the main gas feed line. See RT 256:14-16. FFIC theorized that Dixon unwittingly energized the main gas line, allowing propane to enter the plant's drum, and when he electronically lit the burner, the plant exploded. See RT 259:18-260:7, 1111:21-1115:9.

The explosion caused extensive damage to the entire plant. As a result, George Reed was obligated to replace critical components including the baghouse, dryer, and burner. See RT 93:5-22. The company spent approximately $670,000 replacing the destroyed plant components. See RT 105:23-25. FFIC, as Reed's insurer, concluded that Reed's damages were covered and paid claim benefits of $1,324,745. FFIC then sued Gencor as a subrogee for breach of contract and negligence, seeking damages for property damage to the plant, lost profits and additional expenses.

Gerling defended Gencor in the state court proceeding, and after trial a jury concluded that Gencor had breached its contract to George Reed, and that both Gencor and George Reed acted negligently. See RT 1166:19-1167:9. The jury found Gencor 60% negligent for the damage to the Reed plant, and awarded $1,1193,825 in total damages to Reed. See RT

1 1167:19-22. Subsequently, a cost judgment was entered in favor of FFIC in the amount of
2 $42,000 plus interest.

3 Despite defending Gencor, Gerling informed FFIC after the trial that it was denying
4 indemnification on the ground that the exclusions set forth in Gencor's CGL policy
5 precluded coverage. See Beer Decl. Exh. C. FFIC filed a complaint in the District Court for
6 the Southern District of Florida, alleging that Gerling has a duty to satisfy FFIC's judgment
7 against Gencor. See Second Amended Complaint ¶¶ 18-27. Gerling moved to transfer the
8 case to the Northern District of California pursuant to 28 U.S.C. § 1404(a) on the ground that
9 transfer would promote convenience because most witnesses and documents relevant to the
10 scope of Gerling's coverage reside in California. Judge Joan Lenard found that "substantial
11 factors of convenience and ease of access to documentary proof . . . justify a transfer," and
12 granted the motion. After some initial wrangling, both parties now move for summary
13 judgment on Gerling's duty to indemnify Gencor. The parties agree that because the cross-
14 motions turn on the Court's construction of the terms in Gencor's CGL policy – a question of
15 pure law – there are no material facts that would otherwise preclude summary judgment. See
16 Payne v. United States Fidelity & Guar. Co., 625 F. Supp. 1189, 1191 (S.D. Fla. 1985) ("The
17 construction and effect of a written contract of insurance is a matter of law to be determined
18 by the court.") (citation omitted).

### STANDARD OF REVIEW

20 Summary judgment is appropriate "if the pleadings, depositions, answers to
21 interrogatories, and admissions on file, together with the affidavits, if any, show that there is
22 no genuine issue as to any material fact and that the moving party is entitled to a judgment as
23 a matter of law." Fed. R. Civ. P. 56(c). A fact issue is "material" only if it could affect the
24 outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
25 248 (1986). A fact issue is genuine if the evidence is such that a reasonable jury could return
26 a verdict for the nonmoving party. Id.

27 Special rules of construction apply to evaluating summary judgment motions: (1) all
28 reasonable doubts as to the existence of genuine issues of material fact should be resolved

3

against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n., 809 F.2d 626, 630 (9th Cir. 1987).

## LEGAL STANDARD

Because this action was transferred from Florida district court, Florida law governs interpretation of the insurance agreement's terms. See Van Dusen v. Barrack, 376 U.S. 612, 634-36 (1964). "Under Florida law, insurance contracts are construed according to their plain meaning." Taurus Holdings, Inc. v. U.S. Fidelity and Guar. Co., 913 So.2d 528, 532 (Fla. 2005). "If the relevant policy language is susceptible to more than one reasonable interpretation, one providing coverage and another limiting coverage, the insurance policy is considered ambiguous," and the ambiguity must be interpreted against the insurer and in favor of the insured. Auto-Owners Ins. Co. v. Anderson, 756 So.2d 29, 34 (Fla. 2000); see also Swire Pac. Holdings, Inc. v. Zurich Ins. Co., 845 So.2d 161, 165 (Fla. 2003).

Whether an insurer owes its insured a duty to indemnify is determined by the underlying facts adduced at trial or developed through discovery during the litigation. See U.S. Fire Ins. Co. v. Hayden Bonded Storage Co., 930 So.2d 686, 691 (Fla. Dist. Ct. App. 2006). As the plaintiff, FFIC bears the burden of proving that the property damage is covered by the insurance policy. See Hudson Ins. Co. v. Double D Mgmt. Co., Inc., 768 F. Supp. 1542, 1545 (M.D. Fla. 1991). However, Gerling bears the burden of proving an exception to coverage. See id.

## DISCUSSION

The cross-motions for summary judgment compel the Court to address three questions. First, does FFIC have "standing" to challenge Gerling's declination of coverage? Second, if FFIC does have standing, was the property damage that resulted from the explosion a "covered loss" under the insurance agreement? Third, if the damage was a covered loss, is the loss otherwise included in the agreement's numerous exclusions? The Court finds that FFIC may challenge Gerling's declination of coverage and that the damage

4

was a "covered loss," but that the damage is excepted from coverage by the "damage to your work" exclusion.

I. Standing

Gerling argues that as a threshold matter, FFIC is precluded from challenging Gerling's declination of coverage because FFIC never obtained an assignment of rights from Gencor to proceed against Gerling. At oral argument, Gerling explained that it believes that because FFIC never obtained an assignment of rights, this Court lacks jurisdiction over the action.

Florida law requires, as a condition precedent to the maintenance of a cause of action against Gerling, that FFIC obtain a verdict "against a person who is an insured under the terms of such policy for a cause of action which is covered by such policy." Fla. Stat. § 627.4136(1). Of course, there can be no dispute that FFIC satisfied § 627.4136(1) by obtaining a verdict against Gencor for breach of contract and negligence.[1] Gerling has failed to identify another provision of law that would preclude Gencor from maintaining suit, and the Court is unaware of any. Accordingly, Gerling's standing argument is rejected.

II. Coverage

With the risk of oversimplifying the agreement, Gencor's CGL policy provides for two basic forms of coverage. The first form, called "General Aggregate" coverage, obligates Gerling to pay Gencor $1,000,000 per occurrence when property damage or bodily injury is caused by an accident that takes place in, among other places, the United States and that occurs during the policy period. See Commercial General Liability Insurance Policy Number 4 003 527 GLP (hereinafter "CGL Policy") § I.1.b. The second form, entitled "products-completed operations hazard" coverage, obligates Gerling to pay Gencor $1,000,000 per

---

[1] Section 627.4136(4) prohibits plaintiffs from joining an insurer as a party defendant if they "denied coverage under the provisions of s. 627.426(2) or defended under a reservation of rights pursuant to s. 627.426(2)." In turn § 627.426(2) provides that an insurer may deny coverage based on a particular coverage defense by delivering a reservation of rights to the insured, but the denial must be sent "in no case later than 30 days before trial." There can be no argument that § 627.4136(4) applies because Gerling did not send Gencor a letter denying indemnity coverage for FFIC's claim until May 14, 2007, after trial. See Beer Decl. Exh. C.

5

occurrence for bodily injury and property damage that occurs away from property owned or rented by Gencor and arising out of Gencor's "product" or "work." See CGL Policy § V.14.a. The products-completed operations hazard provision does not apply when work has not been completed, however work needing service, maintenance, correction, repair or replacement, but which is otherwise complete, is treated as completed for purposes of the policy.

FFIC maintains – and Gerling only weakly contests – that the plant explosion falls under the terms of the products-completed operations hazard provision coverage. The Court agrees. The explosion certainly resulted in property damage – that is, "[p]hysical injury to tangible property," CGL Policy § V.15.a – that occurred on another party's premises. Moreover, the damage arose out of "work or operations performed by [Gencor] or on [Gencor's] behalf." CGL Policy § V.19.a (defining "Your work"). Gencor employee Calvin Dixon was performing an operation – a dry run of the plant – when the Reed plant exploded. The facts at trial established that Dixon's conduct and negligence was the primary cause of the explosion.

There are two exceptions to the products-completed operations hazard, but neither is applicable here. First, the policy does not cover "[w]ork that has not yet been completed or abandoned." See CGL Policy § V.14.a(2). Both parties agree that because the plant was fully assembled, it was "complete" for coverage purposes. See Def. MSJ at 6; Plf. MSJ at 8.[2] Second, the policy does not cover injury to products still in Gencor's possession. See CGL Policy § V.14.a(1). Neither party disputes that all products – that is, "goods and products . . . sold . . . by" Gencor, CGL Policy § V.18.a – were already in Reed's possession. Accordingly, the Court finds that the explosion falls under the $1,000,000 coverage limit provided by the products-completed operations hazard provision.

///

---

[2] The policy states that "[w]ork that may need service maintenance, correction, repair or replacement, but which is otherwise complete, will be treated as completed." CGL Policy § V.14.a. The plant was certified for operation, but required some maintenance before proper operation. Under the circumstances, the plant – and Gencor's work – was complete.

6

III. Exclusions

In the Court's view, the only difficult point of dispute is whether, notwithstanding coverage, Gerling prevails because one of the policy's exclusions applies. Although it is a close call, the Court concludes that Gerling has narrowly borne its burden of proving that the damage to your work exclusion applies.

**A. Damage to Your Work Exclusion**

By its own terms, Gencor's CGL policy does not apply to: "'Property damage' to 'your work' arising out of it or any part of it and included in the 'products-completed operations hazard.'" CGL Policy § I.2.*l*. Both parties agree that the damage was included in the "products-completed operations hazard" for the reasons explained in the preceding section. Therefore, the question is whether the explosion caused: (1) property damage; (2) to Gencor's work; (3) arising out of Gencor's work or any part of it.

*1. Property Damage*

For the reasons provided in Part II, the Court finds that the explosion resulted in "property damage" for purposes of liability coverage. Just so, the Court concludes that the explosion resulted in "property damage" for purposes of the "damage to your work" exclusion. The policy defines property damage as "[p]hysical injury to tangible property, including all resulting loss of use of that property." There can be no doubt that the explosion resulted in physical injury to tangible property, i.e., the asphalt plant.

*2. Arising out of Gencor's Work*

At oral argument, FFIC conceded that the explosion arose out of Gencor's work. FFIC must take that position because if the explosion did not arise out of Gencor's work, then there would be no coverage under the products-completed operations hazard in the first instance.

But even if FFIC had not conceded that the explosion arose out of Gencor's work, the Court would so hold. Gencor employee Calvin Dixon was performing an operation – a dry run of the plant – when the Reed plant exploded. Thus, the damage arose out of "operations performed by [Gencor] . . . ." CGL Policy § V.19.a (defining "Your work").

7

*3. Damage to Gencor's Work*

The truly challenging question posed by the parties' cross-motions is whether the explosion – which damaged <u>Reed's</u> asphalt plant – can be considered to have damaged Gencor's "work." The purpose of the "your work" exclusion "is to provide protection for personal injury or for property damage caused by the completed product, but not for the replacement and repair of that product." <u>LaMarche v. Shelby Mut. Ins. Co.</u>, 390 So.2d 325, 326 (Fla. 1980). As a leading treatise on insurance law put it, "[t]he primary purpose of this exclusion to prevent liability policies from insuring against an insured's own faulty workmanship, which is a normal risk associated with operating a business. Accordingly, where all of the damage that is being claimed is damage to the work of the insured which is caused by the work of the insured, the 'your work' exclusion will apply to preclude coverage." 9A Couch on Insurance 3d § 129:17 (Lee R. Russ & Thomas F. Segalla eds., 2005). In short, where faulty workmanship causes "bodily injury or damage to property <u>other than to the product or completed work itself</u>," then the exclusion does not apply. <u>Home Owners Warranty Corp. v. Hanover Ins. Co.</u>, 683 So.2d 527, 529 (Fla. Dist. Ct. App. 1996) (quotation omitted) (emphasis added). However, where, as here, faulty workmanship damages the product or completed work itself, then the exclusion does apply. <u>Commercial Union Ins. Co. v. R.H. Barto Co.</u>, 440 So.2d 383, 386 (Fla. Dist. Ct. App. 1983) ("The cases make clear that the risk a contractor takes that he will do defective work or furnish inadequate material is a business risk not insured against. It is the more extensive liability he may incur to others due to injury to them resulting from his defective work which is the coverage extended by this type of policy.").

FFIC takes the position that the asphalt plant cannot be considered Gencor's work – as opposed to George Reed's property – but the CGL policy uses broad language that must be interpreted according to its own terms. The policy defines Gencor's work to include both "[w]ork or operations performed by you or on your behalf" <u>and</u> "[m]aterials, parts or equipment furnished in connection with . . . work or operations." CGL Policy § V.19.b. The Court finds that the exclusion is applicable because the parts that made up the asphalt plant

8

were furnished in connection with Dixon's servicing of the plant. One contract controlled the terms of the transaction between Gencor and Reed, and that contract obligated Gencor to both sell Reed the parts that eventually constituted the asphalt plant and service the plant. The parts making up the plant – which were destroyed in the explosion – were furnished "in connection with" the operations of Gencor employee Calvin Dixon in the sense that Dixon's services and the plant materials were all part and parcel of the same transaction between Gencor and George Reed. See Derrevere Supp. Exh. 3.

FFIC relies on the case of Colony Insurance Company v. Mix Brothers Tank Services, 2008 WL 2277862 (E.D. La. May 29, 2008), to argue that its servicing and sales obligations are not connected. However Mix Brothers – and the case upon which it relies, Markel American Ins. Co. v. Schubert's Marine East, Inc., 2007 WL 54808 (E.D. La. Jan. 5, 2007) – is distinguishable because the insured provided only services to the property whose property they harmed. The insured company, Mix Brothers, contracted to reposition a 373,000 pound storage tank in Louisiana that had drifted as a result of Hurricane Katrina. After jacking the tank off the ground, the tank fell, thereby killing one employee and injuring another. The insurer argued that an identically-worded "damage to your work" exclusion applied, but the court disagreed, finding that " Mix Brothers was hired to perform a service, namely the repositioning of [a tank], and the plaintiff in the underlying state court litigation does not seek recovery for damage to Mix Brothers' work, but rather for the unexpected damage to its tank." Id. at *4. Mix Brothers had no connection to the damaged tank other than that the company provided a repositioning service; the company was not responsible for selling the parts that made up the tank.

The Court agrees that if Gencor had only provided servicing to Reed, then the "your work" exclusion would not apply because there would be no nexus between the damaged plant parts and Gencor's servicing. However, because Gencor agreed to include field servicing – including start-up and calibration – "in the price of the equipment," Gencor's own form contract established the requisite connection between the parts making up the plant and Dixon's servicing.

9

In an effort to avert no coverage, FFIC argues that even if the "your work" exclusion applies, it must be limited in two ways. First, FFIC contends that the "your work" exclusion precludes recovery <u>only</u> for damage to the temperature control system upon which Calvin Dixon was operating, and since the temperature system was replaced for $50,000, Gerling must still pay for the damage to the rest of the asphalt plant. Essentially, FFIC contends that even though Dixon's conduct caused the entire plant's destruction, the "your work" exclusion applies narrowly to the exact location and operation being performed. FFIC's position finds no support in either the language of the policy or case law.

Certain CGL exclusions not at issue here are limited in scope to damage to the "<u>particular</u> part" of property on which the insured is operating at the time of the accident. <u>See</u> CGL Policy §§ I.2.j(5), j(6) (emphasis added). By contrast, the "your work" exclusion contains no such limitation. The implication of the distinction in wording is that the "your work" exclusion applies to damage to <u>any</u> piece of property, so long as that property can be considered Gencor's work. FFIC fails to put forward a persuasive justification for distinguishing between the temperature system and all of the other parts and equipment sold by Gencor that were also damaged.

Second, FFIC contends that the explosion damaged Reed parts and equipment in addition to those parts sold by Gencor. FFIC's premise is persuasive: the "your work" exclusion only applies to parts furnished in connection with Dixon's services – that is, parts sold by Gencor pursuant to its agreement with Reed – and thus FFIC is entitled to recover for any damage to non-Gencor parts. However, there is insufficient evidence in the record for the Court to distinguish between damage to parts and equipment sold by Gencor, and damage to property that was not part of the Gencor contract. Accordingly, the parties are ordered to meet and confer, and agree – if possible – on the amount of damage to materials, parts, and equipment not furnished by Gencor that resulted from the exclusion. Because none of the other exclusions apply, for the reasons set forth below, Gerling will be obligated to pay for the damage to such property. The parties shall appear at a case management conference on Friday, October 17, 2008 at 8:30a.m. to inform the Court of the parties' progress.

10

**B. Contractual Liability Exclusion**

Gerling argues that the explosion is also excluded under the contractual liability exclusion, which precludes recovery for property damage "for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." CGL Policy § I.2.b. This exclusion does not apply because Gencor never assumed liability for damage caused by faulty workmanship.

Florida courts have interpreted the contractual liability exclusion narrowly. In Rad Source Technologies, Inc. v. Colony National Insurance Co., 914 So.2d 1006 (Fla. Dist. Ct. App. 2005), an irradiator was damaged during shipment. The Court refused to grant summary judgment to the insurer based upon the exclusion because the insured nowhere assumed liability for shipment damage. Id. at 1008.

Gencor did assume liability in the event that "any Product or Part" contained a defect, see Beer Decl. Exh. A at 40, but the evidence at trial demonstrated that the property damage was caused by faulty workmanship rather than a defective product or part. Because Gencor did not assume liability for damage caused by faulty workmanship, the contractual liability exclusion is inapposite.

**C. Damage to Your Product**

Gencor's CGL Policy excludes coverage for property damage "to 'your product' arising out of it or any part of it." CGL Policy § I.2.k. The "your product" exclusion is inapplicable for two independent reasons.

First, the language "arising out of it or any part of it" "limits the scope of the exclusion to situations wherein the product itself is defective." Rad Source Tech., Inc. v. Colony Nat. Ins. Co., 914 So.2d 1006, 1009 (Fla. Dist. Ct. App. 2005). Here, the property damage resulted not from an inherent defect in the plant, but from Dixon's negligent workmanship.

Second, the policy itself defines "your product" to exclude real property. See CGL Policy § V.18.a ("'Your product' means . . . [a]ny goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by . . . [y]ou.") (emphasis

11

1  added).  Thus, even assuming an inherent defect in the plant caused the damage, the
2  exclusion would still not apply because the asphalt plant constituted "real property."
3       Under Florida jurisprudence, courts use a three-part test for determining whether an
4  object is a fixture, and thus real property.  See Sears, Roebuck & Co. v. Bay Bank & Trust
5  Co., 537 So. 2d 1041, 1043 (Fla. Dist. Ct. App. 1989).  The three criteria are: (1) whether
6  there is an actual annexation to the realty or something appurtenant thereto; (2) whether the
7  item in question is appropriately applied to the use or purpose of that part of the realty to
8  which it is connected; and (3) whether the party making the annexation intended for the item
9  to be a permanent accession.  See id. at 1043 n.3.  In this case, the plant was plainly a fixture
10 because it was physically attached to Reed's land, the plant was "adapted" to the land , and –
11 given the plant's size and purpose – Reed clearly intended for it to be a fixture on the land.
12 Because Gencor's product had become a fixture, it is not subject to the "your product"
13 exclusion.  See Cincinnati Ins. Co. v. Fab Tech, Inc., 2005 WL 1492377, *6 (D.N.H. 2005);
14 Nat'l Union Fir Ins. Co. v. Structural Sys. Tech., Inc., 756 F. Supp. 1232, 1239 (E.D. Mo.
15 1991).

### D. Professional Liability

17      Finally, Gerling argues that liability is precluded by the professional liability
18 exclusion, which excludes property damages arising out of "[t]he rendering or failure to
19 render any professional services by you or any engineer, architect or surveyor who is either
20 employed by you or performing work on your behalf in such capacity. ¶ Professional services
21 include: . . . Supervisory, inspection, architectural or engineering activities."   There are two
22 independent reasons why this exclusion does not apply.
23      First, under Florida law, the term "professional" refers to persons who belong to a
24 learned profession or whose occupations require a high level of training and proficiency.  See
25 Aerothrust Corp. v. Granada Ins. Co., 904 So.2d 470, 472 (Fla. Dist. Ct. App. 2005).  Dixon,
26 who troubleshooted asphalt plants for Gencor as a "field service technician," was not
27 engaged in a learned profession when the accident occurred.  That is to say, Dixon's job was

not "predominantly mental or intellectual, rather than physical or manual." Vogelsang v. Allstate Ins. Co., 46 F. Supp. 2d 1319, 1322 (S.D. Fla. 1999) (quotation omitted).

It is true that Dixon, who received both in-house and on-the-job training, performed a job that required some training and proficiency. See RT 169:16-19. However, the record does not support the conclusion that Dixon's job required a high level of training. Like a crane inspector – which Florida courts have determined to not be a specialized job – it does not appear that "field service technicians" require a particular educational degree, are certified or accredited, or are subject to a body that regulates or sets forth standards for such personnel. See Aerothrust, 904 So.2d at 472.

The doctrine of judicial estoppel provides a second reason for rejecting Gerling's position. In an effort to evade liability, Gerling takes the position in this proceeding that Dixon was performing a specialized occupation at the time of the explosion. However, Gerling took an inconsistent position in their appeal of the Florida state court judgment in an attempt to take advantage of the "economic loss rule," which Florida courts have extended to preclude claims for the negligent performance of contracted-for non-professional services.

"Judicial estoppel is an equitable doctrine invoked at a court's discretion, designed to protect the integrity of the judicial process." Transamerica Leasing v. Institute of London Underwriters, 430 F.3d 1326, 1335 (11th Cir. 2005) (citing New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001)). A district court may invoke the doctrine "to prevent a party from asserting a claim in a legal proceeding that is inconsistent with a claim taken by that party in a previous proceeding." Id. "[T]he circumstances under which judicial estoppel should be invoked are not reducible to a general formulation of principle," but courts have traditionally looked at three factors: (1) whether a later position asserted by a party was clearly inconsistent with an earlier position; (2) whether a party succeeded in persuading a court to accept an earlier position, "so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled"; and (3) whether the party with an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped. Id.

Although Gerling has not yet succeeded in convincing the Florida court to rule that Dixon acted as a non-professional – because no decision has yet been rendered – the other two factors strongly weigh in favor of applying estoppel. First, Gerling's current position that Dixon was acting as a professional is clearly inconsistent with its earlier position that Dixon was not. Second, Gerling would derive an unfair advantage in this proceeding if not estopped because FFIC was not aware of the inconsistency in sufficient time to raise an objection in the <u>original</u> proceeding. See <u>Ajaka v. Brooksamerica Mortg. Corp.</u>, 453 F.3d 1339, 1345 (11th Cir. 2006).

Gerling objects to application of estoppel on the ground that Gencor – not Gerling – is the named party in the Florida suit, and therefore that it would be unfair to apply estoppel against them. However, Gerling represents Gencor in the Florida proceedings and it is Gerling, not Gencor, directing that litigation. Accordingly, it is entirely appropriate to apply estoppel to Gerling in this case.

## CONCLUSION

The explosion arising from the actions of Gencor employee Calvin Dixon resulted in property damage to Gencor parts and materials furnished in connection with Gencor's work. As a result, summary judgment is granted in favor of Gerling to the extent that FFIC seeks recompense for damage to parts, equipment and materials supplied by Gencor to Reed. FFIC is entitled to recover for any damage to property not furnished by Gencor, but the Court cannot determine – on the current record – the amount of such property damaged in the explosion. Accordingly, the parties are ordered to meet and confer to determine the value of non-Gencor property damaged in the explosion.

**IT IS SO ORDERED.**

Dated: August 11, 2008

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE